**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 26-5101**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES,

Plaintiff-Appellee,

v.

NATIONAL PARK SERVICE, et al.,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Columbia

---

**EMERGENCY MOTION FOR A STAY PENDING APPEAL:**
**RELIEF REQUESTED BY APRIL 10, 2026**

---

ADAM R.F. GUSTAFSON
  *Principal Deputy Assistant*
*Attorney General*

PETER M. TORSTENSEN, JR.
  *Deputy Assistant Attorney*
*General*

MARISSA A. PIROPATO
  *Deputy Chief*
  *Environment and Natural*
  *Resources Division*
  *Natural Resources Section*

BRETT A. SHUMATE
  *Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
BRANTLEY T. MAYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202)-514-3301*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Plaintiff-appellee is the National Trust for Historic Preservation in the United States.  Defendants-appellants are the National Park Service; Jessica Bowron, in her official capacity as Acting Director, National Park Service; John Stanwich, in his official capacity as Superintendent, the White House and President's Park; the Department of the Interior; Douglas Burgum, in his official capacity as Secretary of the Interior; the General Services Administration; Michael J. Rigas, in his official capacity as Acting Administrator, General Services Administration; Donald J. Trump, in his official capacity as President of the United States; Executive Office of the President; Susie Wiles, in her official capacity as White House Chief of Staff; Office of the Executive Residence; and Robert B. Downing, in his official capacity as White House Chief Usher.

### B.    Rulings Under Review

The ruling under review (issued by Judge Richard J. Leon) is a memorandum opinion and accompanying order filed March 31, 2026,

granting plaintiff's motion for a preliminary injunction. Add.90-127. The memorandum opinion is available on Westlaw at 2026 WL 877779.

## C.    Related Cases

This case has not previously been before this Court or any court other than the district court. Undersigned counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Brett A. Shumate*
BRETT A. SHUMATE

ii

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................... 1

STATEMENT .................................................................................... 8

ARGUMENT ................................................................................... 12

I.   The Trust's Claims Are Legally Baseless. .................................. 12

    A.   The Trust Lacks Standing. .................................................. 12

    B.   The President Has Complete Authority To Renovate
        The White House ............................................................... 16

II.  The Equities Demand A Stay ....................................................... 24

CONCLUSION ................................................................................. 27

CERTIFICATE OF COMPLIANCE

ADDENDUM

## INTRODUCTION

For decades, Congress has vested the President with overlapping statutory authorities that allow the President to make the improvements he deems necessary to White House grounds and structures. Yet, a district judge ordered the President to halt ongoing reconstruction of the East Wing of the White House by April 14, leaving a massive excavation and structurally completed site adjacent to the now open and exposed Executive Mansion and threatening grave national-security harms to the White House, the President and his family, and the President's staff. Almost 400 Million Dollars of private donations and contributions (No taxpayer dollars are being used to build this long sought, and desperately needed, ballroom!) have already been committed, or spent, in the purchase of heavy, large scale, and other types of building materials. As an example, the protective missile resistant steel columns, beams, drone proof roofing materials, and bullet, ballistic, and blast proof glass, are largely made, being used, and/or on their way to the project. Likewise, the bomb shelters, hospital and medical area, protective partitioning, and Top Secret Military installations, structures, and equipment, are built and/or ready to be built, installed, and placed.

This order is untenable and must be stayed in that the building is under construction, with deep Top Secret excavations, foundations, and structures, already built, and ready to receive heavily fortified, for security reasons, steel, bullet, ballistic, and blast proof glass, and drone proof roofing materials, which must be finished quickly, and not allowed to be exposed to the conditions and elements of an open construction site. Time is of the essence!

In granting this shocking, unprecedented, and improper injunction, one that could have been sought long ago, prior to the start of construction (in that there was full knowledge, through large scale media attention and publicity, that the White House ballroom was planned to be built, and there would have been a great deal of time for them to object, long before the start of construction, even though their objection would likewise have been baseless and frivolous), the district court took the erroneous, sweeping view that Congress did not authorize the ballroom construction at the White House—yet correctly allows construction "necessary to ensure the safety and security of the White House and its grounds, including the ballroom construction site, and provide for the personal safety of the President and his staff." Add.122, 126. The judge

2

was given an opportunity to see the construction taking place at the site, but surprisingly, never responded to our invitation.

As the President has stated publicly, and as classified declarations in the record detail, the new East Wing's entire design cohesively advances critical national-security objectives, including protecting the President, his family, staff, all elements of the White House itself, continuity of operations, and communications infrastructure from hostile attacks via drones, ballistic missiles, bullets, biohazards, through specially and specifically designed Military grade ventilation, and much more. Those security features and objectives, so necessary for the safety of the President, his family, and staff, and the White House itself, dictate the entire project. *See* Mar. 31 President Trump Remarks, https://perma.cc/5384-KYCA; https://perma.cc/SYL9-L6EJ.

The path to this injunction confirms its unfairness, untenability, and danger to the White House and the people working and living within its walls. Months ago, after exhaustive planning, the President, in conjunction with the United States Military, Secret Service, and various other Governmental Agencies authorized long-overdue construction, improvements, and alterations to the East Wing. Private donors and

3

American Patriots singlehandedly funded the 300 to 400 Million Dollar project (depending on finishes), which is on budget and ahead of schedule. No taxpayer dollars are being used for the funding of this beautiful, desperately needed, and completely secure (for national security purposes) ballroom.

Among other issues, the old East Wing was in very dangerous and poor condition, and totally vulnerable to attack by even the most basic of Military weaponry, but especially now with the new advanced technologies of drones, missiles, much more powerful rifles, and other emerging national-security technologies and threats. The original East Wing has been completely rebuilt, many times over, with columns being knocked down, put back, and then taken out again, a common red brick addition added haphazardly on top of the original very small structure (to the chagrin of many!), and severely damaged during the process of the Military building large Top Secret spaces below the original structure. In other words, the East Wing, prior to demolition, was a completely different building than that which was designed many years ago.

Additionally, the building sorely needed new bullet and blast proof windows, ventilation, strengthening of the walls and roofs, and other

4

additions, upgrades, and reinforcements, which would have been impossible to do in that the structure would not have been able to carry such heavy loads. It would not have been allowed, under modern day conditions, to entertain foreign leaders or anyone having to do with Presidential functions. Additionally, the original complex suffered from degraded foundations due to all of the previous reconstructions, mold, mildew, and various other contaminants, some of which were not possible to have been cured.

Three days ago, the district court said that we had to get approval from Congress to build this desperately needed new ballroom, with the exception of "actions strictly necessary to ensure the safety and security of the White House and its grounds, including the ballroom construction site, and provide for the personal safety of the President and his staff." We agree with the second part of that ruling having to do with Presidential and White House safety and security, but disagree with the need for Congressional approval in that the White House has, with all of the many projects undertaken in many years, including the large-scale construction of the East Wing and West Wing themselves, never asked for, or received, Congressional approval for a specific construction plan.

To start, the court lacked authority under Article III to entertain this suit, which rests on a single pedestrian's subjective architectural feelings. But feelings do not confer standing, let alone confer a heckler's veto over critically important White House renovations and national security improvements. As the Supreme Court has held, the "psychological consequence … produced by observation of conduct with which [one] disagrees … is not an injury sufficient to confer standing." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). And the actual organizational plaintiff (the non-profit National Trust for Historic Preservation in the United States) states it has "no personal or financial stake" in this matter. Add.5. Actually, Congress stopped providing funding to the National Trust for Historic Preservation in 2005 because it was not in agreement with the Trust's motives or objectives.

The Trust's claims also fail on the merits. It invokes *ultra vires* review: the "Hail Mary pass … [that] rarely succeeds." *Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 681 (2025). Here, failure is assured, because two different statutes independently authorize the East Wing project. *First*, Congress has empowered the President to make

6

"alteration[s]" and "improvement[s]" to the White House, "as the President may determine." 3 U.S.C. § 105(d). This has never been challenged before. And that is for good reason: Presidents must be able to change White House structures and grounds to fit their Article II responsibilities and address evolving security threats. This has long been accepted. Congress did not get involved with the design, planning, and architecture of either the original East Wing or the West Wing many decades ago. Decisions about what is needed to keep the President, his family, and his staff safe rest with the President, and cannot possibly be outsourced to other branches of government, just as the President could not dictate the Senate's building needs or architectural design.

*Second*, Congress has broadly authorized the National Park Service (NPS) to construct buildings in national parks—and Congress long ago designated the White House as a national park. 54 U.S.C. § 100101(a). Congress did not plausibly grant general authority to build a tennis stadium in Rock Creek Park but silently exclude White House structures. The district court's contrary view that Congress must approve *all* construction in national parks would result in the untenable outcome that thousands of buildings were illegally constructed over decades. At

7

minimum, quibbles over the scope of these statutes does not show an error "so extreme that one may view it as jurisdictional." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022).

The equities overwhelmingly favor a stay also. The Trust faces no cognizable harm, while the ballroom is clearly a vital project for the safety and security of the White House and the President, his family, and his staff. There is no world in which equity elevates idiosyncratic architectural likes or dislikes of a single passer-by over the security of the President and the functionality of the White House complex.

We have an obligation to appeal this erroneous ruling, as it pertains to Congressional approval, for future Presidencies, projects, and the White House itself. The government respectfully requests a stay pending appeal and (at least) a 14-day stay if this Court denies relief, so the Solicitor General may seek emergency relief from the Supreme Court.[1]

## STATEMENT

**1.** In 2025, President Trump initiated a project to modernize the East Wing of the White House (the Project). As early as 2000, NPS

---

[1] The Trust opposes. The district court stayed its order for 14 days but did not grant the request for a stay pending appeal. Add.123.

8

identified a need for "expanded event space to address growing visitor demand and provide a venue suitable for significant events." Add.44. Other needs include "Secret Service upgrades"; "reducing degradation of the Executive Mansion's historic structure" caused by hosting large events; repairing the East Wing's foundation; and addressing contamination. Add.44-45. The Project serves mission-critical national-security goals. *See* President Trump Remarks, *supra.*

The President designated the White House's Executive Residence Office (EXR)—the office most familiar with the unique needs and deficiencies of the East Wing—to manage the Project. Add.45. In consultation with the Secret Service and NPS, EXR determined that "demolition of the existing East Wing structure and reconstruction of a new East Wing" would be the best, most efficient, and cost-effective approach. Add.46. NPS determined that the Project's impacts "do not prevent [NPS] from fulfilling the park's purpose or result in impairment of park resources." Add.29. NPS found the Project "will directly benefit the American people," and planned changes "are consistent with the ongoing historical significance of the White House and its grounds." Add.29. NPS agreed that EXR was best suited to "directly manage the

9

Project." NPS arranged to accept donations for the Project under 54 U.S.C. § 101101 and transfer them to EXR under the Economy Act, 31 U.S.C. § 1535. *See* Add.49-52.

Demolition began on October 20, 2025, and finished on December 5, 2025. Add.34-37. Above-ground construction begins early April 2026. Add.37.

**2.** The Trust sued on December 12, 2025. The district court denied a TRO on December 17, 2025, Add.39-42, and denied the Trust's first preliminary-injunction motion on February 26, 2026, Add.56-78.

In its February opinion, the court erroneously held that the Trust had associational standing because one member (Alison Hoagland) claimed supposed aesthetic injury from plans to create an East Wing that she did not like, Add.63-64, and because this suit was germane to the Trust's purported purposes. Add.67. It denied relief because the Trust lacked a cause of action, yet invited the Trust to amend its complaint to pursue *ultra vires* claims. Add.77.

**3.** The Trust again sought preliminary relief, which the court granted on March 31, 2026. Add.90-127.

10

The court erroneously deemed the Trust likely to succeed on its *ultra vires* claims because, in the court's incorrect reading, "neither 3 U.S.C. § 105, nor the NPS Organic Act, authorize the President to build a ballroom on White House grounds." Add.101. The court wrongly concluded that § 105(d) only authorizes "ordinary maintenance and repair." Add.102. As to the NPS Organic Act, the court incorrectly held that "nothing in the text of the statute grants NPS blanket authority to engage in construction in national parks." Add.116. The court alleged that Congress "has given *limited* authority to NPS to construct by authorizing appropriations for those purposes," but those appropriations were somehow inapplicable because NPS is using its donation authority, 54 U.S.C. § 101101, to fund the Project privately. Add.116. The court then incorrectly concluded that the Project violated 40 U.S.C. § 8106, which requires congressional authorization for construction within parks in the District of Columbia. Add.101, 108-14. Finally, the court found that the equities favored the Trust. Add.118-22.

The court stayed its order until April 14, at which point only the construction "necessary to ensure the safety and security of the White

11

House and its grounds … and provide for the personal safety of the President and his staff" may proceed. Add.126.

## ARGUMENT

At the behest of a party lacking standing and based on atextual claims that contradict both the separation of powers and historical practice, the district court enjoined the ongoing White House ballroom construction project. The court did so despite the government's showing that its injunction would imperil the President and national security and indefinitely leave a large hole beside the Executive Residence. This Court should stay this unlawful and unprecedented injunction. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

## I.    The Trust's Claims Are Legally Baseless.

### A.    The Trust Lacks Standing.

Federal courts "do not exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). A plaintiff "must have a 'personal stake' in the case." *Id.* at 423. The district court erred in holding that the Trust has associational standing when (a) the only harm any Trust member asserts is a non-cognizable architectural dislike, and (b) vindicating that

12

subjective objection is not germane to the Trust's purposes. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

**1**.    No Trust member has standing.  The Trust provided a declaration from a single member, Hoagland, who asserts harms to her "aesthetic, cultural, and historical interests" from an East Wing ballroom she does not find to her liking.  Add.11.  Aesthetic harm, however, must be concrete like any other.  *TransUnion*, 594 U.S. at 417.  A plaintiff must describe her "use[] and enjoy[ment of] the land" beyond "mere incidental viewership" and identify how she must "alter[] her behavior." *Environmental Def. Fund v. FERC*, 2 F.4th 953, 969-70 (D.C. Cir. 2021) (*EDF*).  Thus, a plaintiff lacked standing when she did "not even allege that she c[ould] see the new [construction] from her property," and attested only that "she must look at an 'eyesore' several times per week while driving past."  *Id.* at 968, 970.  There is "nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact."  *Id.* at 970.

Hoagland lives "about 2 miles from the White House," Add.9, and has not alleged using or enjoying the view any way distinct from anyone else.  She expects to visit "once a month," Add.10, less frequently than

13

the *EDF* plaintiff, 2 F.4th at 969-70. During that visit, she "view[s] the White House from the south side," from where the Project may not even be visible. Add.9. Such "incidental viewership" is insufficient. *EDF*, 2 F.4th at 969-70. She claims an academic interest in D.C. architecture, but Article III requires plaintiffs to be "directly affected apart from their special interest in the subject." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992). Moreover, the Project will not substantially alter the classic White House views from north or south. Add.47.

Quoting *Lujan*, 504 U.S. at 562-63, the district court believed "the 'desire to use or observe' something, 'even for purely [a]esthetic purposes, is undeniably a cognizable interest for purpose of standing.'" Add.64. *Lujan rejected* standing on this theory because Article III also requires that the plaintiff be "among the injured." 504 U.S. at 563. Hoagland is not.

The district court also misread precedent. *Sierra Club v. FERC*, 827 F.3d 59 (D.C. Cir. 2016), found standing for an individual who "fishes, boats, and seasonal[ly] duck hunts" in an area that would experience increased tanker traffic. *Id.* at 66. This individual would be subject to a "large exclusion zone" that "the Coast Guard maintains

14

around tankers." *Id.* Being forced to move from an area one regularly uses to fish and hunt categorically differs from once-a-month exposure to a view of the White House that might not even include a view of the Project. *Id.*; *see EDF*, 2 F.4th at 970 (similar distinction). The district court's other authorities are similarly distinguishable.

Ultimately, Hoagland's "alleged aesthetic injuries reflect nothing more than generalized grievances." *EDF*, 2 F.4th at 970. If the district court's holding is allowed to stand, it should not, that would result in never-ending litigation over alleged architectural preferences and cripple the federal judiciary.

**2.** Standing is independently lacking because this suit is not germane to the Trust's purposes, which as relevant here are to "receive donations of sites, buildings, and objects significant in American history and culture" and "preserve and administer" those donated sites "for public benefit." 54 U.S.C. § 312102(b)(1)-(2). The White House has not been donated; indeed, the Trust is *forbidden* from acquiring property (including the White House) within a National Park "System unit." *Id.* § 312105(g). Vitally, Congress has specifically said that the Trust lacks any role in White House matters. *E.g.*, *Hearing on S. 3035 Before the H.*

15

*Comm. on Interior & Insular Affs.*, 89th Cong. 67 (Aug. 9, 1966) (statement that National Historic Preservation Act, which granted matching funds to the Trust, would not apply to "homes" of "three branches of the government"). As a key legislator stated, the Trust should not "busy itself with the White House." 112 Cong. Rec. 25,942 (1966) (statement of Rep. Saylor).

**B.    The President Has Complete Authority To Renovate The White House.**

The Trust's claims fail on the merits. On *ultra vires* review, "[o]nly error that is patently a misconstruction of the Act" or "disregards a specific and unambiguous statutory directive" supports relief. *Changji*, 40 F.4th at 722. This case is nowhere close: Congress not only authorized the President to alter and improve the White House itself, but also authorized NPS to construct buildings on national parks, of which the White House is one. Further, neither statute limits how the President can choose to protect the White House, his family, staff, and visitors.

**1.**    Congress has authorized appropriations to the President for "the care, maintenance, repair, *alteration*, refurnishing, *improvement*, air-conditioning, heating, and lighting … of the Executive Residence at the White House." 3 U.S.C. § 105(d)(1) (emphases added). Such sums

"may be expended as the President may determine, notwithstanding the provisions of any other law." *Id.* This provision presupposes that the President has power to make "alterations" and "improvements" to the White House—as presidents have for decades.

The district court incorrectly viewed the Project as too substantial to be an "alteration" or "improvement." *See* Add.102-08. But these terms are capacious. To "alter" means "to modify" or "change the appearance" of something. *Alter*, Oxford English Dictionary (2d ed. 1989). And to "improve" means "to bring into a more profitable or desirable state" or "to make better." *Improve*, Oxford English Dictionary (2d ed. 1989). In the real-property context, "improvement" often includes erecting "buildings and structures." *Land*, Black's Law Dictionary. Modernizing the East Wing to bolster security, update infrastructure, and increase capacity easily fits that definition.

Misapplying various canons, the district court reasoned that "alteration" and "improvement" limit the President to minor repairs or upkeep. Add.104-06. But such canons are used to resolve statutory ambiguities, *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519-20 (1923); invoking them reveals the kind of ambiguity fatal to *ultra vires*

17

claims, *see National Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022). Indeed, the Trust concedes some need for line-drawing, admitting that Presidents can commence *certain* significant projects, just, in their view, not this one. *See* Dkt. 20-1, at 9-10 (acknowledging that a general appropriation for "[c]are, maintenance, repair, and alteration" allows some construction (quoting Act of Mar. 29, 1947, ch. 25, 61 Stat. 26, 28)). The Trust offers no textual basis for this supposed implicit limit, confirming that its *ultra vires* claim fails: without express limits, claimed excesses are not "obvious[]." *Florida Health Scis. Ctr. v. Sec'y of Health & Human Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016).

The district court suggested that Congress somehow authorized prior White House renovations, but acknowledged that significant projects like the "1933 West Wing expansion and the 1942 East Wing expansion" were funded "through general appropriations," not specific authorizations or earmarks. Add.114. To try to twist "President Ford's 1975 pool and President Trump's 2019 tennis pavilion" into its approach, the court asserted that they are "not visible to the public" and are "for the

18

President's private use," Add.114, but never explained why those atextual points matter. They do not.

The district court also erroneously held that § 105(d) only empowers the President to use funds appropriated under that provision. Add.106. Section 105(d) establishes a *framework* under which Congress appropriates funds and presupposes the President can expend those sums on improvements and alterations. And as explained below, funds appropriated under § 105(d) have been lawfully supplemented.

**2.** Independent of § 105(d), Congress empowered NPS to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units," including construction. 54 U.S.C. § 100101(a). The White House is a unit of the National Park System—thus the Project is independently authorized. Pub. L. No. 87-286, 75 Stat. 586, 586 (1961).

NPS has long relied on § 100101(a) for construction projects large and small nationwide. Add.80-81; *see* 89 Fed. Reg. 97,631, 97,631 (Dec. 9, 2024). In the District of Columbia, NPS has constructed the National Capital Region Headquarters, U.S. Park Police Headquarters, East

19

Potomac Park facilities, and a tennis stadium in Rock Creek Park—all under its Organic Act authority. Add.80-84.

Nonetheless, the district court claimed that "nothing in the text of the statute grants NPS blanket authority to engage in construction in national parks," Add.116, and that NPS somehow violated the APA by contracting with EXR to undertake the Project. That is wrong. Even the Trust never pushed that unsustainable theory. And the court rejected the government's many examples by positing—without factual basis— that "Congress was aware of those projects and at least indirectly authorized them." Add.117. The idea that Congress tacitly authorized the U.S. Park Police Headquarters because Congress was abstractly aware of their existence is absurd. The court's bottom line—that NPS's Organic Act does not include authority to engage in construction—would mean NPS has been violating the law for decades and again, would cause mayhem and inefficiency.

The court apparently believed that prior NPS construction projects had used appropriations for construction. Add.116-17. But those appropriations *confirm* NPS's Organic Act construction authority; otherwise, Congress would be funding prohibited activity. Regardless,

NPS has long used its donation authority, 54 U.S.C. § 101101(2), to raise private funds for construction in national parks. Add.81-82. Since the Carter Administration, the Executive Branch has maintained that because the White House is a national park, NPS holds "authority for the acceptance of gifts in connection with the … maintenance of the White House and its grounds." *The White House—The Vice President—Gifts*, 2 Op. O.L.C. 349, 350 (1977). That funding mechanism was "not squarely at issue," Add.107, because the Trust never challenged it.[2]

The district court suggested that the government could not rely on NPS's statutory authorities given its representation that EXR runs the Project. Add.115-16. But under the Economy Act, 31 U.S.C. § 1535, NPS could contract with EXR to manage the Project. *See* Add.51-52. By doing so, EXR could rely on NPS's statutory authorities and funding sources. Add.87; 18 Comp. Gen. 489, 490-91 (1938) (funds transferred under Economy Act are "available for the purposes for which the appropriation from which transferred are available"). It was entirely proper for EXR to

---

[2] The district court believed recent appropriations bills limit use of donated funds to projects "within the original scope of effort for projects funded by the [NPS] Construction appropriation." Add.117 n.16. That at most suggests that NPS could solve any problem by dedicating some appropriated construction funds to the Project.

lead the Project; the statute making the White House a unit of the National Park System provides that nothing done by NPS "shall conflict with the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes." 75 Stat. at 586. That is exactly what the Project is achieving: ensuring that the White House is safe both to be the home of the President and his family and for conduct of official duties, including the reception of foreign leaders.

**3.** The district court compounded its error in finding a likely violation of 40 U.S.C. § 8106, which provides that a "building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." The court declined to hold that Congress must expressly approve each structure, merely finding "*some form* of authorization" required. Add.110. That holding on 40 U.S.C. § 8106 thus hinged on its wrongful determination that neither 3 U.S.C. § 105(d) nor 54 U.S.C. § 100101(a) authorized the Project. Put differently, if either statute authorized construction *as a general matter*, the court agreed § 8106 would have no role to play. Both do.

If any doubt remained, this Court must avoid constitutional questions by reading 40 U.S.C. § 8106 as inapplicable to the President. *Cf. Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). Construing § 8106 to preclude the President from erecting any structure on White House grounds invites a collision with the separation of powers. Congress has never understood the statute as inviting that clash; the district court erred in reading the statute to block construction to facilitate the President's core Article II functions and to protect all Presidents, their families, and their staff.

All else aside, 40 U.S.C. § 8106 does not "confer rights upon the individual seeking ultra vires review." *Global Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025). It protects *Congress's* institutional interests, not private aesthetic preferences. Whether Congress authorized the Project is "a judgment peculiarly for Congress to make in carrying on its own functions in our constitutional system, not for non-congressional parties to carry on as an ersatz proxy for Congress itself." *Natural Res. Def. Council v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988).

\*    \*    \*

The East Wing Project is the President's to approve, plan, and coordinate under both the powers that Congress has granted to NPS and other entities and consistent with the separation of powers. The Trust depends on novel statutory readings that it concedes (*e.g.*, Dkt. 54 at 7) could render decades of practice unlawful. A "lack of historical precedent" is a "telling indication" that a party has misread a statute. *National Fed'n of Indep. Business v. OSHA*, 595 U.S. 109, 119 (2022). Here, where a party must show an indisputable entitlement to relief, such a lack is fatal.

## II.    The Equities Demand A Stay.

The equities overwhelmingly support a stay: the Trust faces zero harm, whereas the injunction threatens the President, White House staff, and others with significant harm during heightened threats and severely undercuts the public interest.

The Trust concededly lacks a "personal or financial stake" in this litigation, Add.5; its declarant simply believed, in her own view, that the renovation would cause aesthetic "harm to the White House," Add.11. That is not irreparable harm to the *plaintiff*. The demolition of the most

24

recent East Wing is complete, after undergoing many iterations, and leaving a gaping hole on White House grounds would exacerbate aesthetic harms. The Trust's litigation choices refute its claim to the equities: for months, it did not raise an *ultra vires* claim.

Conversely, the injunction immensely harms the government and the public interest. Halting construction would imperil the President and others who live and work in the White House. As explained here, and as the President has consistently emphasized, the ballroom's overarching design is to advance critical security objectives as an integrated whole. *See* President Trump Remarks, *supra.* Classified declarations lodged below and being filed with this Court by lodging them with the court information security officers further substantiate those serious concerns. Dkts. 13, 25, 40, 59. Canvas tents, which are necessary without a ballroom, are significantly more vulnerable to missiles, drones, and other threats than a hardened national security facility. Beyond obvious inherent safety and security risks, pitching temporary tents on the South Lawn is costly, cumbersome, and unsightly for receiving foreign dignitaries, and "cause[s] substantial damage to NPS resources on the grounds." Add.33; *see* Add.54-55.

Further, the government provided unrebutted testimony from the Secret Service explaining that "[c]ontinued construction work is … necessary to maintain and update the security infrastructure of the project site and the White House Complex," and until that work finishes, the "Secret Service's ability to meet its statutory mission of protecting the President … continues to be hampered." Add.54. The Secret Service added that the "current open construction site is, in and of itself, a coordinated and managed safety hazard and adds additional challenges to Secret Service operations." Add.54. For instance, part of the construction leaves the East Room of the Executive Mansion vulnerable and necessitates that some structure be built up to that level. The district court did not reconcile its injunction with these imperatives.

The district court egregiously erred in elevating the subjective aesthetic judgments of one pedestrian over national-security and other public interests that strongly favor the Project's completion. Even if the Trust's claims were meritorious, they are not, the injunction would remain an abuse of discretion given the lopsided equities. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23-24, 32 (2008). This Court should stay the district court's improper attempt to prevent the President from

26

undertaking and coordinating improvements to the Executive Mansion— as Presidents of the United States of America have done since the White House was first planned and built.

## CONCLUSION

The Court should enter a stay by April 10, 2026. At minimum, the Court should extend the district court's stay for an additional 14 days to allow the Solicitor General to seek relief in the Supreme Court.

Respectfully submitted,

*/s/ Brett A. Shumate*

ADAM R.F. GUSTAFSON
  *Principal Deputy Assistant Attorney General*

BRETT A. SHUMATE
  *Assistant Attorney General*

PETER M. TORSTENSEN, JR.
  *Deputy Assistant Attorney General*

MARISSA A. PIROPATO
  *Deputy Chief*
   *Environment and Natural Resources Division*
   *Natural Resources Section*

MARK R. FREEMAN
MICHAEL S. RAAB
BRANTLEY T. MAYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202)-514-3301*
  *brett.a.shumate@usdoj.gov*

APRIL 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion satisfies the type-volume requirements set out in Rule 27(d)(2)(A) because it contains 5,196 words. This motion was prepared using Microsoft Word in Century Schoolbook, 14-point font, a proportionally spaced typeface.

*/s/ Brett A. Shumate*
Brett A. Shumate

**ADDENDUM**

# TABLE OF CONTENTS

Declaration of Elizabeth S. Merritt
    (Dec. 12, 2025) (Dkt. No. 2-2).................................................Add.1

Declaration of Alison K. Hoagland
    (Dec. 12, 2025) (Dkt. No. 2-3).................................................Add.7

National Park Service, Finding of No Significant Impact
    (Dec. 15, 2025) (Dkt. No. 14-2)..............................................Add.14

Declaration of John Stanwich
    (Dec. 15, 2025) (Dkt. No. 14-6)..............................................Add.31

Memorandum Order Denying TRO
    (Dec. 17, 2025) (Dkt. No. 17).................................................Add.39

Declaration of Joshua Fisher
    (Jan. 15, 2026) (Dkt. No. 30-1)..............................................Add.43

Supplemental Declaration of Jessica Bowron
    (Jan. 15, 2026) (Dkt. No. 30-3)..............................................Add.49

Declaration of Matthew C. Quinn
    (Jan. 15, 2026) (Dkt. No. 30-5)..............................................Add.53

Memorandum Opinion Denying First Preliminary Injunction
    Motion
    (Feb. 26, 2026) (Dkt. No. 47).................................................Add.56

Order Denying First Preliminary Injunction Motion
    (Feb. 26, 2026) (Dkt. No. 48).................................................Add.78

Supplemental Declaration of Tammy Stidham
    (Mar. 12, 2026) (Dkt. No. 52-1)..............................................Add.79

Second Supplemental Declaration of Heather Martin
    (Mar. 23, 2026) (Dkt. No. 55-3)..............................................Add.86

Memorandum Opinion Granting Second Preliminary Injunction
     Motion
          (March 31, 2026) (Dkt. No. 60) .............................................. Add.90

Order Granting Second Preliminary Injunction Motion
          (March 31, 2026) (Dkt. No. 61) .............................................. Add.125

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED STATES,

　　　　　*Plaintiff,*

　　v.

NATIONAL PARK SERVICE, *et al.,*

　　　　　*Defendants.*

Civil Action No. _____

## DECLARATION OF ELIZABETH S. MERRITT

1.　　　　My name is Elizabeth S. Merritt, and I am Deputy General Counsel at the National Trust for Historic Preservation in the United States ("National Trust"). I have served in the National Trust's Law Department for more than 41 years, focused on advocacy to protect historic places throughout the nation, in both the administrative and judicial arenas.  As a result, I am very familiar with the National Trust's programs, and especially its advocacy and litigation activities. The facts set forth in this declaration are based upon my personal and professional knowledge and, if called as a witness in this proceeding, I could and would testify competently thereto under oath.

2.　　　　The National Trust is a private charitable, educational, nonprofit corporation chartered by Congress in 1949 to further the historic preservation policies of the United States, and to facilitate public participation in the preservation of historic properties. See 54 U.S.C. § 312102(a).

3.　　　　As part of the National Trust's public interest advocacy program, the National Trust has often participated in litigation to enforce federal, state, and local laws that protect historic places.  Since 1970, the National Trust has formally participated in hundreds of cases in

Add.1

state and federal courts around the country, both as a plaintiff and as *amicus curiae*, and occasionally as an intervening defendant.

4.     The National Trust has a long history of active involvement in the federal project and planning review processes conducted by the National Capital Planning Commission ("NCPC").  For example, the National Trust has previously submitted testimony or comments to the NCPC over the course of many years regarding the following matters:

- Opposing demolition of historic officers' housing at Fort McNair (Feb. 2, 2023);
- Adverse impacts of McMillan Park development on President Lincoln's Cottage (Nov. 7, 2014);
- Comments regarding the Height Act (Oct. 25 and Nov. 19, 2013);
- Master Plan for Homeland Security Department headquarters at St. Elizabeths Hospital campus (Nov. 1, 2007 and Jan. 8, 2009);
- Proposed Vietnam Veterans Memorial Visitor Center (Dec. 6, 2007);
- Courtyard roof for Old Patent Office Building (June 2, 2005); and
- Closing of Pennsylvania Avenue in front of the White House (Mar. 12, 2003).

5.     In addition, I personally have submitted written or in-person testimony to NCPC on behalf of the National Trust regarding the following matters:

- Redevelopment of the McMillan Park site (Nov. 6, 2014);
- Proposed Vietnam Veterans Memorial Visitor Center (Aug. 3, 2006 and June 3, 2009);
- Courtyard roof for Old Patent Office Building (Sept. 8, 2005); and
- Washington Monument security and visitor facilities (May 1, 2003).

6.     The National Trust is also routinely and actively involved in review of environmental assessments ("EA") and environmental impact statements ("EIS") prepared by federal agencies pursuant to the National Environmental Policy Act ("NEPA").

7.     The National Trust frequently submits comments on NEPA documents, and is often involved in enforcing federal agency compliance with NEPA. *See, e.g., National Parks*

*Conservation Ass'n, et al. v. Semonite,* No. 18-5179 (D.C. Cir. Mar. 1, 2019); *Coalition Against a Raised Expressway (CARE), et al. v. Dole,* 835 F.2d 803 (11th Cir. 1988); *Druid Hills Civic Ass'n, et al. v. Federal Highway Admin.,* 772 F.2d 700 (11th Cir. 1985); *Citizen Advocates for Responsible Expansion, Inc. (I-CARE), et al. v. Dole,* 770 F.2d 423 (5th Cir. 1985); *City of South Pasadena, et al. v. Slater,* 56 F. Supp. 2d 1106 (C.D. Cal. 1999).

8.     In my decades of personal experience at the National Trust, the National Trust's commentary and advocacy before the NCPC and other governmental entities (whether federal, state, or local) has been highly influential. The National Trust's advocacy often results in modifications to proposed projects.

9.     The National Trust follows developments in preserving and interpreting the White House through, among other things, the White House Historical Association, and a representative of the National Trust serves as an ex officio member of the board of the Association.  The White House Historical Association is also co-steward, with the National Trust, of Decatur House. Decatur House, located adjacent to President's Park in Lafayette Square and owned by the National Trust since 1956, is itself a historic building and the first private residence built in the White House neighborhood. When the National Trust conducts board meetings in Washington, D.C., they are frequently held at Decatur House.

10.     On October 21, 2025, in response to the initiation of demolition of the White House East Wing, the National Trust's President and CEO, Carol Quillen, sent a letter to the Chair of the NCPC, the Acting Director of the National Park Service, and the Chair of the CFA. The letter expressed serious concerns about the failure to comply with the public review process for the Ballroom Project, and urged the Administration and the National Park Service to cease

demolition until after the required review procedures for the Ballroom Project had been completed.

11. Because of the National Trust's concern regarding the failure to initiate review by the NCPC, I personally reached out to Meghan Hottel-Cox, General Counsel and Secretary at the NCPC, to inquire as to whether the NCPC had received any submissions regarding the White House Ballroom Project. And on December 3, 2025, I specifically mentioned my concern by email that construction of the Ballroom has already been initiated. Ms. Hottel-Cox responded by email on December 5, 2025 that "NCPC has not yet received a submission for the Ballroom project."

12. Assuming that the Defendants do submit plans for the Ballroom Project to the NCPC and CFA, the National Trust intends to participate actively in the public comment process. In addition, the National Trust intends to submit comments in response to any NEPA document that is released to the public regarding the Ballroom Project. Among other things, the National Trust intends to express a concern that the massing and height of the proposed new construction will overwhelm the White House itself and may also permanently disrupt the carefully balanced classical design of the White House with its two smaller, and lower, East and West Wings, and to urge the NCPC and CFA to take these concerns into consideration. The ongoing demolition and construction activities severely harm the interests of the National Trust by foreclosing alternatives and modifications to the Ballroom Project that could avoid, minimize, and/or mitigate the adverse effects of the Project on the historic significance of the White House.

13. In connection with the National Trust's request for injunctive relief in this case, the National Trust requests a waiver of any security bond requirement.

14.    Because of the National Trust's nonprofit status and limited funds, we have a policy against paying attorneys' fees, other than out-of-pocket expenses, when we participate in advocacy litigation. Instead, we rely on *pro bono* representation when outside counsel is needed, as in this case, or public interest lawyers whose discounted fees can be covered by other organizations.

15.    When the National Trust seeks injunctive relief in a case, the Trust has always requested (and virtually always received) a waiver of the security bond requirement based on the "public interest" nature of our litigation. The National Trust's litigation program is aimed at enforcing and vindicating the rights of the public as a whole, which are reflected in federal, state, and local laws protecting historic properties. This policy is in furtherance of the National Trust's congressional charter, directing the Trust to "facilitate public participation" in historic preservation. 54 U.S.C. § 312102(a).

16.    The doctrine allowing a waiver of the security bond is based on the recognition that organizations such as the National Trust, acting as private attorneys general, have no personal or financial stake in the enforcement litigation and therefore prosecute lawsuits that benefit the public as a whole.

17.    The imposition of a security bond—as a condition for obtaining injunctive relief to temporarily delay construction or demolition activities that would harm historic resources— would have a direct chilling effect on the ability of the National Trust, and other public interest plaintiffs, to advance the public interest and enforce compliance with historic preservation laws through litigation. If the financial burden of vindicating public rights were to fall on nonprofit organizations that bring enforcement actions, such as the National Trust, then the incentives intentionally created by Congress to encourage citizen suits and private attorney general actions,

(*see, e.g.,* 54 U.S.C. § 307105 (NHPA); 28 U.S.C. § 2412 (EAJA)), would be significantly reduced or eliminated.

18.    The National Trust could not post a substantial injunction bond without diverting funds intended for other historic preservation programs.

19.    Alternatively, the National Trust would simply not be able to post such a bond at all, and would be unable to secure the injunction on which it was conditioned.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 11th day of December, 2025.


*Elizbeth S. Meritt*

Elizabeth S. Merritt

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,** *Plaintiff,* v. **NATIONAL PARK SERVICE**, *et al.*, *Defendants.* | Civil Action No. _____ |

## <u>DECLARATION OF ALISON K. HOAGLAND</u>

I, Alison K. Hoagland, declare as follows:

1. The facts set forth in this declaration are based upon my personal and professional knowledge, and if called as a witness in this proceeding, I could and would testify competently thereto under oath. As to those matters that reflect an opinion, they reflect my personal and professional opinion on the matter.

2. I am a member of the National Trust for Historic Preservation in the United States ("National Trust"). I have been a member of the National Trust for more than 40 years. I am currently a Trustee of the National Trust and serve on its Executive Committee. In that role, I advise on the governance and policy-making of the organization. I have also previously served as an advisor to the National Trust on matters relating to Washington, D.C.'s interests in the formation of Trust policy.

3. In addition to my work as a trustee and advisor, I am an active individual member of the National Trust. The National Trust's members, including myself, use, enjoy, derive benefit from, and have a substantial interest in preserving and protecting historic and cultural resources in Washington, D.C., including the White House and President's Park, which have been impaired by

Add.7

the destruction of the East Wing of the White House by the defendants in this action, and will be impaired further by the construction on the East Wing's former site of a ballroom substantially similar to that which the defendants propose to build.

4.      Apart from my work with the National Trust, I am professor emerita at Michigan Technological University, where I taught history and historic preservation from 1994 to 2009.  I received my BA from Brown University and my MA in American Studies, with a concentration in historic preservation, from George Washington University.  I have written six books on various aspects of American vernacular architecture; my most recent is The Row House in Washington, DC: A History (University of Virginia Press, 2023).

5.      Prior to my professorship, I was the senior historian at the Historic American Buildings Survey of the National Park Service, where I worked from 1979 to 1994.  The Historic American Buildings Survey ("HABS") documents significant historic buildings with measured drawings, large-format photographs, and written histories, which are then made available to the public at the Library of Congress and online.  Buildings documented by HABS are located nationwide and include major monuments and memorials in Washington, as well as the White House itself.

6.      In my past capacity as a volunteer and also Vice President of the DC Preservation League (formerly Don't Tear It Down!), I oversaw projects, undertook research, and prepared landmark nominations concerning downtown Washington.  Designation of the Downtown Historic District and the Fifteenth Street Financial Historic District (adjacent to the White House) resulted in part from my work.  Alterations and demolitions of buildings in these historic districts, just as for any locally designated historic landmark, must be reviewed by the Historic Preservation Review Board before permits are granted.

Add.8

7.      I have previously served on the boards of various organizations engaged in history and historic preservation work, several of which have a particular focus on historic preservation in Washington, D.C.  Among these, I have chaired the board of the Delaware Historical Society, chaired the Keweenaw National Historical Park Advisory Commission in Calumet, Michigan, and served as president of the Vernacular Architecture Forum.  I have also served on the boards of the National Council on Public History, the Michigan State Historic Preservation Review Board, on the Committee of 100 on the Federal City, and on the board of the DC Preservation League.

8.      I have also given walking tours for the Smithsonian Institution and public presentations to local groups on various aspects of Washington's historic architecture.  In addition, I have published scholarly articles on the topic, including "Nineteenth Century Building Regulations in Washington, D.C.," Records of the Columbia Historical Society 52 (1989): 57-77, and "The Washington Public Library on Mount Vernon Square," Washington History 2, No. 2 (Fall 1990): 74-89.

9.      I live on Capitol Hill, about 2 miles from the White House.  I first moved to DC in 1977 and stayed until 1994, then returned in 2009 and have been here ever since.  I travel to the White House neighborhood frequently to attend meetings, view exhibits, and have medical appointments.  In the past year alone I have attended two rooftop gatherings with views of the White House.  I regularly walk through portions of President's Park, including Lafayette Square, in order to enjoy the historic buildings, the beauty of the L'Enfant Plan (which placed the President's House on axis with 16th Street), and the innovative preservation project concerning the buildings surrounding Lafayette Square (overseen by Jacqueline Kennedy).  I also regularly view the White House from the south side, whether driving by on Constitution Avenue or walking on the Mall.

10.      Built beginning in the eighteenth century, the White House is one of the most historically significant buildings in the country.  The White House was designed to be a symbol of the new nation, and debates occurred about its style, size, precedents, and name.  As built, the "President's House" was a neoclassical building, akin in size to an English country house.  The selection of this design through a competition shows George Washington's preference for a fairly modest building, not a palace.  As such, the White House in its current form embodies some of the ideals on which the nation was founded.  Architectural historians look for meaning in architecture, and the White House is one of the clearest examples of a building constructed with the explicit intention of imparting meaning with its style, size, and scale.  The symbolic nature of the White House never fails to impress me, my students, and my out-of-town visitors.  Further, the preservation of its essential nature—its republican simplicity—through many alterations and renovations of the building also reflects the attitudes and beliefs of subsequent occupants.

11.      The White House affects my own research on more locally focused architecture in two ways.  As one of the first prominent government buildings in the new capital city, it drove development around it, helping to define commercial and residential areas while also serving as a landmark defining L'Enfant's plan for the city, and attesting to the promise that city construction would follow.  Secondly, as the most important house in the city, the White House was also on the leading edge of all improvements—running water, water closets, electricity, etc.  A study of Washington's architecture without the White House as a reference point would be incomplete.

12.      As a resident of Washington, D.C., I intend to continue to travel to the area around the White House, to walk through Lafayette Square, to attend functions in neighboring buildings, and to continue to be impressed by this iconic building.  In the past I have had reason to be in the area about once a month, and I expect that pattern to continue.  In addition, when the National

Add.10

Trust holds its board meetings in Washington, which it does at least annually, it usually holds them at the Decatur House on the northwest corner of Lafayette Square. I plan to attend those meetings in 2026.

13. If a ballroom were constructed, similar to that which the defendants in this action have proposed to be built on the former site of the East Wing, it would cause permanent and irreparable harm to the White House and President's Park. To have an adjacent structure overshadowing the White House, exceeding it in height and massing, would diminish the primacy of the White House, which makes its architectural statement through its singularity on the landscape. No longer would the eye be drawn to the jewel of the building in the center, declaring to viewers that our president lives in a *house*.

14. Accordingly, I would suffer both professional and personal injuries, including to my aesthetic, cultural, and historical interests, if a ballroom of the proposed form and scale were constructed on the site of the former East Wing.

15. In the past, I have personally participated in public comment periods and public review meetings—across a variety of venues—considering building plans that would alter or impact sites of historic significance. As an example, I submitted comments to the National Capital Planning Commission and the D.C. Historic Preservation Review Board in 2013 and 2014 when those agencies were considering alterations to the Carnegie Library at Mount Vernon Square to accommodate the Spy Museum, a project that ended up not happening. I would intend to participate in any public review processes and comment periods made available for any project of significant scale at the White House, including the ballroom project that has been discussed by the defendants in this action, to provide insight and express concern regarding the adverse impact of such a project on a site of such historical import to its local and national community.

Add.11

16.    As with the rest of the American public, I have so far been denied the opportunity to participate in or comment on this project in any formal setting.  The abrupt demolition of the East Wing has both deeply saddened me personally and affronted my professional work.  But in particular, the project's proceeding without any of the legally mandated consultations and opportunity for public input presents a unique and irreparable harm to the public, one that I feel acutely as an architectural historian who has dedicated her career to studying the relationship between local people and their buildings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

_____
Alison K. Hoagland

Executed this 11th day of December, 2025.



National Park Service
US Department of the Interior

The White House and President's Park

# Finding of No Significant Impact

## White House East Wing Modernization and State Ballroom Environmental Assessment

Washington, DC

NPS-25012

Recommended:

2025.08.28 14:48:32 -04'00'

_____

Frank Lands
Deputy Director, National Park Service

Approved:

JESSICA BOWRON

Digitally signed by JESSICA BOWRON
Date: 2025.08.28 14:53:50 -04'00'

_____

Jessica Bowron
Comptroller, Exercising the Delegated Authority of the Director, National Park Service

Add.14

## Introduction

The National Park Service (NPS) prepared an environmental assessment (EA) consistent with the National Environmental Policy Act (NEPA) (42 U.S.C. 4321 et seq.), the Department of the Interior (DOI) NEPA regulations, 43 CFR part 46, and the 2025 DOI Handbook of NEPA Implementing Procedures (516 DM 1 Handbook). This Finding of No Significant Impact (FONSI) documents the final determinations and approvals for NPS actions related to the East Wing modernization and State Ballroom construction. The statements and conclusions reached in this FONSI are based on documentation and analysis provided in the EA and associated decision file.

Congress established the White House and its grounds as a unit of the National Park System in 1961 and it is managed by the NPS through President's Park. The White House itself has expanded since its original construction and has been subject to many major and minor renovations since its first cornerstone was laid in 1792.  Although the White House has undergone expansions and many presidents have proposed large changes to the White House, its design remains a timeless representation of stability and resilience in our nation (Bushong 2005). The White House sits within President's Park, which includes Lafayette Square, the First Division Monument, Sherman Park, and various sites in and around the Ellipse.

## Purpose and Need for Action

The purpose of the proposed action is to establish a permanent, secure event space within the White House grounds that meets presidential priorities for capacity and dignified official functions, eliminates reliance on temporary tents and associated infrastructure strains, and protects the historic integrity and cultural landscape of the White House and its grounds while maintaining a high-quality visitor experience.

The Comprehensive Design Plan for the White House and President's Park (2000) identified the need for expanded event space to address growing visitor demand and provide a venue suitable for significant events. Successive administrations have recognized this need as an ongoing priority. To meet this need, the Executive Office of the President outlined three functional goals for any permanent event space: (1) immediate adjacency to the Executive Mansion (2) a direct ceremonial procession from the East Room into the venue, and (3) secure second-story access from the Executive Residence.

## Selected Action

The selected action will establish a permanent, secure event space within the White House grounds. This will be accomplished by replacing the existing East Wing of the White House with a new building that will house the White House State Ballroom.

Deconstruction and Design

The existing East Wing and East Colonnade will be deconstructed. Prior to deconstruction, the NPS will remove all museum collections, artifacts, and paintings (collectively "museum objects") from the East Wing and some museum objects from the Executive Mansion. Museum objects

Add.15

USCA Case #26-5101    Document #2167119    Filed: 04/03/2026    Page 51 of 162

from the East Wing may be relocated to other areas within the White House, which could result in temporary removal or modification of interior designs or museum objects in those spaces. If removed from the White House, all items will be stored in accordance with White House standards to ensure proper preservation and accountability.

The interiors and exteriors of the East Wing and East Colonnade have been evaluated to identify historic fabric with potential for salvage and possible reuse. Both buildings will be documented as outlined in the Documentation section below prior to removal of any features or finishes. Selected interior features will be documented, removed, and stored for potential reinstallation including wood paneling, light fixtures, movie theater elements, and interior columns. Selected exterior features, such as exterior columns, Seneca sandstone, the East Wing commemorative cornerstone and bronze plaque from the 1942 renovation, wrought iron fencing and gate, the Kennedy Garden arbor, two fanlight windows from the East Colonnade, and cobblestone paving, will be documented, removed, and stored for potential reinstallation. Some interior and exterior features will be reinstalled at and around the new building.

The new building will be approximately 90,000 square feet and will be connected to the Executive Mansion through the East Colonnade. The East Colonnade will be renovated to include an enclosed second story that will provide direct access from the East Room to the State Ballroom, while maintaining ground-floor access to and from the Executive Mansion. Limited portions of the east façade of the Executive Mansion will be carefully removed to tie in both levels; stones removed for this work will be cataloged and reinstalled.

The exterior design of the new East Wing building will be compatible with the Executive Mansion through classical elements such as columns and pediments. Materials will include a white painted exterior, historically compatible windows and doors, and an architecturally compatible roof. Interior finishes will include stone slab flooring, decorative plaster moldings, and high-quality finishes for elevator cabs. Mechanical, electrical, and plumbing (MEP) upgrades will include custom chandeliers, fixture updates, and architectural grilles, along with advanced audio-visual (AV) system enhancements.

The second floor will contain the State Ballroom with capacity for over 1,000 guests, depending on final design configuration. The State Ballroom will allow flexible staging on the south or east sides and provide views to the west, south, and east. A flat tray ceiling with decorative chandeliers is proposed. The first floor will continue to serve as the visitor entrance to the building with monumental stairs to the ballroom and will house storage, mechanical equipment, and mission space. Ground-floor restrooms will support events on the South Lawn.

Construction and Staging

A temporary construction zone will be established near the East Wing until project completion (summer 2028). This zone will close Madison Place NW from H Street NW to E Street NW and portions of Pennsylvania Avenue NW, extending approximately 260 feet east and 350 feet west from the Madison Place NW centerline to non-construction or emergency vehicles. The construction area will extend south from the East Colonnade, with the South Drive as the western boundary and East Executive Drive as the eastern boundary. The construction zone will

Add.16

extend south to Hamilton Avenue. The construction will not impede visitation to other parts of President's Park.

A tower crane will be erected on site, with its final location determined upon completion of the final design documents. Other heavy construction equipment will be used, and contractors will employ ground protection to prevent turf and utility damage. Given the project's size and duration, turf replacement and ground remediation, such as decompaction of compacted topsoil, are expected to occur during project closeout, along with the repaving of affected roadway areas.

Landscaping

The selected action will expand the footprint of the East Wing, resulting in adjustments to landscaping in the project area. To accommodate the larger building, a variety of ornamental trees and shrubs will be removed from the project site. The commemorative Southern Magnolias on the east front of the East Wing will be removed due to the proposed footprint of the building (north magnolia planted in 1947, south magnolia planted in 1942 by Franklin D. Roosevelt). The East Garden will be carefully removed during construction and reinstalled similar to its existing design. The arbor in the East Garden will be removed, restored, and reinstalled in the East Garden once exterior construction is complete.

The brick pavers along the garden paths will be carefully removed. The bricks will be stored and ready to be relaid as part of the garden reinstallation. The fountain, including its statue, a centerpiece of the garden, will also be carefully dismantled and preserved for future reinstallation. Meanwhile, the Laura Bush Silver Linden Tree will be fenced and protected with a rigid barrier to ensure its safety throughout the construction period.

Documentation

The NPS will continue to survey and record the current interior and exterior conditions of the East Wing, East Colonnade, and Jacqueline Kennedy Garden (East Garden) of the White House. The documentation consists of two components:

1. Digital Survey: A 3-dimensional digital survey of the property using Light Detection and Ranging (LiDAR) laser scanning equipment will be completed. Scanning will be conducted using Leica P50 and RTC360 terrestrial laser scanners. A Leica TS16i total station will be used to create a control network for the scanned data. A single three-dimensional model of the building and site will be completed.
2. High-Resolution Digital Photography: The NPS will capture high-resolution digital photographs of the building and site to include the primary interior and exterior spaces, significant features, and contextual views. Photographs will be taken using a Phase One medium-format digital system and a Canon R5 full-frame digital mirrorless system.

Add.17

**Finding of No Significant Impact**

A description of all potential environmental effects associated with the selected action and no action alternative is included in the EA, incorporated by reference herein. Consistent with the DOI NEPA Handbook, Section 1.2(b), the NPS evaluated the significance of the selected action, identified as the proposed action in the EA, by analyzing the potentially affected environment and the degree of the effects of the selected action. Significance is determined solely in relation to reasonably foreseeable adverse effects. The degree of effect is considered by evaluating both short-and-long term effects, both beneficial effects and adverse effects, effects on public health and safety, economic effects and effects on the quality of life of the American People. The NPS only completes a significance determination for the selected action and does not determine the significance of unselected alternatives.

The EA discloses the reasonably foreseeable effects of the selected action, including the combined effects of the selected action with those of past, ongoing, and anticipated future actions on the park's cultural resources and on visitor access and experience. While other park resources may experience some effects, those effects are minimal and were determined not to warrant detailed analysis in the EA. Accordingly, these resources are not discussed further here, as the anticipated effects are so minor that they have no potential to reach a level of significance. For a detailed description of impact topics considered but dismissed, see Appendix A of the EA.

Potentially Affected Environment

A more detailed description of the potentially affected environment is included in the EA under the subheadings Current and Expected Future Conditions of the Environment if No Action is Taken.

The White House is the oldest public building in the District of Columbia and has served as the home and office of every U.S. president except George Washington. Together with its wings and grounds, the White House functions as the residence of the First Family, the workplace of the President and staff, a national park, and an evolving museum.

The White House and President's Park include three distinct cultural landscapes that were identified as contributing features to the L'Enfant Plan of the City of Washington, DC, a historic district listed in the National Register of Historic Places (NPS 1997): Lafayette Park, White House Grounds and The Ellipse. These cultural landscapes are fundamental to the park and provide the setting for the "President's Park" as defined by Pierre L'Enfant in 1791. Situated on a high point within the city, the White House is a focal point on the principal north-south axis of L'Enfant's plan. Views and vistas were among the most essential features of L'Enfant's plan. The White House grounds are dynamic, changing with the seasons and the needs of the Executive Office of the President. Vegetation is frequently moved or removed, and at times temporary event tents obstruct views of the White House and other features of President's Park.

The Executive Mansion encompasses approximately 55,000 square feet, not including the West and East Wings and colonnades. This historic main building is organized into three primary sections: the Ground Floor, the State Floor, and the Executive Residence floors.  The East Wing, constructed in 1942, has undergone multiple renovations and provides office space for the First Lady and her staff, including the White House Social Secretary, Graphics and Calligraphy Office, and correspondence teams. It also serves as the public entrance for White House tours and special events held at the White House.

The White House hosts major public events such as the Garden Tours, the Easter Egg Roll, and the National Christmas Tree Lighting. President's Park offers open space for recreation, First Amendment expression, and community programming. The NPS provides visitor access, interpretation, and educational services throughout these areas (NPS 2014).

Short and Long-term Beneficial and Adverse Effects

*Cultural Resources[1]- Cultural Landscapes*

Under the selected action, the White House Grounds Cultural Landscape, which was originally designed by Thomas Jefferson and later modified by the designs of Andrew Jackson Downing, Frederick Law Olmsted Jr., and others, will be altered through an expansion of the White House footprint and the addition of a larger structure on its east side. These changes will result in long-term adverse effects on the cultural landscape. Similarly, views of the White House from Lafayette Park and the Ellipse will be permanently altered due to the modifications to the East Wing. In the short term, construction activities, including the presence of equipment and the removal and replanting of vegetation, will result in temporary adverse effects on these landscapes. However, the EA also identifies long-term beneficial effects from eliminating the need for temporary tents and other temporary facilities to support large events.

Despite the adverse impacts identified in the EA, the selected action will not result in significant adverse impacts to the park's cultural landscapes. The selected action will not permanently alter the park's most critical view, the long vista connecting the White House, Washington Monument, and Jefferson Memorial. In addition, mitigation measures such as replanting historically significant trees, salvaging and reusing historic materials, and preserving or reinstalling garden features will help maintain continuity between the site's historic character and its contemporary functions. These measures ensure that significant elements of the landscape are preserved and adapted for continued use, supporting the conclusion that the selected action will not result in significant impacts to cultural landscapes. Finally, the historical significance of the park's cultural landscape reflects its continuous adaptation to meet the evolving needs of the Executive Office of the President. The selected action continues a long-standing tradition reflected in the park's enabling legislation of adapting the White House

---

[1] This Decision Document does not address compliance with Section 106 of the National Historic Preservation Act. Section 106 does not apply to the White House or its grounds, because 54 U.S.C. § 307104 expressly exempts the White House grounds (along with the Supreme Court and Capitol) from all requirements of that statute. Undertakings occurring outside the White House or its grounds may be subject to Section 106 review.

grounds to accommodate essential executive functions. Thus, changes to the landscape for this purpose are consistent with its historic character and are not considered significant.

*Cultural Resources - Historic Buildings*

The White House is designated as a National Historic Landmark (NHL). Under the selected action, the existing East Wing will be deconstructed and replaced with a new building, resulting in the permanent loss of a component that has been integral to White House operations since 1942. This change will disrupt the historical continuity of the White House grounds and alter the architectural integrity of the east side of the property. The new building's larger footprint and height will dominate the eastern portion of the site, creating a visual imbalance with the more modestly scaled West Wing and Executive Mansion. Adding a second story to the East Colonnade will further modify the setting, contrasting with the single-story design of the West Colonnade and changing the traditional spatial organization and sightlines of the grounds. These changes will adversely alter the design, setting, and feeling of the White House and the grounds over the long-term. In addition, construction activities will also introduce temporary risks to the historic building, including noise, vibration, and potential settlement effects, which could affect the structural stability or finishes of the Executive Mansion and adjacent features.

The selected alternative will also provide long-term benefits by reducing reliance on temporary event infrastructure, minimizing wear on the grounds, and improving functionality for large gatherings through the addition of a permanent ballroom.

The selected action will result in a substantial change to one portion of the NHL. However, the essential features that make it nationally significant, particularly its role in establishing the nation's capital and its resilience during the War of 1812, will remain unchanged. Moreover, the NHL documentation identifies the period of significance as 1792-1955, a period that saw significant changes in the configuration of the White House, namely the addition of the East and West Wings. Therefore, the overall impact will not significantly affect the property's significance as an NHL and it retains the qualities that caused it to be designated as an NHL.

Further, mitigation measures, including documentation of the current East Wing as well as salvage and storage of some of the existing historic building materials, will be reused in the new modernized East Wing, and to ensure their availability for future preservation or restoration projects at the White House or for other significant buildings in the district. These efforts will support preservation efforts by providing hard-to-replicate or replacement building materials that can be used at the White House and other historic buildings in the area, including the Smithsonian Castle, limiting potential significant adverse impacts to these resources in the future.

The White House is also unique in that, while it is a historic structure, it continues to evolve to meet the operational needs of the Executive Office of the President. This ongoing adaptation is part of its historical significance. Thus, the selected action will not result in a significant adverse impact to historic buildings.

*Visitor Access and Experience*

Add.20

President's Park, excluding the White House and its grounds, is open to the public without the need for a scheduled tour, however, temporary area closures may be in place due to events and activities. U.S. Secret Service operations may also temporarily affect access to areas of the park to ensure necessary security and safety for the adjacent White House grounds, its occupants, and the public. These closures are frequent, given the high level of activity that occurs in and around the park.

Under the selected alternative, certain areas within both President's Park and the White House and its grounds will become temporarily inaccessible. Visitors to these areas will also experience increased noise and visual intrusions, resulting in adverse effects. However, these impacts are expected to be temporary and will conclude with the completion of construction, anticipated to be summer 2028, limiting the duration and extent of the adverse impacts.

Construction will interrupt normal tour flow through the East Wing, necessitating rerouting (e.g., alternate entry point) or postponement. Historically, tours have been suspended or altered during renovations or heightened security conditions. At the time of the EA's preparation, new tour bookings have been paused while a collaborative group of White House, NPS, and U.S. Secret Service staff work to determine the best way to ensure public access to the White House as this project begins and for the duration of construction. While the selected alternative will temporarily alter the existing White House tour route and potentially reduce tour availability during construction, tours will continue in some capacity and will include access to the State Floor of the Executive Mansion. This will help minimize the overall impact on visitors seeking to tour the interior of the White House. Because these closures are temporary, limited to the construction period, and consistent with previous renovation practices, they do not constitute significant adverse impacts.

The removal of the current East Wing will result in a permanent adverse impact for those who value the experience of this specific space. However, in the long term, the selected alternative will provide a modernized East Wing and a permanent ballroom designed to enhance functionality, accessibility, and visitor amenities, while reducing reliance on temporary event spaces. Additionally, the documentation of the East Wing before deconstruction and potentially during the construction process will provide a new interpretive opportunity in the future. As a result, the loss of the existing structure is not considered a significant adverse impact. Collectively, these improvements will strengthen the White House's capacity to host large indoor events, reinforce its status as a national landmark, and contribute to an improved long-term visitor experience.

Effects on Public Health and Safety

The selected action will not result in significant adverse effects on public health and safety. As detailed in Appendix A of the EA, the project's limited grading area, short duration of construction equipment use, and minimal vehicle trips will not significantly affect regional air quality. Emissions will remain below applicable pollutant thresholds.

Add.21

Vehicle traffic is already restricted on streets near the project area, and additional restrictions will be clearly marked and enforced to ensure public safety. Pedestrian access may also be limited or rerouted in certain areas, as described in the EA under Visitor Access and Experience, to maintain a safe environment during construction. Finally, the selected action does not involve the release of hazardous or solid waste or other hazards to human health.

<u>Economic Effects</u>

NPS considered socioeconomic impacts but dismissed them from detailed analysis, as explained in Appendix A of the EA. While White House tours and visits to President's Park offer valuable experiences, they are not major economic drivers for the region. These sites are typically one of many stops for visitors, and temporary changes to tour availability or site access are not expected to significantly affect the regional economy, tourism sector, or local employment. Although construction may generate some limited opportunities for local businesses, these effects are expected to be minor and likely undetectable.

<u>Effects on the Quality of Life of the American People</u>

As described in the EA, the selected action will affect visitor access and experience, resulting in both adverse and beneficial impacts. In the short term, temporary site closures and reduced tour capacity will create adverse effects. However, over the long term, these areas will reopen and remain accessible, benefitting the American people. The selected action will not significantly alter educational opportunities or public understanding of the park. As noted, White House tours will continue, allowing visitors to engage with the park's purpose and unique resources. The modernized East Wing and new State Ballroom will directly benefit the American people by expanding the White House's ability to host large indoor events, celebrate America's history through new interpretive opportunities, and create a symbolic space for events of national importance, reinforcing shared civic identity and pride. It will also directly benefit the American people by providing comfort facilities that may be used for outdoor events on the South lawn. The selected action will also indirectly benefit the American people by providing modern office space for the Executive Office of the President.

The selected action will not restrict the public's ability to consume, purchase, or use products from public lands. It will also have no impact on public services, traditional land and water use practices, or the cultural heritage of Native American communities. Additionally, the selected alternative will not affect passive recreational use of ecosystems.

## Rationale for the Decision

The proposed action to modernize the White House East Wing and construct a new State Ballroom is the selected action. The EA evaluated two alternatives: a no action alternative and proposed action, which is the selected action. In addition, the Executive Office of the President and the NPS considered several other options for renovating the East Wing and creating space for large events. These alternatives were dismissed from detailed analysis because they did not adequately support the functional goals identified by the Executive Office of the President. The no action alternative was not selected because it does not meet the project's purpose and

need, as it lacks a permanent, secure event space within the White House grounds, and will continue reliance on temporary tents and associated infrastructure.

As described in the EA, successive administrations, including the current one, and existing planning documents have consistently recognized the need for a secure event space capable of hosting large official functions without reliance on temporary tents and associated infrastructure. The selected action fulfills this need by providing permanent facilities to support the operational needs of the Executive Office of the President, including both office and large event space, in a manner consistent with the park's enabling legislation, described below.

Congress established the White House as a unit of the National Park System in 1961 and it is managed by the NPS through President's Park. The enabling legislation (Pub. L. No. 87-286, 75 Stat. 586 (1961)) directs the NPS to prioritize the preservation and interpretation of the museum character of the principal corridor on the ground floor and the main public rooms on the first floor of the White House. The legislation provides that NPS management of the park shall not conflict with the administration of the Executive Offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and their family or for official purposes.

Although the number and format of White House tours will differ from past practice resulting in some temporary effects to the NPS's ability to interpret the unit, tours will resume as soon as practicable and will continue to include access the principal ground floor corridor and the public rooms on the State Floor of the Executive Mansion, consistent with the enabling legislation of the park. Some ground floor rooms adjacent to construction zones or temporarily repurposed as offices for East Wing staff will be unavailable during construction, but this limitation will be temporary, lasting only for the duration of construction. As a result, the selected action will continue to preserve and interpret the museum corridor and principal public rooms of the White House, ensuring that visitor access and the park's core interpretive mission are maintained.

Additionally, under the selected action, museum objects on display in the East Wing and some objects in the Executive Mansion will be relocated or removed. Items not currently in use or on display are curated or stored. The routine removal of museum objects from the White House and off-site storage of those objects when they are not in use or being displayed is consistent with the park's enabling legislation and institutionalized through longstanding regular practice.

As described in the EA, the White House is unique in that, while it is an historic building, it is also a building that has evolved over time. Since 1805, Presidents have expanded and updated the White House to meet the needs of the Executive Office of the President. The selected action is consistent with this historic pattern of use and with the park's enabling legislation. Finally, as further explained in the NPS's Non-Impairment Determination (Appendix A), the action will not result in impairment of, or unacceptable impacts to, the park's resources.

Add.23

In summary, the selected action best meets the project's purpose and need by providing permanent, secure space for large official events within the White House grounds, eliminating reliance on temporary tents. It aligns with the long-standing functional goals of the Executive Office of the President, meets the current operational needs of the Executive Office of the President, and is consistent with the White House's historical evolution and the park's enabling legislation. The action maintains public access to key interpretive areas, and ensures that the museum character of the principal ground floor corridor and State Floor public rooms is upheld. As documented in the EA and the Non-Impairment Determination attached, the selected action will not result in significant environmental impacts or impair the park's resources, allowing the NPS to continue fulfilling its stewardship and interpretive mission.

## Decision

Based on the information contained in the EA and described above, the NPS has determined that the selected action does not constitute a major federal action meeting the criteria that normally requires preparation of an environmental impact statement (EIS). Therefore, an EIS will not be required. Lastly, the NPS certifies that it has considered all relevant information raised during the NEPA process and that the NEPA process is closed (516 DM 1 Handbook § 4.1).

Add.24

# Appendix A
# Non-Impairment Determination

## Compliance with National Park Service (NPS) Management Policies Unacceptable Impacts and the No-Impairment Standard

As described in 2006 NPS Management Policies (Management Policies) (NPS 2006), Section 1.4.4, the National Park Service Organic Act of 1916 (54 USC 100101) prohibits the impairment of park resources and values. *Guidance for Non-Impairment Determinations and the NPS NEPA Process* (NPS 2025) provides guidance for completing non-impairment determinations for NPS actions requiring preparation of an environmental assessment (EA) or environmental impact statement (EIS) pursuant to the National Environmental Policy Act (NEPA). The NPS completed a non-impairment analysis for the White House East Wing Modernization and State Ballroom EA and determined that it will not result in impairment of park resources, or in unacceptable impacts as described in § 1.4.7.1 of Management Policies. Sections 1.4.5 and 1.4.6 of Management Policies further explain impairment.

Section 1.4.5 defines impairment as an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values.

An impact to any park resource or value may, but does not necessarily, constitute an impairment, but an impact would be more likely to constitute impairment to the extent that it affects a resource or value whose conservation is:
- necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park;
- key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park; or
- identified in the park's general management plan or other relevant NPS planning documents as being of significance (NPS 2006, 1.4.5).

Section 1.4.6 of Management Policies identifies the park resources and values that are subject to the no-impairment standard. These include:
- the park's scenery, natural and historic objects, and wildlife, and the processes and conditions that sustain them, including, to the extent present in the park: the ecological, biological, and physical processes that created the park and continue to act upon it; scenic features; natural visibility, both in daytime and at night; natural landscapes; natural soundscapes and smells; water and air resources; soils; geological resources; paleontological resources; archeological resources; cultural landscapes; ethnographic resources; historic and prehistoric sites, structures, and objects; museum collections; and native plants and animals;
- appropriate opportunities to experience enjoyment of the above resources, to the extent that can be done without impairing them;

Page | 11

Add.25

- the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park system; and
- any additional attributes encompassed by the specific values and purposes for which the park was established.

NPS non-impairment analysis normally does not include discussion of impacts to visitor access and experience, socioeconomics, public health and safety, environmental justice, land use, park operations, wilderness, etc., as these do not constitute impacts to park resources and values subject to the no-impairment standard under the Organic Act. See Management Policies § 1.4.6.

## Non-Impairment Determination for the Selected Action

As a basis for evaluating the potential for unacceptable impacts or impairment on the park's resources, the NPS relied on the EA which is incorporated by reference herein. The EA includes analysis of impacts to cultural resources, including cultural landscapes and historic buildings and visitor access and experience. The NPS analyzed a no action alternative and proposed action in detail in the EA.

The proposed action was selected for implementation, because the Executive Office of the President identified the selected action as the only alternative that meets its functional goals and operational needs. The proposed action is referred to as the selected action in this document. The selected action will establish a permanent, secure event space within the White House grounds. This will be accomplished by replacing the existing East Wing of the White House with a new building that will house the White House State Ballroom. The selected action will necessitate some modifications to the existing landscape.

Under the selected action, the existing East Wing and portions of the East Colonnade will be largely deconstructed. Prior to deconstruction, the NPS will remove all collections, artifacts, and paintings (collectively "museum objects") from the East Wing of the White House and some museum objects from the Executive Mansion. Museum objects will be either re-displayed or properly stored.

The new building will be approximately 90,000 square feet and will be connected to the Executive Mansion through the East Colonnade. The East Colonnade will be renovated to include a secure second story that will provide direct access from the East Room to the State Ballroom, while maintaining existing ground-floor access to and from the main Executive Mansion. The second floor of the new building will feature a State Ballroom, while the first floor will accommodate guest suites, executive offices, restrooms, and a visitor entrance with expanded interpretive areas.

Purpose and Fundamental Resources and Values of The White House and President's Park

The purpose of the park and its fundamental resources and values are important context for a non-impairment determination. The purpose of the White House and President's Park is described in the enabling legislation. The enabling legislation states:

> *Primary attention shall be given to the preservation and interpretation of the museum character of the principal corridor on the ground floor and the principal public rooms on the first floor of the White House, but nothing done under this Act shall conflict with the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes* (Pub. L. No. 87-286, 75 Stat. 586 (1961)).

The White House and the surrounding cultural landscapes are fundamental resources of the park as well as visitor experience and public access, First Amendment activities, museum collections, and the park's iconic views and vistas. The park is also significant for its historical importance and its enduring role as a symbol of democracy (NPS 2014). The EA discusses impacts to the White House building and cultural landscapes in detail and acknowledges the importance of views and vistas as part of the cultural landscape. The analysis below further addresses these resources in the context of the Organic Act.

Other park resources subject to the no-impairment standard may experience some effects; however, these effects are minimal and were determined not to warrant detailed analysis in the EA. Museum collections and objects, which are fundamental resources of the park, were not carried forward for detailed analysis. As described in the EA, museum objects will be properly stored to ensure their preservation for the future enjoyment of the American people. Also, resources such as noise, wildlife and wildlife habitat, archeology and air quality are not discussed further here, as the anticipated effects are so minor that they have no potential to result in unacceptable impacts or impairment. For a detailed description of park resources considered but dismissed from detailed analysis, see Appendix A of the EA.

As noted above, the NPS does not include a non-impairment analysis for visitor access and experience, as it is not identified in Section 1.4.6 of Management Policies as a resource subject to the no-impairment standard. However, as described in the Finding of No Significant Impact (FONSI) and in greater detail in the EA, the selected action does not permanently restrict visitor access to the White House. While some areas of the White House and grounds will be temporarily restricted or closed, White House tours and events are expected to occur in some capacity. Thus, this fundamental value will be maintained under the selected action.

In most cases, the evaluation of unacceptable impacts or impairment to the resources discussed in this document, specifically cultural landscapes and historic buildings, considers the extent to which the selected action changes characteristics from the period of significance, such as whether a building still reflects its appearance during an important historical event or period. In this case, however, the analysis must be guided not only by the preservation requirement in the Organic Act, but also by the park's unique enabling legislation and its primary purpose, which recognizes the White House as both a residence and a workplace. The Organic Act's preservation mandate is constrained by the purposes of the park to support the use and

Add.27

occupancy of the buildings and grounds by the President and First Family, and to facilitate official Executive functions. As described in the FONSI, the selected action meets the needs identified by the Executive Office of the President. The non-impairment analysis below appropriately considers potential impacts not only through the lens of the Organic Act and NPS Management Policies, but also consistent with the park's enabling legislation.

Cultural Resources Non-Impairment Analysis

*Cultural Resources – Cultural Landscapes*

The White House and President's Park include three distinct cultural landscapes that were identified as contributing features to  the L'Enfant Plan of the City of Washington, DC, a historic district listed in the National Register of Historic Places (NPS 1997). The White House Grounds Cultural Landscape, which was originally designed by Thomas Jefferson and later modified by the designs of Andrew Jackson Downing, Frederick Law Olmsted Jr., and others, will be altered through an expansion of the White House footprint and the addition of a larger structure on its east side. Similarly, views of the White House from Lafayette Park and the Ellipse will be permanently altered due to the modifications to the East Wing. In the short term, construction activities, including the presence of equipment and the removal and replanting of vegetation, will result in temporary adverse effects on these landscapes.

While the selected action introduces adverse impacts to the park's cultural landscapes, these impacts do not rise to the level of impairment, particularly in relation to the historic views and vistas central to the L'Enfant Plan of 1791. The long vista, connecting the White House, Washington Monument, and Jefferson Memorial, has been a defining feature of Washington D.C. for over two centuries. The White House, situated at a prominent high point, has undergone many modifications over time, including the construction of the East and West Wings. These changes, while altering the immediate setting, did not compromise the broader visual and spatial relationships that define the L'Enfant Plan. The selected action is consistent with these past changes in that it does not obstruct or diminish the visual connection between these landmarks. The integrity of the long vista, a defining element of the original city plan, remains unobstructed, and thus unimpaired, under the selected action.

Under the selected action, the White House Grounds Cultural Landscape will be affected by a reduction in architectural symmetry and alterations to the manicured environment and built features of the landscape. However, as noted in the EA, mitigation measures such as replanting historically significant trees, salvaging and reusing historic materials, and preserving or reinstalling garden features will help maintain continuity between the site's historic character and its contemporary functions. These measures ensure that significant elements of the landscape are preserved and adapted for continued use, eliminating the potential of impairment.

Most importantly, the historical significance of the park's cultural landscape reflects its continuous adaptation to meet the evolving needs of the Executive Office of the President. The selected action continues a long-standing tradition reflected in the park's enabling legislation of adapting the White House grounds to accommodate essential executive goals. The changes to

the cultural landscapes for this purpose are consistent with its historic character and thus do not rise to the level of impairment.

*Cultural Resources – Historic Buildings*

The White House was designated as a National Historic Landmark (NHL) in 1960. Under the selected action, the existing East Wing will be removed and replaced with a new building, resulting in the permanent loss of a component that has supported White House operations since 1942. The second story addition on the East Colonnade will further modify the traditional spatial organization and sightlines of the grounds. These changes will adversely alter the design, setting, and feeling of the White House and its grounds over the long term. Also, the selected action may introduce temporary risks to the historic building, including noise, vibration, and potential settlement effects, which could affect the structural stability or finishes of the Executive Mansion and adjacent features.

While the selected action will alter the design, setting, and feeling of the White House and its grounds, mitigation measures, including HABS, LiDAR, and photographic documentation and the salvage and storage of select historic building materials, will preserve important elements of the historic fabric. These materials are intended to be reused in the modernized East Wing or retained for future preservation or restoration efforts. Thus, despite the changes, these historic building materials will remain available for the appreciation and benefit of the American people.

Finally, the White House is unique in that, although it is a historic structure, it continues to evolve to meet the operational needs of the Executive Office of the President, a quality that contributes to its historical significance. Indeed, when the NHL was designated, the East Wing had existed in its current form for only 18 years. Under the selected action, the White House retains its designation as an NHL, along with its historical value and iconic status. The modernized East Wing and new State Ballroom will directly benefit the American people by expanding the White House's ability to host large indoor events, celebrate America's history through new interpretive opportunities, and create a symbolic space for events of national importance, reinforcing shared civic identity and pride. It will continue to serve both as a symbol of democracy and as a functioning seat of the executive branch. Therefore, the selected action does not result in unacceptable impacts or impairment, as the changes are consistent with the ongoing historical significance of the White House and its grounds.

Conclusion

As demonstrated here and supported by the analysis in the EA, the impacts from the modernization of the East Wing and the construction of a State Ballroom, do not prevent the National Park Service from fulfilling the park's purpose or result in impairment of park resources. Additionally, the selected action will not unreasonably interfere with park programs or activities, including tours and special events; with other appropriate uses; with the overall atmosphere of peace and tranquility; with the natural soundscape; or with NPS concessioner or contractor operations. Therefore, the selected action will not cause impairment of, or unacceptable impacts to, the park's resources or visitor experience.

Add.29

# References

Department of the Interior
2025    U.S. Department of the Interior Handbook of National Environmental Policy Act
        Implementing Procedures. 516 DM 1.

National Park Service (NPS)
1997    National Register of Historic Places: Nomination for L'Enfant Plan of the City of
        Washington, DC

2000    Comprehensive Design Plan: The White House & President's Park, Washington, DC
        United States Department of the Interior

2006    Management Policies. US Department of the Interior, Washington, DC

2014    Foundation Document. The White House and President's Park.
        https://www.nps.gov/whho/learn/management/prpa-foundation-document.htm.
        Accessed August 6, 2025.

2025    Revised Guidance for Non-Impairment Determinations and the National Environmental
        Policy Act Process Memorandum. April 2025.

United States Congress
1961    Public Law 87-286: Concerning the White House and providing for the care and
        preservation of its historic and artistic contents. Enabling Legislation. U.S. Government
        Printing Office.

Add.30

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

       Plaintiff,

    v.

NATIONAL PARK SERVICE, *et al.*,

       Defendants.

Case No. 1:25-cv-04316-RJL

**DECLARATION OF JOHN STANWICH, NATIONAL
<u>PARK SERVICE LIAISON TO THE WHITE HOUSE</u>**

I, John Stanwich declare as follows:

1. I am the National Park Service ("NPS") Liaison to the White House. I have been in this position for approximately 11 years. Prior to that time, I served as the Deputy NPS Liaison to the White House for approximately 5 years. I have been employed by NPS since 1992. In my current position, I report to the Deputy Regional Director of the NPS National Capital Region ("NCR").

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. As NPS Liaison to the White House, I supervise approximately 60 employees and oversee NPS daily operations at the White House and President's Park ("the Park") as well as at the White House Visitor Center and the Executive Support Facility. I function as and have the line authority of a park superintendent, but, due to the unique nature of the Park, I also have additional responsibilities of coordinating with other executive branch entities that have responsibilities in and around the Park. My role also includes

1
Add.31

planning for and executing major national events such as Presidential Inaugurations, the National Christmas Tree Lighting, and the White House Easter Egg Roll.

4. The Park is an administrative unit within the National Park System comprised of the White House, Lafayette Park, Sherman Park, the First Division Monument, and the Ellipse. The Park is unique within the National Park System in that it serves as a private residence, the seat of the executive branch of the U.S. government, a military installation, a museum, and a public park.

5. In my role as NPS Liaison at the White House I regularly meet and coordinate with representatives of several federal entities with responsibilities in and around the Park including: the Office of Administration, Executive Office of the President; the Executive Residence at the White House ("Executive Residence"); the White House Curator's Office; the National Capital Region of the U.S. General Services Administration; the U.S. Secret Service; and the White House Military Office. I also perform on-site oversight of NPS activities in and around the Park and am present on site on a daily or near daily basis.

6. As the home of presidents, the White House must serve the needs of the presidential family, just as any American home serves its occupants. Additionally, the White House must serve the president as the location for official and ceremonial functions. In my role as NPS Liaison to the White House, I coordinate closely with the Executive Residence at the White House, within the Executive Office of the President to provide NPS support for day-to-day official activities at the White House, to ensure that NPS's maintenance and preservation activities on site do not interfere with planned official functions, and to support the White House tour program. The Executive Residence at the White House

2

Add.32

provides for the use of the White House and its grounds as the official home of the President and his family, supports the official ceremonial functions of the President, and works with the NPS and other entities to promote the preservation and public appreciation of the White House and its contents.

7.   The White House currently lacks a secure event space to host large events, such as State Dinners. To accommodate such events, large tents are typically erected on the South Lawn of the White House. In the past, these tents have caused substantial damage to NPS resources on the grounds, particularly the turf, which then must be repaired or remediated by NPS. The use of stakes to secure these tents also risks damaging irrigation systems and other NPS infrastructure elements on the ground.

8.   The Executive Residence is managing the White House East Wing Modernization and State Ballroom Project ("the Project"), which requires extensive coordination with not only NPS, but also with other government entities with management responsibilities in and around the Park. Members of my staff and I have been closely coordinating with staff at the Executive Residence and supporting the Project since early spring 2025. I have personally attended, and continue to attend, coordination and planning meetings, and I personally observe activity on site in the performance of my official duties. I, or members of my staff, also attend weekly meetings with the general contractor engaged by the Executive Residence at the White House for the Project, Clark Construction, that provide regular updates on the Project's status, identify potential issues that arise in connection with the Project, and resolve those issues. Since the selection of Shalom Baranes Associates as the Project architect, representatives of Shalom Baranes Associates have also attended these meetings.

3

Add.33

9. On August 18, 2025, I signed a Categorical Exclusion Documentation Form to document compliance with the National Environmental Policy Act ("NEPA") for NPS activities on site in anticipation of the commencement of construction activities, including removal of museum objects from the White House and East Wing, limited relocation of trees and shrubs, and survey and historic documentation actions at the White House. A copy of this Form is attached to this Declaration as Exhibit A, and available online on the NPS's Planning, Environment & Public Comment ("PEPC") website at [ParkPlanning - White House East Wing Modernization and State Ballroom Environmental Assessment](#).

10. The Park's enabling legislation, Public Law 87-286, expressly addresses the management of artifacts and stipulates that furniture, fixtures, and decorative objects declared by the President to be of historic or artistic interest shall be considered inalienable and property of the White House. Pub. L. No. 87-286 (1961). Items not currently in use or on display are curated or stored at the NPS's Executive Support Facility and may be returned to the White House when required. NPS routinely transfers museum objects and other materials from the Executive Support Facility to the White House for use or display there and removes such objects from the White House for storage or curation at the Executive Support Facility.

11. The Executive Support Facility is an off-site facility that houses utilitarian property for use at the White House, as well as parts of the White House historical collection not in use and other artifacts.

12. In late August 2025 through September 2025, I and members of my staff coordinated closely with the White House Curator's Office to identify and remove museum objects, including paintings and historic furniture, from the East Wing, East Colonnade, and the

4

Add.34

Ground Floor State Rooms of the White House to be stored or curated at the Executive Support Facility.

13. NPS's Heritage Documentation Programs completed Historic American Building Survey ("HABS") documentation of the East and East Colonnade in late August 2025, including 3D/LIDAR scanning and photo documentation. NPS's Heritage Documentation Programs, including HABS, document historic sites and structures across the United States through the creation of measured drawings, large-format photographs, and historical reports. NPS's Heritage Documentation Programs are prepared to provide ongoing photographic documentation during the construction process to document the Project for posterity.

14. The Executive Residence and the office of the White House Curator also performed similar documentation including photography and 3D scanning to create a digital twin of the East Wing and East Colonnade spaces for future preservation and interpretive purposes.

15. During summer 2025, my staff and I worked closely with Clark Construction to identify and plan to preserve historic building elements. Beginning in late-August 2025 through early-October 2025, Clark Construction performed historic preservation work salvaging historic materials within the East Wing and East Colonnade. Clark Construction removed and is storing the stone columns, doors, and other items that are planned to be reincorporated into the new facility. In addition to museum objects, NPS is also storing historic items removed from the East Wing and East Colonnade by Clark Construction, including the East Wing cornerstone and plaque, historic fencing, historic windows, light fixtures, and the IM Pei-designed pergola from the East Garden.

Add.35

16.  I have been informed that abatement activities related to certain hazardous materials within the Project area were performed by Clark Construction during the months of September and October 2025. After Clark Construction completed the planned historic preservation work and abatement activities, structural demolition of the East Wing and East Colonnade commenced on October 20, 2025.

17. On November 6, 2025, members of NPS Cultural Resources Planning and Science directorate visited the East Colonnade to consult with Clark Construction and review plans regarding the removal of the portion of the East Colonnade immediately abutting the Executive Mansion. Substantial care and consideration was given to ensure that the removal of this last portion of the East Colonnade did not harm the Executive Mansion and that the vibrations from construction activity were monitored so that the deconstruction effort did not impact the artifacts and objects inside the Executive Mansion. Removal of this portion of the East Colonnade was completed on November 21, 2025.

18.  The White House tour program, which NPS supports in furtherance of its mission for the Park, was suspended on August 30, 2025 to accommodate on-site Project activities. The tour program resumed on December 2, 2025. Prior to the resumption of tour activities, a need was identified to install a temporary modular pavilion and walkway on the North Grounds of the White House to provide an entryway for guests and to house restroom and coat check facilities that will likely otherwise be unavailable until the Project is complete. On November 20, 2025, I signed a Categorical Exclusion Documentation Form to document compliance with NEPA for the installation of this temporary tour facility, a

Add.36

copy of which is attached to this Declaration as Exhibit B, and available online on the Project's PEPC page.

19. As of December 5, 2025 above grade structural demolition of the East Wing and East Colonnade has been completed by Clark Construction. Below grade structural demolition has begun and is expected to be completed during December 2025. Below grade excavation activities throughout the site continue.

20. At present, I anticipate that Clark Construction will commence work on the footings and below-grade structural concrete in the East Colonnade area in January and in the East Wing area in February. Above grade structural work is not anticipated to begin until April 2026, at the earliest.

21. The architectural design for the above grade elements is still in progress but has been coordinated in a manner to allow the below grade elements to be constructed as planned while the above grade design is finalized.

22. I am coordinating with the Executive Residence and staff at the NPS National Capital Region on submitting materials regarding the Project to the National Capital Planning Commission. I understand that the Executive Office of the President intends to engage with the U.S. Commission on Fine Arts at its discretion when the Commission has a quorum and that plans are underway to appoint new members to the U.S. Commission on Fine Arts. The NPS will provide whatever support is needed to advance these efforts.

23. Due to the impacts of the Project, spaces that were previously included in tours of the White house are occupied by staff as office spaces, including the Vermeil Room, the China Room and the Library, and thus no longer included in tours. Until the Project is complete, Park visitors will not have the opportunity to enjoy and benefit from seeing

Add.37

historic items in their historic context, such as the White House China Collection in the China Room. Additionally, the East Colonnade, which will be reconstructed as part of the Project, provided opportunities for Park visitors to view the South Lawn and its gardens. If progress on the Project were halted, this would prolong these impacts to the experiences of Park visitors.

24. I have also been informed that the below-grade waterproofing and structural concrete work that will be occurring over the next four months is critical to bringing the temporary construction state of the site into a more permanent condition, particularly in areas where the existing-to-remain elements have been temporarily exposed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 15, 2025.

Digitally signed by JOHN
STANWICH
Date: 2025.12.15 15:33:48 -05'00'

John Stanwich

8

Add.38

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES, <br>         Plaintiff, <br><br>   v. <br><br> NATIONAL PARK SERVICE, *et al.*, <br><br>         Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Case No. 25-4316 (RJL) |

## MEMORANDUM ORDER
December 17, 2025 [Dkt. #2]

This matter comes before the Court on plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction [Dkt. #2]. For the reasons set forth below, I will **DENY** plaintiff's motion for a temporary restraining order and **DEFER** judgment on plaintiff's motion for a preliminary injunction until after the Court has held its hearing in January.

A temporary restraining order ("TRO") is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Its purpose is to "preserve the relative positions of the parties" pending a merits decision. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). To obtain a TRO, the plaintiff must show "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the TRO

1

Add.39

were not granted, (3) that the TRO would not substantially injure other interested parties, and (4) that the public interest would be furthered by the TRO." *Am. Foreign Serv. Ass'n v. Trump*, 766 F. Supp. 3d 25, 28 (D.D.C. 2025) (cleaned up).

Here, plaintiff has not demonstrated "a clear and present need for equitable relief to prevent irreparable harm" before this Court can consider plaintiff's motion for a preliminary injunction. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (internal quotation marks omitted). Plaintiff points to both the procedural harm of being denied participation in the review process for the proposed ballroom and the aesthetic (as well as historic and cultural) harm of an expansive ballroom overshadowing the White House. But bare procedural injury, standing alone, is insufficient to demonstrate irreparable harm. *See, e.g., Manzanita Band of Kumeyaay Nation v. Wolf*, 496 F. Supp. 3d 257, 268–69 (D.D.C. 2020); *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017). Further, the Government has committed to commencing the consultation processes with the National Capital Planning Commission ("NCPC") and the Commission of Fine Arts ("CFA") by the end of the month. The Court will hold the Government to its word.

As for plaintiff's claims of aesthetic harm, I find that plaintiff has not yet demonstrated that such harm is "certain, great, actual, imminent, and beyond remediation." *Fisheries*, 236 F. Supp. 3d at 337. While below-grade demolition and excavation at the East Wing are ongoing, the Government has represented that below-grade structural work—*i.e.*, "footings and below-grade structural concrete"—will not begin until January 2026 for the colonnade and February 2026 for the ballroom. Decl. of John Stanwich [Dkt.

2

Add.40

#14-6] ¶¶ 19–20.  And at yesterday's hearing, the Government represented that nothing about the ballroom has been finalized, including its size and scale.  Based on those representations, there is no sufficiently imminent risk of irreparable aesthetic harm warranting a temporary restraining order halting construction over the next fourteen days.  *See* Fed. R. Civ. P. 65(b)(2).

Indeed, because plaintiff has not made a sufficient showing of irreparable harm, I may deny "the motion for injunctive relief without considering the other factors." *Fisheries*, 236 F. Supp. 3d at 336.  Accordingly, I reserve judgment as to plaintiff's likelihood of success on the merits and the balance of the equities.  And I reserve judgment on whether plaintiff may be able to show irreparable harm at the preliminary injunction stage.

Finally, the Court takes seriously the Government's representations that its plans are not yet final, that it will commence consultations with the NCPC and CFA by the end of this month, and that no above-grade construction will take place before April 2026.  If there *is* any below-grade construction that dictates the size or scale of the proposed ballroom *before* the Court can act on plaintiff's motion for a preliminary injunction, then the Government should be prepared to take it down depending on the Court's resolution of the merits of this case.

Accordingly, it is hereby

**ORDERED** that plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction [Dkt. #2] is **DENIED** in part (insofar as it seeks a temporary

Add.41

restraining order) and **DEFERRED** in part (insofar as it seeks a preliminary injunction); and it is further

**ORDERED** that a hearing on plaintiff's motion for a preliminary injunction is set for January 15, 2026 at 3:30 PM in Courtroom 18 (In Person); and it is further

**ORDERED** that plaintiff shall file a supplemental brief in support of its motion for a preliminary injunction by December 29, 2025; defendants shall file a response by January 8, 2026; and plaintiff shall file a reply brief by January 12, 2026; and it is further

**ORDERED** that the parties shall address the following questions in their briefs, along with any other issues the parties wish to raise:

- Whether and to what extent, past Presidents have obtained congressional authorization and/or regulatory approval for construction and modifications to the White House structure and grounds.

- Whether the President has independent constitutional and/or statutory authority to construct a ballroom on White House grounds.

- Whether the entities directing the ballroom construction, including the Office of the Executive Residence, are "agencies" within the meaning of the Administrative Procedure Act.

**SO ORDERED**.

RICHARD J. LEON
United States District Judge

4

Add.42

USCA Case #26-5101   Document #2167119   Filed: 04/03/2026   Page 78 of 162

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

        Plaintiff,

        v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

Case No. 1:25-cv-04316-RJL

**DECLARATION OF JOSHUA FISHER, DIRECTOR FOR WHITE HOUSE
MANAGEMENT AND ADMINISTRATION**

I, Joshua Fisher declare as follows:

1. I am an Assistant to the President, a Presidentially Commissioned Officer. In addition, I am the Director for White House Management and Administration ("M&A") and the Director of the Office of Administration ("OA").

2. I have personal knowledge of all the facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. In my position as Director of M&A, the President of the United States has delegated to me all authorities required to accomplish the mission of the White House and the White House Executive Residence. I am specifically responsible for certifying expenditures for the operation and maintenance of the Executive Residence at the White House ("EXR") on behalf of the President of the United States pursuant to 3 U.S.C. §§ 103 and 105(d). As the Director of OA, I am also the "head of the agency" for the Executive Office of the President ("EOP") solely for the purpose of carrying out the functions of a Chief Financial Officer as described in 31 U.S.C. § 902, which include, among other things,

Add.43

USCA Case #26-5101    Document #2167119    Filed: 04/03/2026    Page 79 of 162

overseeing all financial management activities relating to programs and operations of the EOP.

4. In addition, I am responsible for managing the East Wing Modernization Project ("the Project") on behalf of the President of the United States. In this role, I meet regularly with the President, federal officials within the EXR Chief Usher's Office, the United States Secret Service ("USSS"), the National Park Service ("NPS"), and other agencies, as well as contractors, architects, and engineers associated with the Project.

5. The Comprehensive Design Plan for the White House and President's Park (2000) identified the need for expanded event space to address growing visitor demand and provide a venue suitable for significant events. Successive administrations have recognized this need as an ongoing priority. To meet this need, EOP outlined three functional goals for any permanent event space: (1) immediate adjacency to the White House Executive Mansion; (2) a direct ceremonial procession from the East Room into the venue; and (3) enclosed second-story access from the Executive Mansion. Exhibit A, Comprehensive Design Plan for the White House and President's Park.

6. The President directed me to initiate a project to implement those and many other longstanding goals important to him and various other entities within the United States Government. Some of those additional goals included: (1) carrying out significant Secret Service upgrades to meet current protection requirements for the President and First Family; (2) creating a cohesive modern infrastructure for the White House to correct the network of fragmented, incompatible, and obsolete systems that remained after decades of incremental, uncoordinated projects that were never comprehensively integrated into a unified system; (3) reducing degradation of the Executive Mansion's historic structure

caused by hosting events larger and more frequently than it was structurally designed for; (4) enhancing the overall visitor experience of all guests to the White House and park grounds; (5) reducing costs and negative impacts to the White House grounds, including to the sod on the South Lawn, associated with the use of temporary structures to compensate for the lack of adequate event space; and (6) providing the First Lady and her staff with an office space that meets all modern life-safety requirements, such as ensuring there are two methods of egress from the building from each office space.

7. Given EXR's mission to directly support the President's management of the Executive Mansion and its substantial expertise in (1) preservation and maintenance of the White House structure and its historical contents; and (2) providing for the use of the White House for official ceremonial purposes as well as the private home of the President, the President determined that he would manage the Project through EXR. With its unique position within the White House complex, EXR is also best-positioned to coordinate with other agencies (such as the USSS and NPS) that have equities affected by the Project.

8. Accordingly, EXR is the entity responsible for developing contractual requirements, contracting for, and managing the Project at the direction of the President. To date, EXR is the signatory on all contracts associated with the Project.

9. Prior to executing on the President's directives, I met with EXR, USSS, NPS, and other government agencies to evaluate all options for implementing the President's goal of establishing a modernized East Wing facility. Each of the stakeholders identified various issues within the Executive Mansion and the East Wing that had been discovered over their many years of service to the White House. We then used this information to contact and work with various contractors, architects, historians, and engineers to assess those

Add.45

issues and the various options for resolving them as part of the Project. The issues identified by these agencies included the need to: (1) provide a safe and secure facility for the President and world leaders to meet while minimizing impacts to the public, including reducing road and park closures associated with the use of temporary tent structures; (2) address the aging and structurally unstable East Wing colonnade roof along with insufficient foundation and underpinning support to execute required structural upgrades; (3) address ongoing substructure water infiltration that has caused progressive deterioration and corrosion of structural components; (4) update roof systems on the East Wing that had exceeded their service life, causing chronic water intrusion, substructure leaks, and accelerated deterioration of structural and historic elements; (5) eliminate mold contamination that resulted from persistent moisture; (6) update obsolete electrical infrastructure that was undersized and non-compliant with current code, which increased fire risks and the likelihood of operational failure; (7) replace aging, inefficient, and unreliable steam and mechanical systems that support the Executive Mansion and continuous critical missions; (8) come into compliance with Americans with Disability Act requirements as well as other life-safety requirements; and (9) remove toxic substances spread throughout the structure, including asbestos and lead based paint.

10. After careful consideration of the President's goals identified in Paragraph 6 and the issues identified in Paragraph 9, EXR determined that, based on a cost analysis, demolition of the existing East Wing structure and reconstruction of a new East Wing provided the lowest total cost of ownership and the most effective long-term risk reduction.

USCA Case #26-5101    Document #2167119    Filed: 04/03/2026    Page 82 of 162

11. EXR also carefully considered the views of the White House complex throughout the design process. A primary goal of the Project has been to maintain the visual primacy of the Executive Mansion and to ensure that the East Wing remains minimally visible from public spaces. Based on existing geographical features on the White House grounds, EXR does not expect public views of the East Wing to significantly change. In particular:

A. Views from the South fence of the White House lawn will not be significantly affected due to the "Jefferson mounds" – graded areas of the South lawn - and trees that frame the Executive Mansion and cover the West Wing and East Wing. It is possible that the uppermost point of the new south portico roof of the East Wing may be visible above the treetops.

B. Views from the North fence of the primary north façade of the East Wing will be largely obscured by trees. In the winter months, with the deciduous trees having lost their foliage, portions of the north façade will be visible through the trees.

C. The west views and principal north and south views from the White House will not be affected. The east views from the central White House Executive Mansion to the Treasury will be replaced by views of the western elevation of the new East Wing.

D. Several stands of trees are located between the Decatur House and the White House complex. Given the locations of these trees and the distance between the Decatur House and the White House, my understanding is that the East Wing will not alter existing views of the White House complex from the Decatur House.

12. Donated funds received by NPS pursuant to NPS's gift authority are being transferred to the White House Repair and Restoration Account pursuant to the Economy Act, 31

Add.47

USCA Case #26-5101    Document #2167119    Filed: 04/03/2026    Page 83 of 162

U.S.C. § 1535 to fund this Project and supplement the Executive Mansion's annual allowance appropriated pursuant to 3 U.S.C. § 105(d).

13. My understanding is that the final design for the Project is still under development, and is the subject of ongoing discussions between the President, the architect, and the relevant contractors.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 14, 2026.

Joshua Fisher

Add.48

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

       Plaintiff,

  v.

NATIONAL PARK SERVICE, *et al.*,

       Defendants.

Case No. 1:25-cv-04316-RJL

**SUPPLEMENTAL DECLARATION OF JESSICA BOWRON, COMPTROLLER OF
THE NATIONAL PARK SERVICE EXCERCISING THE DELEGATED
AUTHORITY OF THE DIRECTOR OF THE NATIONAL PARK SERVICE**

I, Jessica Bowron, declare as follows:

1. I am the Comptroller for the National Park Service ("NPS") and am exercising the delegated authority of the Director of the NPS pursuant to a January 20, 2025 delegation of that authority from the Acting Secretary of the Interior, and subsequent extensions of that authority by the Secretary of the Interior. I have been employed by NPS since 2007 and have served as NPS Comptroller since 2017.

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. In my current position as Comptroller, Exercising the Delegated Authority of the Director of the NPS, I oversee the management and operation of all units within the National Park System nationwide, as well as all NPS programs, NPS directorates, and regional offices. The White House and President's Park ("the Park") is an administrative unit within the National Park System in the NPS National Capital Region ("NCR") comprised of the

1

Add.49

White House, Lafayette Park, Sherman Park, the First Division Monument, and the Ellipse.

4. NPS's mission is to preserve unimpaired the natural and cultural resources and values of the National Park System for the enjoyment, education, and inspiration of this and future generations.

5. Under the NPS Organic Act of 1916, NPS was authorized to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101. This authority generally extends to historic preservation and construction activities at individual park units in furtherance of the purpose of the park unit at issue.

6. The NPS Organic Act also authorizes NPS to accept donations, including "patented land, rights-of-way over patented land or other land, buildings, or other property within a [National Park] System unit" and "money that may be donated for the purposes of the System." 54 U.S.C. § 101101.

7. In 1961, Congress enacted the Park's enabling legislation and directed that the President's Park enclosure, which includes the White House, its wings, the grounds within the White House fence and facilities located on those grounds, be administered pursuant to the NPS Organic Act, Pub. L. No. 87-286 (1961). Congress directed that in carrying out NPS's responsibilities, "primary attention shall be given to the reservation and interpretation of the museum character of the principal corridor on the ground floor

and principal public rooms on the first floor of the White House." *Id.* However, Congress further directed that "nothing done under [the Park's enabling legislation] shall conflict with the administration of the Executive offices of the President or with the use and occupancy of the buildings and grounds as the home of the President and his family and for his official purposes." *Id.*

8.  In my current position, I have been and continue to be regularly briefed by John Stanwich, the NPS Liaison to the White House, and members of the Park's staff regarding the East Wing Modernization project ("the Project"), the purpose of which is to establish a permanent, secure event space within the White House grounds that meets presidential priorities for capacity and dignified official functions and eliminates reliance on temporary tents and associated infrastructure strains.

9.  The Project is intended to meet the functional goals and operational needs of the Executive Office of the President ("EOP"). NPS determined that the Project was consistent with the Park's enabling legislation.  Pub. L. 87-286. The Project will directly benefit the American people in a number of ways, including by: (1) expanding the White House's ability to host large indoor events; (2) reducing reliance on large tents that damage turf and infrastructure and necessitate costly repairs; (3) celebrating America's history through new interpretive opportunities; (4) maintaining public access to key interpretive areas and ensuring preservation of the museum character of the principal ground floor corridor and State Floor public rooms of the White House; and (5) creating a symbolic space for events of national importance, reinforcing shared civic identity and pride.

Add.51

10. The Executive Residence at the White House ("EXR") has unique expertise in fulfilling the operational needs of the President and providing for the use of the White House for official ceremonial purposes as well as the President's home. EXR is also best positioned to coordinate with all agencies that have equities in the White House that may be affected by the Project. Accordingly, NPS determined that it was in the best interests of the United States for EXR to contract for and directly manage the Project.

11. EXR is therefore handling project management for the Project, meaning that it is in control of all aspects of the day-to-day execution of the Project, including its scope, schedule, budget, design, and completion. However, EXR is coordinating with NPS staff regarding the Project, in particular with respect to potential impacts on NPS operations at the White House.

12. Pursuant to NPS's donation acceptance authority, 54 U.S.C. § 101101, on November 13, 2025, the agency accepted a private donation for the Project.

13. Pursuant to the Economy Act, 31 U.S.C. § 1535, and for the reasons articulated in Paragraphs 9 and 10 above, on November 17, 2025, NPS entered into a reimbursable agreement with EXR under which the donated funds were transferred to EXR to fund the Project.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 15, 2026.

JESSICA BOWRON  Digitally signed by JESSICA BOWRON
Date: 2026.01.15 12:02:57 -05'00'

_____

Jessica Bowron

4

Add.52

USCA Case #26-5101    Document #2167119    Filed: 04/03/2026    Page 88 of 162

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

       Plaintiff,

       v.

NATIONAL PARK SERVICE, *et al.*,

       Defendants.

Case No. 1:25-cv-04316-RJL

## DECLARATION OF U.S. SECRET SERVICE
## DEPUTY DIRECTOR MATTHEW C. QUINN

I, Matthew C. Quinn declare as follows:

1. I am the Deputy Director of the United States Secret Service (Secret Service).

2. I previously submitted a declaration in this matter, filed on December 15, 2025 ("the Prior Declaration") (Dkt. No. 14-11). The Prior Declaration is incorporated herein by reference. Except as expressly stated below, to the best of my knowledge the statements contained in the Prior Declaration remain true and correct.

3. This declaration is submitted for the limited purpose of updating the Court regarding the status of security-related projects at the White House Complex.

4. Since the filing of the Prior Declaration, the East Wing Project contractor has made progress on certain elements of the security infrastructure and security projects referenced in the Prior Declaration. *Id.* ¶ 8.

5. While additional efforts are ongoing, crucial security projects remain incomplete. These outstanding security projects are expected to require additional weeks or months to complete.

1

Add.53

USCA Case #26-5101    Document #2167119    Filed: 04/03/2026    Page 89 of 162

6. Continued construction work is therefore necessary to maintain and update the security infrastructure of the project site and the White House Complex. For example, continued waterproofing and water management is necessary to maintain the integrity of security elements throughout the Complex as flooding poses risks to infrastructure, utilities, and other critical systems.

7. Until this remaining work is completed, Secret Service's ability to meet its statutory mission of protecting the President, the First Family, and the White House Complex continues to be hampered.

8. In addition, the current open construction site is, in and of itself, a coordinated and managed safety hazard and adds additional challenges to Secret Service operations. For example, the site requires the Secret Service to redirect resources to account for the disruption to existing security procedures caused by construction activities.

9. More broadly, the construction of a new East Wing is beneficial to the long-term security of the President (both current and future) and the White House Complex as a whole. The former East Wing was outdated in terms of security and support for Secret Service operations, and its modernization to today's technological standards will enable the Secret Service to more effectively achieve its protective mission.

10. As an additional example, due to size and infrastructure constraints with the previous East Wing building, tents were often set up on the South Grounds of the White House Complex to host larger events. This process limited screening space and types of security equipment, and the measures necessary to secure the outdoor area were numerous and costly, both in terms of expense and personnel resources. Additionally, these larger events relied on a temporary visitor screening trailer that, due to space and infrastructure

Add.54

USCA Case #26-5101    Document #2167119    Filed: 04/03/2026    Page 90 of 162

constraints, resulted in a lower throughput of guests and prevented the Secret Service from using the most advanced screening equipment available. Having permanent, updated, and secure structures for screening guests and hosting events will obviate the need to use outdoor tents and the temporary screening building for future events and will also increase the safety and security of all attendees at those events, including the President and foreign leaders and dignitaries.

11. As stated in the Prior Declaration, should the Court request it, the Secret Service is prepared to provide more details, including law enforcement sensitive and/or classified information, in an appropriate setting, such as a classified declaration available for *in camera* review.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 15, 2026.

Matthew C. Quinn
Deputy Director
United States Secret Service

Add.55

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES, <br>       Plaintiff, <br><br>     v. <br><br> NATIONAL PARK SERVICE, *et al.*, <br><br>       Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Case No. 25-4316 (RJL) |

**MEMORANDUM OPINION**
February 26, 2026 [Dkt. #2]

The National Trust for Historic Preservation in the United States ("Plaintiff" or "the National Trust") challenges the President's authority to destruct and construct the East Wing of the White House without the prior approval of Congress and with private funds. Plaintiff bases its challenge on a ragtag group of theories under the Administrative Procedure Act ("APA") and the Constitution. The President, not surprisingly, disagrees, claiming that the White House is not covered by the APA and that his authority is statutory in nature, not constitutional.

Unfortunately for Plaintiff, its challenge fails because the White House office in question is not an "agency" under the APA and because Plaintiff did not bring the *ultra vires* claim necessary to challenge the President's statutory authority to complete his construction project with private funds and without congressional approval!

1

Add.56

As such, unless and until Plaintiff amends its existing complaint to include the necessary *ultra vires* claim, the Court cannot address the merits of the novel and weighty issues raised by this statutory challenge, and Plaintiff's motion for a preliminary injunction must therefore be **DENIED**.

FACTUAL AND PROCEDURAL BACKGROUND

## I.    The White House Ballroom Project

The White House is the official residence of the President. Am. Compl. [Dkt. #19] ¶ 25. It is part of President's Park, which is a federal park administered by the National Park Service. *Id.* The White House is flanked by the East and West Wings. *Id.* ¶ 30. Before its demolition in October 2025, the East Wing housed the offices of the First Lady and contained a small theater. *Id.* ¶¶ 30–33, 64.

On July 31, 2025, the White House issued a press release announcing plans for a "White House State Ballroom." *Id.* ¶ 36; *see also* Ex. J to Mot. for TRO & Prelim. Inj. [Dkt. #2-14]. According to the press release, the ballroom would be "approximately 90,000 total square feet," "substantially separated from the main building of the White House," and located on the site of the "small, heavily changed, and reconstructed East Wing." Ex. J. The press release indicated that the President was "fully committed to working with the appropriate organizations to preserving [sic] the special history of the White House," and that the President had "held several meetings with members of the White House Staff, the National Park Service, the White House Military Office, and the United States Secret Service to discuss design features and planning." *Id.*

2

Add.57

On October 20, 2025—without advance notice—President Trump posted on social media that "ground ha[d] been broken on the White House grounds to build the new, big, beautiful White House Ballroom." Am. Compl. ¶ 51. On October 21, media outlets reported that heavy machinery was tearing down the East Wing. *Id.* ¶ 53. The entire East Wing was demolished over the next few days. *Id.* ¶ 64.

The site of the former East Wing is now "a bustling project site," with "heavy construction machinery" and a "construction crane" present. *Id.* ¶¶ 78, 81. Defendants have indicated that "work on the footings and below-grade structural concrete" will commence "in the East Wing area in February." Decl. of John Stanwich ("Stanwich Decl.") [Dkt. #14-6] ¶ 20. "Above grade structural work is not anticipated to begin until April 2026, at the earliest." *Id.*

## II.    The National Trust for Historic Preservation in the United States

The National Trust is a private, charitable, educational non-profit chartered by Congress. Am. Compl. ¶ 4. Its purpose "is to further the historic preservation policy of the United States and to promote the public's awareness of and ability to comment on any activity that might damage or destroy our nation's architectural heritage." *Id.* The National Trust "stewards twenty-seven historic sites" and "takes legal action to protect threatened sites where necessary." *Id.* ¶ 21. The National Trust "has thousands of members," who "use, enjoy, derive personal and professional benefit from, and have a substantial interest in preserving and protecting historic and cultural resources in Washington, D.C." *Id.* ¶ 22.

After the demolition of the East Wing, the National Trust contacted the National Park Service, the National Capital Planning Commission, and the Commission of Fine Arts

3

Add.58

expressing concerns about the "massing and height of the proposed new construction." *Id.* ¶¶ 54–55. The National Trust wrote that the ballroom could "permanently disrupt the carefully balanced classical design of the White House with its two smaller, and lower, East and West Wings." *Id.* ¶ 55. The National Trust "urge[d] the Administration and the National Park Service to pause demolition until plans for the proposed ballroom [go] through the legally required public review process." *Id.* ¶ 56. Curiously, the National Trust "received no response." *Id.* ¶ 57.

## III.   This Lawsuit

On December 12, 2025, the National Trust sued the National Park Service and its Acting Director, the Superintendent of the White House and President's Park, the Department of the Interior, the Secretary of the Interior, the General Services Administration, the Acting Administrator of the General Services Administration, and the President ("Defendants"). *See* Compl. [Dkt. #1]. The National Trust brought claims under the Administrative Procedure Act ("APA") and the Constitution, alleging that Defendants had failed to consult with the National Capital Planning Commission and the Commission of Fine Arts, comply with the National Environmental Policy Act ("NEPA"), and obtain congressional authorization for the ballroom. *See id.* ¶¶ 105–69. The National Trust moved for a temporary restraining order and preliminary injunction halting construction of the ballroom. Mot. for TRO & Prelim. Inj. [Dkt. #2].

On December 15, 2025, Defendants filed their opposition brief. *See* Mem. in Opp'n to Mot. for TRO & Prelim. Inj. ("Defs.' Opp'n") [Dkt. #15-1]. Defendants argued that the "President possesses statutory authority to modify the structure of his residence, and that

authority is supported by background principles of Executive power." *Id.* at 2. Defendants indicated that consultations with the National Capital Planning Commission and the Commission of Fine Arts would "soon be underway." *Id.* Defendants attached a previously-unpublished Environmental Assessment and Finding of No Significant Impact and argued that these documents satisfied their procedural obligations under NEPA. *See* Defs.' Opp'n at 20–21; Ex. 1A to Defs.' Opp'n [Dkt. #14-2]; Ex. 1B to Defs.' Opp'n [Dkt. #14-3]. And Defendants indicated that the ballroom construction was "now proceeding under the leadership of the Office of the Executive Residence." Defs.' Opp'n at 6.

On December 16, 2025, I held a hearing on the National Trust's motion for a temporary restraining order. *See* Dec. 16, 2025 Hr'g Tr. [Dkt. #18]. The following day, I denied the National Trust's motion for lack of "irreparable harm before this Court can consider plaintiff's motion for a preliminary injunction." *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, __ F. Supp. 3d __, 2025 WL 3672837, at *1 (D.D.C. Dec. 17, 2025) (internal quotation marks omitted). I deferred my decision on the National Trust's motion for a preliminary injunction and ordered the parties to submit supplemental briefs addressing the following questions: "[1] Whether and to what extent, past Presidents have obtained congressional authorization and/or regulatory approval for construction and modifications to the White House structure and grounds. [2] Whether the President has independent constitutional and/or statutory authority to construct a ballroom on White House grounds. [3] Whether the entities directing the ballroom construction, including the Office of the Executive Residence, are 'agencies' within the meaning of the Administrative Procedure Act." *Id.* at *2.

Add.60

On December 29, 2025, the National Trust filed an amended complaint, *see* Am. Compl., and its supplemental brief in support of its motion for a preliminary injunction, *see* Suppl. Mem. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Suppl. Br.") [Dkt. #20]. The National Trust added the Executive Office of the President, the White House Chief of Staff, the Office of the Executive Residence, and the White House Chief Usher as Defendants, and added a new claim alleging that placing responsibility for the ballroom with the Office of the Executive Residence violated the separation of powers. *See* Am. Compl. ¶¶ 17–20, 188–96.

On January 15, 2026, Defendants filed their supplemental brief. Defs.' Suppl. Resp. Br. in Opp'n to Pl.'s Mot. for a Prelim. Inj. ("Defs.' Suppl. Br.") [Dkt. #30]. In it, Defendants for the first time *disclaimed* the President's constitutional authority to build the ballroom and instead rested entirely on certain statutory authority! *Id.* at 12, 30. On January 20, the National Trust filed its reply brief ("Pl.'s Reply") [Dkt. #33], and on January 22, I held a hearing on the National Trust's motion for a preliminary injunction. *See* Jan. 22, 2026 Hr'g Tr. [Dkt. #38].

### LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

6

Add.61

## ANALYSIS

### I.    Subject-Matter Jurisdiction

"[A] federal court generally may not rule on the merits of a case without first determining that it has" "subject-matter jurisdiction." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 93–102 (1998)). Before reaching the parties' substantive arguments about the APA and the Constitution, therefore, this Court must decide whether the National Trust has established a "substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). For the following reasons, I conclude that it has done so.

To establish standing to sue, a plaintiff must show (1) it has "suffered an injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) the injury is "likely" to "be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). As an organization, the National Trust "can assert standing on its own behalf, on behalf of its members or both." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011).

The standing inquiry here begins and ends with associational standing.[1] "[A]n association has standing to bring suit on behalf of its members when: (a) its members would

---

[1] The National Trust also argues for organizational standing. *See* Mem. in Supp. of Mot. for TRO & Prelim. Inj. [Dkt. #2-1] at 36; Pl.'s Reply at 2–4; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982). Because I conclude that the National Trust has adequately demonstrated associational standing, I need not address the parties' organizational standing arguments at this time.

7

otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

To satisfy the first element, the National Trust must show that "at least one of its members" has suffered an "actual or imminent" "injury-in-fact" that is "fairly traceable to the challenged action" and "likely" to "be redressed by a favorable decision." *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016) (internal quotation marks omitted) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

To do so, the National Trust relies on a declaration from Alison K. Hoagland, a Washington, D.C.-based professor of history and historic preservation and member of the National Trust. *See* Decl. of Alison K. Hoagland ("Hoagland Decl.") [Dkt. #2-3] ¶¶ 2–4. Hoagland has lived in Washington, D.C. for a total of over thirty years and currently lives two miles from the White House in Capitol Hill. *Id.* ¶ 9. She "travel[s] to the White House neighborhood frequently" and "regularly walk[s] through portions of President's Park, including Lafayette Square, in order to enjoy the historic buildings" and "the beauty of the L'Enfant Plan." *Id.* She also "regularly view[s] the White House from the south side, whether driving by on Constitution Avenue or walking on the Mall." *Id.* She has given "walking tours . . . on various aspects of Washington's historic architecture" and has "published scholarly articles on the topic." *Id.* ¶ 8. The White House is relevant to her

8

Add.63

"research on more locally focused architecture" because the White House "drove development around it" and was "on the leading edge of all improvements" in Washington. *Id.* ¶ 11.

Hoagland intends to continue visiting President's Park roughly once a month. *Id.* ¶ 12. She asserts that construction of a ballroom of the form and scale proposed by the President would disrupt her enjoyment and use of President's Park and cause her to "suffer both professional and personal injuries, including to [her] aesthetic, cultural, and historical interests." *Id.* ¶ 13–14. The President's proposed ballroom would, in Hoagland's words, "overshadow[]" the White House and "diminish [its] primacy," thereby disrupting the message that "our president lives in a *house*." *Id.* ¶ 13.

Based on her claims of aesthetic injury, Hoagland could sue in her own right. It is well-settled that the "desire to use or observe" something, "even for purely [a]esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562–63. Hoagland, who is a longtime D.C. resident and scholar of history and historic preservation, "use[s] the affected area" around the White House and is the type of person "for whom the aesthetic and recreational values of the area will be lessened by" the ballroom. *Friends of the Earth*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). She alleges that Defendants' construction of "a ballroom of the proposed form and scale" would "cause permanent and irreparable harm to the White House and President's Park," thereby damaging her own "aesthetic, cultural, and historical interests" in the property. Hoagland Decl. ¶¶ 13–14.

Add.64

Moreover, Hoagland asserts more than a "vague desire" to visit the affected space sometime in the future. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). She instead provides "specific facts and concrete plans," *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1157–58 (D.C. Cir. 2025), namely that she will continue to visit President's Park "about once a month" to enjoy the historic character of the setting and attend upcoming meetings in the neighboring Decatur House, *see* Hoagland Decl. ¶ 12. The construction of the planned ballroom would, as Hoagland alleges, diminish the "architectural statement" of the White House, thereby undermining her enjoyment and appreciation of the grounds. *Id.* ¶ 13. These are "here-and-now injuries" that will undoubtedly come to pass if construction proceeds as planned. *Ctr. for Biological Diversity*, 146 F.4th at 1157–58. Accordingly, Hoagland has demonstrated an "imminent" injury-in-fact. *Lujan*, 504 U.S. at 560.

Indeed, Hoagland's declaration goes much further than the declaration relied upon unsuccessfully by the plaintiff in *Environmental Defense Fund v. FERC*, 2 F.4th 953 (D.C. Cir. 2021), which Defendants cite in their supplemental brief. Hoagland is not a mere bystander who "incidentally views something unpleasant." *Id.* at 970. To the contrary, Hoagland expressly articulates her "particularized connection to the land." *Id.* She describes how she "derived aesthetic value" from the White House as it existed before the construction and explains that her "future uses," including research and aesthetic enjoyment, would be diminished by the President's proposed ballroom. *Id.* at 969. Further, in Hoagland's personal view, the White House is "one of the most historically significant buildings in the country" and "was designed to be a symbol of the new nation." Hoagland

10

Add.65

Decl. ¶ 10. To say the least, this is a far cry from an "eyesore" on the side of a road. *Envt'l Def. Fund*, 2 F.4th at 969–70.

Our Circuit has routinely found Article III injury in similar circumstances. *See Sierra Club*, 827 F.3d at 66 (standing based on allegations of aesthetic and recreational harms from "greater tanker traffic" in waterway); *Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1180–81 (D.C. Cir. 2025) (standing where train traffic caused "increased disruption" to members' "homes and in nearby scenic areas"); *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596–97 (D.C. Cir. 2015) (members who used waterways for recreational purposes would suffer harm to "aesthetic interests" by "additional leasing" in those waterways); *WildEarth*, 738 F.3d at 305–06 (members' "aesthetic interests in the land" and "specific plans to visit the area regularly for recreational purposes" sufficient for standing).[2]

Hoagland's alleged harms are also "fairly traceable to the challenged action" and likely to "be redressed by a favorable decision." *Sierra Club*, 827 F.3d at 65. Defendants do not address these elements. *See* Defs.' Suppl. Br. at 8–12. Indeed, there can be no dispute that Hoagland's alleged aesthetic harm stems directly from construction of a ballroom in the manner proposed by the President. And a decision from this Court halting

---

[2] Defendants quibble with the intensity and frequency of Hoagland's alleged aesthetic interests because she lives "2 miles from the White House," "several times further away than the [*Environmental Defense Fund*] plaintiff" lived from the metering station, and because Hoagland only intends to visit the White House area "once a month" instead of "several times a week." Defs.' Suppl. Br. at 10. Neither our Circuit nor the Supreme Court have parsed alleged aesthetic harms so finely for purposes of standing, and it would be incongruous for this Court to do so now. Defendants' objection that Hoagland's injury is not "sufficiently imminent" because "the East Wing plans are not finalized" is similarly meritless. *Id.* at 11. Construction is well underway, *see* Stanwich Decl. ¶ 20, and Defendants identify no authority for the proposition that an aesthetic injury must fully materialize before it may be cognizable.

Add.66

that project for lack of statutory authority would redress Hoagland's alleged harm.  In sum, Hoagland has standing to sue on her own.

Having established that one of its members has standing, the National Trust must also demonstrate that the interests it seeks to protect are "germane to the organization's purpose." *Ctr. for Sustainable Econ.*, 779 F.3d at 596 (quoting *Hunt*, 432 U.S. at 343).  It has done so!  The National Trust was established by Congress "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest."  54 U.S.C. § 312102(a).  It exists to "protect[] America's historic sites through stewardship, advocacy, and direct assistance" and to "take[] legal action to protect threatened sites where necessary."  Am. Compl. ¶ 21.  As such, the National Trust has an "obvious interest" in challenging the construction of a massive new ballroom on White House grounds that could likely alter the aesthetic, cultural, and historical integrity of one of the most historic sites in the country.  *Cf. Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) (quoting *Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013)) (concluding that an organization "dedicated to the protection and enjoyment of the environment" had an "obvious interest in challenging" the authorization of a pesticide).

Finally, as Defendants do not dispute, this lawsuit does not "require[] the participation of" Professor Hoagland.  *Ctr. for Sustainable Econ.*, 779 F.3d at 596 (quoting *Hunt*, 432 U.S. at 343).  Indeed, "neither the claim asserted . . . nor the relief requested . . . requires any [National Trust] member to participate as a named plaintiff in the lawsuit." *Ctr. for Biological Diversity*, 861 F.3d at 182.

Add.67

Accordingly, the National Trust has established a substantial likelihood of Article III standing.

## II.    Availability of Judicial Review

Having concluded that the National Trust has standing, I may now consider whether judicial review is available for the National Trust's claims. Defendants advance two arguments to the contrary. First, Defendants argue that the Office of the Executive Residence ("EXR") is not an "agency," so there is no "agency action" to enjoin under the APA. Second, Defendants argue that the National Trust cannot bring freestanding constitutional claims because its claims in the final analysis are statutory in nature. Unfortunately for the National Trust, and based on the claims presently before the Court, I agree with Defendants on these two points and conclude that I lack authority to reach the merits of the National Trust's claims.

### A. Administrative Procedure Act Claims

To find a likelihood of success on the National Trust's APA claims, the National Trust must show that the relevant defendant is an "agency," such that there could be "final agency action" or "agency action unlawfully withheld." 5 U.S.C. §§ 704, 706(1). According to Defendants, EXR, which is part of the Executive Office of the President, is now "the entity managing the East Wing project." Defs.' Suppl. Br. at 13. I agree that EXR is likely not an "agency" under the APA.

Our Circuit held in *Sweetland v. Walters*, 60 F.3d 852 (D.C. Cir. 1995), that the "staff of the Executive Residence is not an agency as defined in" the Freedom of Information

Add.68

Act. *Id.* at 855.[3]  Whether an entity that has been determined to be a "non-agency" can subsequently become an agency by taking on agency responsibilities has not been resolved by our Circuit. *Compare Ryan v. Dep't of Just.*, 617 F.2d 781, 788 (D.C. Cir. 1980) ("Once a unit is found to be an agency, this determination will not vary according to its specific function in each individual case."), *with Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1042 n.5 (D.C. Cir. 1985) (suggesting that "[i]f the President adds duties to an entity which bring it outside the sole-function test, Congress would want the entity to be covered" by FOIA).  But even if EXR could be considered an agency due to the change in its responsibilities, the current record does not support finding EXR an "agency."  How so?

As a general matter, the Executive Office of the President is not an "agency" under the APA. *Am. Oversight v. Biden*, 2021 WL 4355576, at *6 (D.D.C. Sept. 24, 2021) (citing *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir. 1998)).  But certain entities within the Executive Office of the President may be considered "agencies" if they "exercise[] 'substantial independent authority.'" *Competitive Enter. Inst. v. Podesta*, 643 F. Supp. 3d 121, 126–27 (D.D.C. 2022) (quoting *Armstrong v. Exec. Off. of President*, 90 F.3d 553, 557–58 (D.C. Cir. 1996)).  Courts consider "how close operationally the group is to the President," "whether it has a self-contained structure," and "the nature of its delegat[ed] authority." *Id.* (alteration in original) (quoting *Citizens for Resp. & Ethics in Wash. v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009)).

---

[3] The Freedom of Information Act ("FOIA") "incorporates and expands on the APA's definition of agency," *Am. Oversight v. Biden*, 2021 WL 4355576, at *6 n.6 (D.D.C. Sept. 24, 2021), so if EXR is not an agency under FOIA then it is not an agency under the APA.

14

Here, the limited record suggests that EXR has an "intimate organizational and operating relationship" with the President himself. *Armstrong*, 90 F.3d at 560. Indeed, the President directed EXR to manage the ballroom construction, *see* Decl. of Joshua Fisher [Dkt. #30-1] ¶¶ 7–8, and the National Trust has alleged that the President "is planning and directing the construction of the Ballroom," Am. Compl. ¶ 16; *see also id.* ¶ 79 ("it was reported that President Trump had been 'holding frequent meetings about [the Ballroom's] design and materials'" and "personally select[ed] the project's contractors" (first alteration in original)). And while there are insufficient facts in the record to determine whether EXR has a "self-contained structure," *Competitive Enter. Inst.*, 643 F. Supp. 3d at 127, this factor alone is not dispositive, *see Armstrong*, 90 F.3d at 559 (National Security Council had a "firm structure, a staff, and a separate budget" but was not an agency (internal quotation marks omitted)). Finally, EXR's responsibilities— "handling project management" for the ballroom and "coordinating with NPS staff," Suppl. Decl. of Jessica Bowron [Dkt. #30-3] ¶ 11—are distinguishable from the "delegat[ed] authority" that has made certain entities agencies, *see Competitive Enter. Inst.*, 643 F. Supp. 3d at 127 (alteration in original); *see also Meyer v. Bush*, 981 F.2d 1288, 1292 (D.C. Cir. 1993) (Council on Environmental Quality was an agency because it had authority to "coordinate federal environmental programs," "issue guidelines to federal agencies," and "promulgate regulations"); *Soucie v. David*, 448 F.2d 1067, 1075 (D.C. Cir. 1971) (Office of Science and Technology was an agency because it took on the "function of evaluating federal programs").

15

Add.70

For these reasons, EXR is likely not an agency under the APA, and the National Trust therefore may not challenge EXR's actions under the APA. As a result, the National Trust's APA claims are unlikely to succeed on the merits.[4]

B. Constitutional Claims

Next, the parties dispute whether the National Trust's constitutional claims are reviewable by this Court in equity—in other words, they dispute whether the National Trust has a "cause of action" to enjoin allegedly unconstitutional actions by Defendants. As the case now stands, under *Dalton v. Specter*, 511 U.S. 462 (1994) and *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025), I have concluded that the National Trust lacks a cause of action to assert its constitutional claims as presented. Therefore, I lack authority to reach the merits of its statutory arguments.

The National Trust's principal constitutional argument is that Defendants' construction of the ballroom usurps Congress's authority under the Property Clause. Am. Compl. ¶¶ 179–87. The National Trust also alleges that Defendants' reorganization of the executive branch violates Congress's Article I power to "establish[] . . . offices." *Id.* ¶¶ 188–96.

To obtain judicial review of their claims, the National Trust must have some basis "to invoke the power of the courts," often referred to as having a "cause of action." *See Davis v. Passman*, 442 U.S. 228, 239 (1979). For statutory claims, "private rights of action

---

[4] Even if EXR were an agency, the National Trust's APA claims face additional hurdles. Defendants have represented that consultations with the National Capital Planning Commission and Commission of Fine Arts are ongoing, so those claims will likely become moot. And the National Trust's remaining procedural claim must overcome the "substantial deference" afforded to agencies in NEPA cases. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025).

16

Add.71

to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Though the National Trust invokes several statutes that it claims the President is violating—including 40 U.S.C. § 8106, which prohibits the construction of buildings on public grounds in the District of Columbia without congressional authorization, and 3 U.S.C. § 105(d)(1), which authorizes appropriation of funds for White House maintenance—the National Trust has not argued that any of these statutes grant it a right to sue to "judicially enforce" the statutes' requirements. *Davis*, 442 U.S. at 239.

Instead, the National Trust relies on a freestanding constitutional claim for injunctive relief. But courts permit this kind of claim only when the claim is, in fact, *constitutional*. To assess whether the National Trust may bring such a claim here, I must determine whether "the underlying claim is properly characterized as statutory or constitutional." *Glob. Health Council*, 153 F.4th at 14. If the claim is "properly characterized as statutory," then it may not be "refram[ed]" as constitutional "to avoid statutory limits on review." *Id.* (citing *Dalton*, 511 U.S. at 474).

Courts have recognized freestanding constitutional claims when the plaintiff "challenge[s] the constitutionality of the statute itself," such as by arguing that there is some structural constitutional defect. *Id.*; *see also, e.g.*, *Collins v. Yellen*, 594 U.S. 220, 250 (2021) (reviewing separation-of-powers claim challenging statute's "for-cause restriction on the President's removal authority"); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2, 492 (2010) (reviewing separation-of-powers claim

17

Add.72

challenging statute with "dual for-cause limitations on the removal of Board members"). The National Trust does *not* challenge the constitutionality of any of the statutes!

That forces the National Trust to confront the Supreme Court's decision in *Dalton*. *Dalton* held that a plaintiff's claim that the President "violated the terms of [a statute] by accepting procedurally flawed recommendations" could not be brought as a freestanding separation-of-powers constitutional claim. 511 U.S. at 474. The Supreme Court clearly explained that a "claim that the President exceeded his authority under [a statute] is not a constitutional claim, but a statutory one." *Id.* at 476–77. "Our cases do not support the proposition that every action by the President . . . in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472.

Indeed, our Circuit recently applied *Dalton* to foreclose judicial review of a "freestanding constitutional claim" alleging that "the government violated the Constitution by infringing on the Congress's spending power through alleged violations of the 2024 Appropriations Act, the [Impoundment Control Act,] and the Anti-Deficiency Act." *Glob. Health Council*, 153 F.4th at 17, 21. The *Global Health* plaintiffs' "alleged statutory violations" were "the predicate acts for the constitutional claims because without an appropriations statute there could be no improper impoundment." *Id.* at 15. These "statutory claims c[ould not] be transformed into constitutional ones." *Id.* at 16.

Here, the National Trust's constitutional claims are more "properly characterized" as statutory! *Id.* at 14. The National Trust argues that the President "is wholly without constitutional authority to build or demolish anything on federal grounds" and that "[t]here is no statute that provides the President with the authority to demolish the White House or

18

Add.73

construct a ballroom." Am. Compl. ¶¶ 181, 184. Defendants themselves have *disclaimed* any inherent constitutional authority and have instead argued that the President's authority to construct the ballroom comes from a series of statutes. *See* Defs.' Suppl. Br. at 12 ("Nor is the President relying here on constitutional authority[.]"), 28–35 (arguing that 3 U.S.C. § 105(d), 54 U.S.C. § 101101(2), 31 U.S.C. § 1321, and 31 U.S.C. § 1535 supply the President's authority). Whether those statutes give the President authority to build the ballroom is thus a statutory dispute! *See Glob. Health Council*, 153 F.4th at 14. The parties dispute the scope of 3 U.S.C. § 105(d), *see* Pl.'s Suppl. Br. at 12–15; Defs.' Suppl. Br. at 32–35, and whether 40 U.S.C. § 8106 may be read to constrain the President, *see* Defs.' Suppl. Br. at 28–32; Pl.'s Reply at 8–11. Unfortunately for the National Trust, the Court's equitable power to enjoin constitutional violations does not extend to this kind of statutory dispute! *See Dalton*, 511 U.S. at 476–77; *Glob. Health Council*, 153 F.4th at 13; *see also Trump v. Sierra Club*, 588 U.S. 930, 930 (2019) (staying injunction because "the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005").[5]

The National Trust's reliance on *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), *see* Pl.'s Reply at 23, is misplaced. "In *Youngstown*, the Government disclaimed any statutory authority for the President's seizure of steel mills," so the "case necessarily turned on whether the Constitution authorized the President's actions." *Dalton*,

---

[5] The same goes for Plaintiff's unlawful reorganization claim. This claim is statutory because it is predicated on the statute "vesting [Congress's] authority over the management and regulation of the National Park System in the National Park Service." Am. Compl. ¶ 190 (citing 54 U.S.C. § 100101).

511 U.S. at 473. Here, the situation is the exact opposite—Defendants have disclaimed inherent constitutional authority to construct the ballroom. *See* Defs.' Suppl. Br. at 12, 30; *see also, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of President*, __ F. Supp. 3d __, 2025 WL 3042704, at *25 (D.D.C. Oct. 31, 2025) (*Dalton* did not preclude implied equitable constitutional claims where the defendants "invok[ed] the Article II Vesting Clause, arguing that the President has inherent constitutional authority"), *appeal filed*, No. 25-5476 (D.C. Cir. Dec. 31, 2025).

To be fair, the President's source of legal authority to construct the ballroom was *not* apparent before the National Trust brought its motion. *See, e.g.*, Am. Compl. ¶ 45 (alleging that "President Trump said that he had been told by two men that, as President, he could do anything he wanted to the White House" (cleaned up)). And to make things murkier, Defendants initially suggested that there *was* a dispute about the President's constitutional authority. *See* Defs.' Opp'n at 1 ("The Constitution makes the President of the United States the head of the Executive Branch and the sole organ of American foreign policy, and it requires the President to 'receive Ambassadors and other public Ministers.'"), 15 n.6 (discussing the Reception Clause). But Defendants' subsequent abandonment of any constitutional claims of authority places this case—as it now stands—squarely in *Dalton* territory. *See* Jan. 22, 2026 Hr'g Tr. at 24:25–25:2; *Dalton*, 511 U.S. at 474 n.6.

The National Trust argues that Defendants' "reading of *Dalton* would insulate a wide swath of genuinely constitutional claims from review simply because the executive has claimed some statutory authority for the challenged action." Pl.'s Reply at 23. Indeed, it strikes me as incongruous that Defendants' choice to make "expansive" statutory

20

Add.75

arguments, *see* Jan. 22, 2026 Hr'g Tr. at 37:7, forecloses judicial review of those arguments in the context of constitutional claims!

But as several courts have recognized, where the question becomes one of the President's statutory authority to act, *ultra vires* review is the proper vehicle to bring such a challenge. *See Dalton*, 511 U.S. at 472 ( "If all executive actions in excess of statutory authority were *ipso facto* unconstitutional . . . , there would have been little need in [*Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949)] for our specifying unconstitutional and ultra vires conduct as separate categories."); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996) (reviewing claim that "presidential action—not one, it should be added, even contemplated by Congress—independently violates [another] statute" under *ultra vires* theory).[6]

The National Trust unfortunately did not bring an *ultra vires* claim, and the parties as a result have not briefed whether *ultra vires* review is available or whether Defendants' conduct rises to the level of acting *ultra vires*. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (noting the Court has "strictly limited nonstatutory ultra vires review to the painstakingly delineated procedural boundaries of [*Leedom v. Kyne*, 358 U.S. 184 (1958)]" (internal quotation marks omitted)); *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (describing "demanding" standard for successful *ultra vires*

---

[6] Recent cases challenging executive action have proceeded under *ultra vires* theories. *See, e.g., Illinois v. Trump*, 2025 WL 2886645, at *21 (N.D. Ill. Oct. 10, 2025) (granting temporary restraining order on *ultra vires* claim), *stay denied in part and granted in part by, Illinois v. Trump*, 155 F.4th 929, 933 (7th Cir. 2025), *stay denied by, Trump v. Illinois*, 146 S. Ct. 432, 434 (2025); *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1369–70 (Ct. Int'l Trade) (granting summary judgment on *ultra vires* claim), *aff'd in part, vacated in part, remanded sub nom., V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *aff'd sub nom., Learning Res., Inc. v. Trump*, 2026 WL 477534 (U.S. Feb. 20, 2026).

21

Add.76

claims). Thus, absent an amended complaint raising *ultra vires* claims, I cannot reach the merits of the National Trust's novel and weighty statutory arguments.

## CONCLUSION

The parties have jockeyed for the most legally advantageous position to either support, or oppose, the injunction that is the object of this suit.

Unfortunately, because both sides initially focused on the President's constitutional authority to destruct and construct the East Wing of the White House, Plaintiff didn't bring the necessary cause of action to test the statutory authority the President claims is the basis to do this construction project without the blessing of Congress and with private funds.

If Plaintiff is inclined to amend its complaint with the necessary *ultra vires* cause of action to test the President's statutory authority, the Court will expeditiously consider it and, if viable, address the merits of the novel and weighty issues presented.

Until then, however, I have no choice but to deny Plaintiff's motion for a preliminary injunction for lack of likelihood of success on the merits.

For all the reasons stated above, it is hereby **ORDERED** that the National Trust's Motion for a Preliminary Injunction [Dkt. #2] is **DENIED**.

An Order consistent with the above will issue with this Memorandum Opinion.

**SO ORDERED**.

RICHARD J. LEON
United States District Judge

22

Add.77

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,
        Plaintiff,

    v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Case No. 25-4316 (RJL)

### ORDER
February 26, 2026 [Dkt. #2, 35, 39, 41]

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that plaintiff's Motion for Preliminary Injunction [Dkt. #2] is **DENIED**; and it is further

**ORDERED** that defendants' Motion to Strike Declaration [Dkt. #35] is **DENIED**; and it is further

**ORDERED** that defendants' Motion to Stay Any Preliminary Injunction Pending Appeal [Dkt. #39], and plaintiff's Motion to Strike Defendants' Motion for Stay Pending Appeal [Dkt. #41] are both **DENIED** as moot.

**SO ORDERED.**

RICHARD J. LEON
United States District Judge

1

Add.78

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

        Plaintiff,

    v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

Case No. 1:25-cv-04316-RJL

**SUPPLEMENTAL DECLARATION OF TAMMY STIDHAM, ASSOCIATE REGIONAL DIRECTOR, LANDS AND PLANNING, NATIONAL PARK SERVICE, NATIONAL CAPITAL REGION**

I, Tammy Stidham declare as follows:

1. I am the Associate Regional Director for Lands and Planning for the National Park Service ("NPS") National Capital Region. I have been in this position for approximately two years. Prior to that time, I served as the Deputy Associate Regional Director for Lands and Planning at the NPS National Capital Region. All together, I have been employed by the NPS for over thirty-six years.

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. In my position as Associate Regional Director, and my previous position as Deputy Regional Director, I have worked to plan and implement a substantial portfolio of NPS projects across the region involving many different types of buildings and structures, including comfort stations, offices, maintenance and operational facilities, law enforcement facilities, stables, visitor-use and recreational facilities, utility and

1
Add.79

infrastructure-related structures, large buildings, and nationally significant memorials. My experience includes seeking and obtaining the approval of the National Capital Planning Commission (NCPC) for NPS projects in the National Capital Region and obtaining review by the Commission on Fine Arts (CFA) for NPS projects in the National Capital Region.

4. Additionally, in my current position I represent the Secretary of the Interior as an ex officio member of the NCPC. As such, I fully participate in the business of NCPC including making motions and voting on Commission actions.

5. Due to my position, I am generally familiar with the buildings, structures and other facilities on NPS managed lands in the District of Columbia, including their history and condition. I am also generally familiar with NPS history and authorities.

6. Under the NPS Organic Act of 1916, the NPS is required to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101. This authority extends to historic preservation and construction activities at individual park units in furtherance of the purpose of the park unit at issue.

7. The National Park System has evolved over time and now includes more than 400 parks across the country, covering more than 85 million acres. Systemwide, NPS infrastructure includes more than 75,000 assets, such as historic buildings, visitor centers, comfort stations, NPS administrative and maintenance facilities, trails, roads, bridges, and utility

Add.80

systems. There are over 5,500 miles of paved roads, 17,000 miles of trails, and 25,000 buildings managed by the NPS. This unique infrastructure has evolved over time in response to the NPS mission. Maintaining that infrastructure is a key NPS responsibility

8.  In general, the NPS plans and approves projects to construct, rehabilitate, and maintain the wide variety of buildings, structures, and other NPS facilities that support park operations, resource protection, visitor use, public safety, resource interpretation, or park administration. The NPS has long performed this role on parklands in the District of Columbia.

9.  NPS Administrative units in D.C. include Rock Creek Park, the White House and President's Park, the National Mall and Memorial Parks, National Capital Parks – East and parts of the Chesapeake and Ohio Canal National Historical Park and the George Washington Memorial Parkway. These administrative units manage individual park units in D.C. such as the Lincoln Memorial, Ford's Theatre, and the National Mall.

10. The NPS has substantial park infrastructure in D.C., including recreational facilities, such as the NPS's three public golf courses, administrative and maintenance facilities, visitor centers, comfort stations, historic structures, and interpretive waysides and kiosks, as well as other types of facilities in furtherance of the NPS's mission.

11. The NPS may carry out construction, rehabilitation or maintenance projects itself using appropriated funds through the NPS's annual construction appropriation, if funds are available. The National Capital Region headquarters and the recently constructed U.S. Park Police substation, discussed below, were constructed using appropriated funds.

12. The NPS also uses its donation acceptance authority, 54 U.S.C. § 101101, to carry out projects on parkland, including the construction of facilities. Such projects may involve

3

Add.81

the donation of funds to NPS for the NPS to complete the construction. Examples of privately supported construction or rehabilitation projects on NPS-managed lands in D.C. include the repairs to the Washington Monument after the D.C. earthquake, the Washington Monument elevator modernization, the Lincoln Memorial roof restoration, the Lincoln Memorial undercroft project, and the Thomas Jefferson Memorial museum/accessibility improvements. In some instances, these privately raised funds were provided through authorized philanthropic partners such as the National Park Foundation or the Trust for the National Mall and used in combination with appropriated funds.

13. Alternatively, the NPS uses its donation acceptance authority to accept donations of completed projects. In such cases, the NPS authorizes a donor to construct a project on NPS-managed land to NPS's specifications, and the completed project is then donated to the NPS. The U.S. Park Police Stables and Tennis Stadium, both discussed below, were constructed by donors and donated to the NPS.

14. My office is located in the National Capital Region headquarters campus on Hains Point, in East Potomac Park, managed by the NPS as part of the National Mall and Memorial Parks. The NPS constructed the National Capital Region Headquarters, the U.S. Park Police Headquarters, and additional administrative facilities at this site between 1963 and 1969 as part of the Mission 66 program ("National Capital Region Campus").

15. In 2016, the NPS proposed renovation of the existing National Capital Region Campus to consolidate NPS administrative offices, including park and regional headquarters, and the construction of a new 13,000 square foot facility for the U.S. Park Police substation to move the existing facilities out of the floodplain. The construction of the substation was submitted to NCPC and CFA for review and approval.

4

Add.82

16. Below is an image of the campus as it existed in 2016 when the proposed substation construction was submitted to NCPC for approval.



17. Below is a photograph of the newly constructed substation.



18. The tennis stadium in Rock Creek Park is another example of a large facility constructed under NPS's authority on parkland in D.C. The tennis stadium, large enough to seat 7,500, was constructed in the late 1980s by Washington Area Tennis Patrons Foundation and donated to the NPS after construction was completed.

19. An image of the outside of the tennis stadium, which is the home of the annual DC Open tournament, is below:

Add.83



20. The recent U.S. Park Police Stables project on the National Mall is another example of an NPS construction project in D.C. The stables were originally constructed in 1975 as a temporary structure, adjacent to a maintenance yard and water treatment plant for the Lincoln Memorial reflecting pool, to house park police horses. The project was submitted to NCPC and CFA for review and approval.

21. In 2023, the NPS opened a 13,542 square foot U.S. Park Police facility that includes public paddocks, educational areas, stable space, training and medical paddocks, administrative areas, support, and employee parking. This project was constructed as a donation from the Trust for the National Mall.

22. Below is an image depicting the newly constructed U.S. Park Police facility:



6

Add.84

Add.85

I declare under penalty of perjury that the foregoing is true and correct. Executed on

March 12, 2026.



TAMMY STIDHAM  Digitally signed by TAMMY STIDHAM
Date: 2026.03.12 11:32:22 -04'00'

Tammy Stidham

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,

        Plaintiff,

    v.

NATIONAL PARK SERVICE, *et al.*,

        Defendants.

Case No. 1:25-cv-04316-RJL

**SECOND SUPPLEMENTAL DECLARATION OF HEATHER MARTIN**

I, Heather Martin, declare as follows:

1. I am a Deputy Assistant to the President, a Presidentially Commissioned Officer. In addition, I serve as the Chief Financial Officer and Deputy Director of the Office of Administration, Executive Office of the President ("EOP"). I serve as a senior official supporting the East Wing Modernization Project ("the Project").

2. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3. I submit this declaration to supplement the testimony in my earlier declarations submitted in this matter, Dkts. No. 30-2 and 52-2.

4. The Economy Act, currently codified at 31 U.S.C. § 1535, is a longstanding authority under which agencies may order goods or services from other federal agencies or major organizational units within the same agency. It promotes efficiency by allowing interagency acquisitions when it is in the government's best interest, funds are available, and the service cannot be provided as conveniently or cheaply by the private sector.

1

Add.86

5.  The Government Accountability Office ("GAO") is a nonpartisan, independent agency within the legislative branch. The GAO publishes a treatise titled "Principles of Federal Appropriations Law," which is referred to as "the Red Book." The third volume of this treatise, available online at https://www.gao.gov/assets/2019-11/203470.pdf, provides detailed information and guidance to federal agencies regarding Economy Act transactions. Agencies regularly consult this document regarding appropriations issues, including Economy Act transactions, as well as the Office of Management and Budget's ("OMB") Circular No. A-11 "Preparation, Submission and Execution of the Budget," which also discusses Economy Act transactions. OMB's Circular No. A-11 is publicly available at https://www.whitehouse.gov/wp-content/uploads/2025/08/a11.pdf.

6.  The Red Book explains that "the subject of an Economy Act transaction must be something the ordering agency is authorized to do and the performing agency is in a position to provide. Also, there must be direct benefit to the paying agency. Apart from these general prescriptions, the Economy Act makes no attempt to define the kinds of work, services, or materials that can be ordered. This is in apparent recognition of the great diversity of tasks and functions one encounters in the federal universe, and the fact that these tasks and functions are subject to change over time." Red Book, Third Edition, Volume III at page 12-64. It is my understanding that funds transferred under the Economy Act are "available for the purposes for which the appropriation from which transferred are available, and also subject to the same limitations fixed in the appropriations from which the funds are transferred." 18 Comp. Gen. 489, 490-91 (1938).

7.  The Red Book also provides examples of transactions in which the Economy Act "has been used," or at least "recognized as available [authority] for," including an agreement

2

Add.87

between the Department of Veterans Affairs and the Department of the Navy under which the "Navy would execute and superintend a contract for the construction of the Corregidor-Bataan Memorial." Red Book, Third Edition, Volume III at page 12-67.

8. EOP regularly enters into agreements under the Economy Act, 31 U.S.C. § 1535. The Economy Act is commonly used at EOP when an agency determines that it does not have the appropriate resources to execute an action of work, services or materials that EOP, as a servicing entity, is in the position to provide more conveniently. Once a formal agreement between the agency and EOP is executed, EOP assumes responsibility for carrying out the acquisition, activities, and necessary support for the goods and/or services that are being sought by the requesting agency. This includes developing requirements in coordination with the requesting agency, conducting market research as needed, and securing qualified vendors through appropriate competitive procedures. EOP also issues solicitations and awards contracts to companies capable of delivering required goods and services.

9. Over the past decade, components of EOP have entered into approximately 2500 Economy Act agreements, which is an average of 21 agreements per month or an average of 250 per year.

10. The Office of the Executive Residence ("EXR") has often served as the servicing entity for construction projects at the White House. In these instances, EXR has received funding from other government agencies to manage permanent improvements to the Executive Residence at the White House. EXR is uniquely suited to carry out such projects given its close relationship with the President and its substantial expertise in providing for (1) the preservation and maintenance of the White House structure and its

3

Add.88

historical contents, and (2) the use of the White House for official ceremonial purposes as well as the private home of the President.

11. Past Economy Act agreements with EXR concern, for instance, installation of security windows on behalf of the U.S. Secret Service, improvements to the North Portico paving on behalf of the National Park Service ("NPS"), a 1.5-million-dollar renovation of the White House press room on behalf of NPS, and rehabilitation of the fire alarm systems on behalf of NPS.

12. Other examples include personnel details—in which EOP staff will temporarily work for another agency to provide specific expertise—and temporary construction for events taking place across the country that involve an EOP principal. Like other examples, EOP components act as the servicing agency and receive reimbursement for their services from the ordering agency.

13. As the above examples make clear, use of the Economy Act has long been standard operating procedure at EOP. The Economy Act agreement concerning the Project, in which EXR acts as the servicing agency for NPS, is consistent with this precedent.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 23, 2026.

HEATHER MARTIN

Digitally signed by
HEATHER MARTIN
Date: 2026.03.23 16:15:08
-04'00'

_____
Heather Martin

4

Add.89

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES, <br>        Plaintiff, <br><br>      v. <br><br> NATIONAL PARK SERVICE, *et al.*, <br><br>        Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )   Civil Case No. 25-4316 (RJL) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM OPINION**
March **31** , 2026 [Dkt. #51]

The President of the United States is the steward of the White House for future generations of First Families. He is not, however, the owner! President Trump ("the President") claims that Congress has given him authority in existing statutes to construct his East Wing ballroom project and to do it with private funds. The plaintiff, the National Trust for Historic Preservation in the United States ("National Trust"), claims the President has no such authority under existing statutes and that a preliminary injunction is necessary to avoid irreparable harm. I have concluded that the National Trust is likely to succeed on the merits because no statute comes close to giving the President the authority he claims to have. As such, I must therefore **GRANT** the National Trust's Motion for a Preliminary Injunction, and the ballroom construction project must stop until Congress authorizes its completion.

1

Add.90

## BACKGROUND

### I.    The White House

Shortly after the founding, Congress passed the Residence Act of 1790, which authorized three commissioners to "provide suitable buildings for the accommodation of . . . the President." *See* An Act for Establishing the Temporary and Permanent Seat of the Government of the United States, ch. 28, 1 Stat. 130 (1790).[1] The three commissioners, empowered by Congress and appointed by the President, selected James Hoban as the architect of the President's residence through a design competition. *See* Pl.'s Suppl. Br., Annex 1 ("Annex") [Dkt. #20-1] at 2. Congress funded construction of the White House through several statutes. *See id.* In 1800, President John Adams moved into the still-unfinished White House, and every President has resided in the White House since then. Second Am. Compl. [Dkt. #50] ¶ 27.

Congress has continued to authorize and fund construction and maintenance at the White House up until the present day. *See generally* Annex. For example, Congress authorized repairs to the White House after it suffered extensive damage during the War of 1812, *see* Annex at 2–3; Act of Feb. 13, 1815, ch. 41, 3 Stat. 205; Act of Feb. 10, 1820, ch. 10, 3 Stat. 541, and received regular updates on progress, *see* H. R. Doc. No. 15-8, at 14–

---

[1] Relevant filings are abbreviated as follows: Pl.'s Mem. in Supp. of Mot. for TRO & Prelim. Inj. ("Pl.'s TRO Br.") [Dkt. #2-1]; Defs.' Mem. in Opp'n to Mot. for TRO & Prelim. Inj. ("Defs.' TRO Opp'n") [Dkt. #15-1]; Pls.' Suppl. Mem. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Suppl. Br.") [Dkt. #20]; Defs.' Suppl. Resp. Br. in Opp'n to Pl.'s Mot. for a Prelim. Inj. ("Defs.' Suppl. Br.") [Dkt. #30]; Pl.'s Reply Br. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Reply Br.") [Dkt. #33]; Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Renewed PI Br.") [Dkt. #51-1]; Defs.' Mem. in Opp'n to Pl.'s Second Mot. for Prelim. Inj. ("Defs.' Renewed Opp'n") [Dkt. #52]; Pl.'s Reply in Supp. of Mot. for Prelim. Inj. ("Pl.'s Renewed Reply Br.") [Dkt. #54].

16 (1818).  Congress appropriated funds for construction of the South Portico in 1823, the North Portico in 1829, and the East and West Wings in 1902.  *See* An Act Making Appropriations for the Public Buildings, ch. 62, 3 Stat. 784 (1823); An Act Making Appropriations for the Public Buildings, and for Other Purposes, ch. 51, 4 Stat. 362 (1829); Act of June 28, 1902, ch. 1301, 32 Stat. 419, 460.

In the late 1940s, after the discovery of major structural issues, Congress appropriated funds for "the renovation, repair, and modernization" of the White House but prohibited any "change of [the] present architectural appearance of the exterior of the mansion or the interior of its main floor."  Act of June 23, 1949, ch. 236, 63 Stat. 231, 235; *see also* Annex at 10–11.  More recently, Congress funded the replacement of the White House perimeter fence in 2019 through a series of appropriations.  *See* Annex at 13–14; Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135, 435; Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2503.

Today, the White House remains the official residence of the President.  Second Am. Compl. ¶ 25.  It sits in President's Park, a federal park administered by the National Park Service in Washington, D.C.  *Id.*

## II.    The East Wing Ballroom Project

On July 31, 2025, the White House issued a press release announcing plans to build a "State Ballroom" on White House grounds.  Second Am. Compl. ¶ 36; *see also* Mot. for TRO & Prelim. Inj., Ex. J [Dkt. #2-14].  The press release stated the ballroom would be constructed at the site of the "small, heavily changed, and reconstructed East Wing" and would encompass "approximately 90,000 total square feet."  Ex. J.  The press release also

3

Add.92

stated that "President Trump, and other patriot donors, have generously committed to donating the funds to build" the ballroom. *Id.*; *see also* Mot. for TRO & Prelim. Inj., Ex. X ("Ex. X") [Dkt. #2-28] (ballroom will have "zero cost to the American Taxpayer!").

On October 20, 2025—without advance notice or apparent approval—President Trump announced on social media that "ground ha[d] been broken on the White House grounds to build the new, big, beautiful White House Ballroom." Second Am. Compl. ¶ 51. On October 21, 2025, media outlets confirmed that heavy machinery was demolishing the East Wing. *Id.* ¶ 53. The next day, President Trump showed new renderings of the proposed ballroom to the press, noting that "many presidents have made changes" at the White House but "[t]his . . . obviously would be the biggest change." *Id.* ¶¶ 59–60. By October 23, 2025, the East Wing had been demolished in its entirety. *Id.* ¶ 64.

After the demolition of the East Wing, the National Trust—a nonprofit with "thousands of members" who "have a substantial interest in preserving and protecting historic and cultural resources in Washington, D.C."—contacted various federal entities to express concerns. Mem. Op. [Dkt. #47] at 3–4; *see also* Second Am. Compl. ¶ 22. The National Trust warned that the "massing and height of the proposed new construction would overwhelm the White House itself and might also permanently disrupt the carefully balanced classical design of the White House." Second Am. Compl. ¶ 55 (cleaned up).

Receiving no response, the National Trust brought this lawsuit in December 2025. *See* Compl. [Dkt. #1]. Since then, there has been significant progress on construction of the ballroom. The site of the former East Wing is a "bustling project site" with "heavy construction machinery," "pile drivers," and a "construction crane." Second Am. Compl.

4

Add.93

¶¶ 78, 81. Demolition work has been largely completed, and work on "footings and below-grade structural concrete" began in February 2026. Decl. of John Stanwich ("Stanwich Decl.") [Dkt. #14-6] ¶ 20. "Above[-]grade structural work" is "anticipated to begin" in April 2026. *Id.* Indeed, President Trump has stated that ballroom construction is "ahead of schedule." Pl.'s Renewed PI Br. at 23 (quoting Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 10, 2026, at 1:41 PM ET), https://truthsocial.com/@realDonaldTrump/posts/116047799547098230).

According to the parties' filings, the ballroom plans are in the final stages of the design approval process. The Commission of Fine Arts approved designs on February 27, 2026. *See* T. Luebke to J. Fisher, CFA 19/FEB/26-1, https://perma.cc/CV2F-VE6M (cited in Suppl. Decl. of Heather Martin ("Martin Suppl. Decl.") [Dkt. #52-2] ¶ 6). The National Capital Planning Commission has reviewed detailed "final" plans for the ballroom and is scheduled to vote on the design on April 2, 2026. *See* Martin Suppl. Decl. ¶ 7. The plans presented to these entities show a planned size of 89,000 square feet and a seated capacity of 1,000 guests. Exec. Director's Recommendation, Nat'l Cap. Planning Comm'n (Mar. 5, 2026), https://perma.cc/4LFC-YDEJ (cited in Martin Suppl. Decl. ¶ 7). The ballroom is now projected to cost around $400 million, and the President has represented that private donations will foot the bill. *See* Jan. 22, 2026 Hr'g Tr. [Dkt. #38] at 33:2–3; Ex. X.

### III.   Procedural History

I recounted the procedural history of this case in my previous opinions, which I incorporate by reference here. *See* Mem. Order [Dkt. #17] at 2; *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, __ F. Supp. 3d __, 2025 WL 3672837 (D.D.C. Dec. 17, 2025); Mem.

5

Add.94

Op. [Dkt. #47]; *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, ___ F. Supp. 3d ___, 2026 WL 533420 (D.D.C. Feb. 26, 2026). To summarize, I previously denied the National Trust's motion for a temporary restraining order for lack of irreparable harm before the Court could decide the motion for a preliminary injunction. *See* Mem. Order. On February 26, 2026, I denied the National Trust's request for a preliminary injunction. *See* Mem. Op. While I concluded that the National Trust had shown a "substantial likelihood" of Article III standing, *see id.* at 7–12, I found that the National Trust's motion suffered from two fatal flaws. As to its Administrative Procedure Act ("APA") claims, I concluded that "the Office of the Executive Residence . . . is not an 'agency,' so there is no 'agency action' to enjoin under the APA." *Id.* at 13. As to the National Trust's constitutional claims, I concluded that those claims were foreclosed by *Dalton v. Specter*, 511 U.S. 462 (1994) because they were "statutory in nature." Mem. Op. at 13, 16–22.

On February 27, 2026, the National Trust sought leave to file a second amended complaint, *see* Mot. for Leave to File Second Am. Compl. [Dkt. #49], which I granted, *see* Minute Order (Mar. 1, 2026). The National Trust's second amended complaint adds four new *ultra vires* claims challenging the Defendants' statutory authority to construct a ballroom on White House grounds and to do it with private funds. Second Am. Compl. ¶¶ 197–224.[2] On March 5, the National Trust filed a renewed motion for a preliminary injunction based on its *ultra vires* claims. *See* Second. Mot. for Prelim. Inj. [Dkt. #51].

---

[2] Defendants named in the Second Amended Complaint include: the National Park Service; Jessica Bowron, in her official capacity as Acting Director of the National Park Service; John Stanwich, in his official capacity as Superintendent of the White House and President's Park; the Department of the Interior; Douglas Burgum, in his official capacity as Secretary of the Interior; the General Services Administration;

6

Add.95

Defendants filed their opposition on March 12, *see* Defs.' Renewed Opp'n, and the National Trust filed its reply on March 16, *see* Pl.'s Renewed PI Reply Br. I held a hearing on March 17, 2026. The National Trust's motion is now ripe for decision.

## IV.   Statutory Background

The National Trust's claims require consideration of three main statutes.

*3 U.S.C. § 105(d)*. Section 105, titled "Assistance and Services for the President," provides for the employment of staff members to assist the President and authorizes appropriations for expenses related to White House administration. Most relevant here, § 105(d) provides: "There are authorized to be appropriated each fiscal year to the President such sums as may be necessary for[] (1) the care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House." 3 U.S.C. § 105(d). The statute continues: "Sums appropriated under this subsection for expenses described in paragraph[] (1) . . . may be expended as the President may determine, notwithstanding the provisions of any other law." *Id.* This statute was enacted in 1948, *see* Act of June 25, 1948, ch. 644, §§ 109, 110, 62 Stat. 672, 679, and Congress added the language about "care, maintenance, repair . . ." in 1978, *see* Act of Nov. 2, 1978, Pub. L. No. 95-570, § 105, 92 Stat. 2445, 2446.

---

Michael J. Rigas, in his official capacity as Acting Administrator of the General Services Administration; Donald J. Trump, in his official capacity as President of the United States; the Executive Office of the President; Susie Wiles, in her official capacity as White House Chief of Staff; the Office of the Executive Residence; and Robert B. Downing, in his official capacity as White House Chief Usher. They are referred to collectively in this opinion as "Defendants."

*40 U.S.C. § 8106*. This statute provides that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106. This provision was originally enacted in 1912, *see* Act of Aug. 24, 1912, ch. 355, 37 Stat. 417, 444 (codified at 40 U.S.C. § 68 (1912)), and was recodified in 2002, *see* Act of Aug. 21, 2002, Pub. L. No. 107-217, 116 Stat. 1062, 1206.

*54 U.S.C. § 100101*. The National Park Service ("NPS") Organic Act provides that the Secretary of the Interior, acting through the director of the NPS,

> shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

54 U.S.C. § 100101(a). Congress later reaffirmed these purposes through a 1978 amendment known as the "Redwood Amendment." *See* Act of Mar. 27, 1978, Pub. L. No. 95-250, sec. 101(b), 92 Stat. 163, 166 (codified at 54 U.S.C. § 100101(b)(2)). The Redwood Amendment provides that the "management" and "administration" of NPS units "shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress." 54 U.S.C. § 100101(b)(2).

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555

8

Add.97

U.S. 7, 22 (2008). To obtain a preliminary injunction, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

**ANALYSIS**

## I.        Likelihood of Success on the Merits

This case, in essence, is about whether the President has the authority to build a ballroom on White House grounds with private funds without seeking authorization from Congress. The National Trust asserts that Defendants' actions are *ultra vires* of statutory authority and violate the APA. But why do Defendants even need statutory authority in the first place? The Constitution shows why.

The Property Clause vests Congress with complete authority over public lands. *See* U.S. Const. Art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."). "Congress exercises the powers both of a proprietor and of a legislature over the public domain," *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976), and those powers are "without limitations," *id.* at 539 (quoting *United States v. City & Cnty. of San Francisco*, 310 U.S. 16, 29 (1940)). This "broad" grant of authority "extend[s] to . . . personal and real property rightfully belonging to the United States." *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 331 (1936) (quoting Joseph Story, Commentaries on the Constitution of the United States §§ 1325, 1326 (1833)).

9

Add.98

The Appropriations Clause "provides that money may be 'drawn from the Treasury' only 'in Consequence of Appropriations made by Law.'" *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 426 (2024) (quoting U.S. Const. Art. I, § 9, cl. 7). "Since the earliest days of our Republic, Congress's 'power over the purse' has been its 'most complete and effectual weapon' to ensure that the other branches do not exceed or abuse their authority." *Id.* at 447–48 (Alito, J., dissenting) (quoting The Federalist No. 58, at 359 (Clinton Rossiter ed., 1961) (James Madison)).

The District Clause gives Congress legislative authority over the District of Columbia. *See* U.S. Const. Art. I, § 8, cl. 17. The Constitution "confer[red]" this power on Congress "in broad terms." *Nat'l Mut. Ins. Co. of Dist. of Col. v. Tidewater Transfer Co.*, 337 U.S. 582, 589 (1949).

Together, the Property Clause, the Appropriations Clause, and the District Clause establish Congress's primacy over federal property, spending, and the District of Columbia. Indeed, Defendants have declined to argue that they have any inherent constitutional authority to build the ballroom. *See* Defs.' Suppl. Br. at 12, 30. So the President must identify some law that allows him to demolish the East Wing and construct his planned ballroom with private funds. For the following reasons, I conclude that the National Trust is likely to succeed on the merits on its *ultra vires* claims because no law comes close to giving the President this authority.[3]

---

[3] Defendants argue that successive preliminary injunction motions are improper. *See* Defs.' Renewed Opp'n at 5–6. But there is no per se bar. And here, "change[s] in circumstances" counsel in favor of considering the motion. *U.S. Sec. & Exch. Comm'n v. Young*, 121 F.4th 70, 78 (10th Cir. 2024); *see also Gill v. Monroe Cnty. Dep't of Soc. Servs.*, 873 F.2d 647, 648–49 (2d Cir. 1989). It was only *after* the National Trust

### A.    *Ultra Vires*

The National Trust argues that Defendants' construction of the ballroom is *ultra vires*. "Literally translated, the Latin phrase 'ultra vires' means 'beyond the powers (of),' and as a legal term, the phrase means 'unauthorized' or 'beyond the scope of power allowed or granted by law.'" *Adamski v. McHugh*, 304 F. Supp. 3d 227, 236 (D.D.C. 2015) (cleaned up) (quoting Black's Law Dictionary 1755 (10th ed. 2014)).

To succeed on a nonstatutory *ultra vires* claim, the plaintiff must show that "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly act[ed] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Com.* ("*FedEx*"), 39 F.4th 756, 763 (D.C. Cir. 2022) (internal quotation marks omitted). Defendants have not disputed the first two factors, so the principal question before the Court is whether the President has "'stepped so plainly beyond the bounds of [his statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court.'" *Id.* at 764 (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)). Unfortunately, he has!

*Ultra vires* review is a high bar—the Supreme Court has described it as "a Hail Mary pass." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (internal quotation

---

amended its complaint that "Defendants for the first time disclaimed the President's constitutional authority to build the ballroom." Mem. Op. at 6 (emphasis omitted). Defendants' late-breaking abandonment of any constitutional arguments, as well as Defendants' factual representations about the Office of the Executive Residence, were crucial to my decision to deny the National Trust's first motion. *See id.* at 13. I find these circumstances "[]sufficient reason why the grounds were not urged in the earlier application." 43A C.J.S. *Injunctions* § 365.

11

Add.100

marks omitted). But it is not insurmountable. Our Circuit has held that the U.S. Postal Service's failure to maintain statutorily-mandated pay differentials was *ultra vires*, *see Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 972–74 (D.C. Cir. 2022), and that an executive order barring government contractors from permanently replacing lawfully striking employees was *ultra vires* under the National Labor Relations Act, *see Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996). Most recently, the Court of International Trade's decision invalidating the Trump Administration's tariffs on *ultra vires* review was affirmed on the merits by the Supreme Court. *See V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1369–70 (Ct. Int'l Trade), *aff'd in part, vacated in part, remanded sub nom. V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *aff'd sub nom. Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026).

Here, the National Trust is likely to succeed in its argument that Defendants have "stepped . . . plainly beyond the bounds of" their statutory authority. *FedEx*, 39 F.4th at 763. Indeed, neither 3 U.S.C. § 105, nor the NPS Organic Act, authorize the President to build a ballroom on White House grounds. Moreover, his actions run up against an explicit statutory prohibition in 40 U.S.C. § 8106. In fact, Defendants' reading of the statutes *assumes* that Congress has granted nearly unlimited power to the President to construct anything, anywhere on federal land in the District of Columbia, regardless of the source of funds. This clearly is not how Congress and former Presidents have managed the White House for centuries, and this Court will not be the first to hold that Congress has ceded its powers in such a significant fashion!

12

Add.101

1.    **3 U.S.C. § 105**

Defendants principally rely on 3 U.S.C. § 105(d)(1) as their authority to construct the ballroom. *See* Defs.' TRO Opp'n at 16–17; Defs.' Suppl. Br. at 18, 32–35; Defs.' Renewed Opp'n at 10–13. As I read it, 3 U.S.C. § 105(d)(1) is a statute authorizing the President to conduct ordinary maintenance and repair of the White House, up to the limits of the congressionally appropriated amount. Interpreting 3 U.S.C. § 105(d)(1) to grant virtually unlimited authority to the President to demolish and build at will on White House grounds is a "patent[] misconstruction of the Act." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quoting *FedEx*, 39 F.4th at 764). How so?

Let's start with the kind of statute 3 U.S.C. § 105 is: an authorization for appropriations. Section 105 says "[t]here are authorized to be appropriated each fiscal year to the President such sums as may be necessary for" specific purposes. 3 U.S.C. § 105(d). "The expression 'authorized to be appropriated' clearly indicates that no appropriation is made or intended to be made, but the bill when enacted becomes the authority of law for an expected appropriation in the future[.]" GAO, The Red Book 2-54 to 2-55 (4th ed. 2016) (quoting 27 Comp. Dec. 923 (1921) (ellipses omitted)). An "authorization act" is "a directive to Congress itself, which Congress is free to follow or alter . . . in the subsequent appropriation act." *Id.* at 2-56 (citing B-323433 (Comp. Gen. Aug. 14, 2012)); *see also, e.g.*, *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 307–10 (2020) (relying on GAO Red Book to interpret federal appropriations law). Since § 105(d) is an authorization act, it must be read in conjunction with the relevant appropriations statute,

13

Add.102

which is the Further Consolidated Appropriations Act, 2024. *See* Pub. L. No. 118-47, 138 Stat. 460, 532 (2024).

So what do these statutes authorize the President to do? Section 105(d)(1) authorizes the use of appropriated funds for "the care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House." 3 U.S.C. § 105(d)(1). The corresponding 2024 appropriations act provides "[f]or the repair, alteration, and improvement of the Executive Residence at the White House" at a fixed sum— $2,475,000—which is appropriated specifically "for required maintenance, resolution of safety and health issues, and continued preventative maintenance." 138 Stat. at 532.

Section 105(d)(1) plainly authorizes the President to conduct ordinary maintenance and upkeep of the White House, and nothing more! Reading the text as an "[o]rdinary reader[] of English" would, *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 68 (D.C. Cir. 2023), the list of authorized actions—which includes words like "care, maintenance, repair" and "air-conditioning, heating, and lighting"—bring to mind things like replacing the lightbulbs, fixing broken furniture, and changing the wallpaper, not wholesale demolition of entire buildings and construction of new ones.

Defendants point to "alteration" and "improvement," arguing that these terms are "capacious" and permit the President to "modify" the White House and "make [it] better," including by constructing entirely new buildings like the ballroom. Defs.' Renewed Opp'n at 10. A brazen interpretation, indeed! Those two words cannot bear that weight, for a few reasons.

14

Add.103

*First*, the meanings of "alteration" and "improvement" are "narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). Here, the "neighboring words," *id.*, including "refurnishing," "heating," and "maintenance," all strongly suggest *minor* "alteration[s]" and "improvement[s]," 3 U.S.C. § 105(d), not wholesale demolition and reconstruction. *See also, e.g.*, *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 643 (2026) (reading "regulate" in the context of its "neighboring words" to conclude that "Congress did not intend for 'regulate' to include the revenue-raising power" (first quoting *Williams*, 553 U.S. at 294)); *Yates v. United States*, 574 U.S. 528, 544 (2015) (reading "tangible object" to refer "specifically to the subset of tangible objects involving records and documents"). Reading "alteration" and "improvement" narrowly also comports with the "cardinal principle" that courts should "give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks omitted).

*Second*, reading § 105(d)(1) to grant limited authority to the President to maintain the White House is consistent with the principle that Congress "does not . . . hide elephants in mouseholes"—meaning that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). As our Circuit has explained, "the *American Trucking* rule rests on a . . . modest intuition about how we use language." *Heating, Air Conditioning & Refrigeration*, 71 F.4th at 67. "Ordinary readers of English," *id.*, would not expect Congress to grant the President unchecked construction authority over the White House

Add.104

through two disparate words in a statute about replacing furniture. *Cf. Biden v. Nebraska*, 600 U.S. 477, 513 (2023) (Barrett, J., concurring) ("[C]ontext is . . . relevant to interpreting the scope of a delegation.").[4]

Defendants argue that canons of construction have no place in *ultra vires* review. Defs.' Renewed Opp'n at 11.  Please!  The Supreme Court itself has made it clear that courts have a *duty* to locate the "single, best meaning" of the statute, no matter the cause of action. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). *Ultra vires* review does not suspend commonsense interpretive canons, nor does it grant the government flexibility to adopt an "utterly unreasonable" reading of a statute that is "contrary to the [statute's] plain language." *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 977–80 (applying canon of construction to reject agency's reading of statute in *ultra vires* case).  Even in *ultra vires* cases, courts retain their duty to apply "commonsense" canons of construction grounded in the way ordinary people read English. *Williams*, 553 U.S. at 294.

*Third*, Defendants' interpretation of § 105(d)(1) lacks any discernible limits. Courts, however, generally do not read statutes to give the "broadest imaginable definitions of its component words," divorced from "linguistic and statutory context." *Dubin v. United States*, 599 U.S. 110, 120 (2023) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (alterations incorporated)).  Under Defendants' reading, virtually any change to the White House could be framed as an "alteration" or "improvement."  Indeed, some might even view tearing down the White House and building a modern skyscraper in its place as

---

[4] The "*American Trucking* rule" is different from the major questions doctrine, which the National Trust has not argued applies here. *See Heating, Air Conditioning & Refrigeration*, 71 F.4th at 67.

16

Add.105

an "improvement." As Defendants have argued it, so long as the White House grounds are "developed" or "occupied by buildings and structures," Defs.' Renewed Opp'n at 10, the President has complete authority to engage in whatever construction activity he sees fit.[5] How grand!

*Fourth*, Defendants' interpretation of § 105(d) loses sight of its "statutory context." *Sackett v. EPA*, 598 U.S. 651, 675 (2023). Section 105(d)(1) is an authorization of appropriations. While it gives the President discretion to spend funds "as [he] may determine, notwithstanding the provisions of any other law," that discretion applies *only* to "[s]ums appropriated under" § 105(d)(1). 3 U.S.C. § 105(d). Section 105(d) simply does not speak to the President's authority to spend funds *not* appropriated under the statute. Defendants must concede that the President is not spending "[s]ums appropriated under" § 105(d)(1) because $2.475 million does not come close to supplying the approximately $400 million required to construct the ballroom. *See* Defs.' Suppl. Br. at 34. So both the plain language of the statute and the annual amount that Congress has appropriated to the President pursuant to § 105(d)(1) limit the President's authority.[6]

To make up the gaping chasm between the § 105(d)(1) appropriations ($2.475 million) and the projected cost of the ballroom ($400 million), Defendants have identified

---

[5] Defendants suggested at oral argument that "bulldoz[ing] the entire White House and build[ing] something completely different in its place" would "exceed[] the scope of 'alteration and improvement.'" Jan. 22, 2026 Hr'g Tr. 41:18–22. But if demolishing one wing of the White House and building a new structure is permissible, it is difficult to understand how demolishing the rest of the complex would cross the line. Both could conceivably "bring [the White House] into a more profitable or desirable state." Defs.' Renewed Opp'n at 10 (quoting Improve, Oxford English Dictionary, 2d ed. 1989).

[6] The precise and limited language of the 2024 appropriation—for "required maintenance, resolution of safety and health issues, and continued preventive maintenance"—further supports a limited reading of § 105(d)(1). 138 Stat. at 532.

Add.106

a convoluted funding scheme that they argue permits the President to fund the ballroom using private donations. Defendants' argument goes like this: Congress has authorized the Secretary of the Interior to accept donations "for the purposes" of the National Park System. 54 U.S.C. § 101101(2). National Park Service donations may be "appropriated to be disbursed" as trust funds. 31 U.S.C. § 1321(a)(17), (b)(1). The Economy Act permits the Secretary of the Interior to transfer funds to the White House account because NPS has "contract[ed]" with the Office of the Executive Residence ("EXR") for the ballroom project. 31 U.S.C. § 1535(a); *see* Suppl. Decl. of Jessica Bowron [Dkt. #30-3] ¶¶ 12–13. So, according to Defendants, this aptly described Rube Goldberg contraption authorizes the President to use private donations to the Secretary of the Interior for the purposes of 3 U.S.C. § 105(d)(1).

While its legality is not squarely at issue here, this funding mechanism is, to say the least, a far cry from affirmative congressional *authorization*. Defendants cannot evade the limitations of § 105(d)(1) and the 2024 appropriations act through a series of unrelated statutes that say nothing about the President, the White House, or the construction of a ballroom.

*Finally*, "[s]tatutory history points in the same direction" as my reading of § 105(d)(1). *Sackett*, 598 U.S. at 673. Plaintiff's historical annex lays out a nearly unbroken history of congressional authorization for construction and major renovations at the White House. *See generally* Annex. Not only did Congress authorize specific changes through legislation, *see id.*, but in some instances Congress exercised its oversight authority over specific projects, *see, e.g.*, H. R. Doc. No. 18-60, at 1 (1824) (examining the "work

18

Add.107

done on the South Portico of the President's House"); An Act To Provide for a Commission on Renovation of the Executive Mansion, ch. 51, 63 Stat. 45 (1949). In other cases, Congress authorized appropriations of funds for the "building to accommodate the offices of the President" and left the "details" to be "approved by the President." *See* Act of June 28, 1902, ch. 1301, 32 Stat. 419, 460 (authorizing construction of the original East and West Wings). There is zero evidence that when Congress enacted the relevant language in § 105(d)(1) in 1978, Congress intended a sea-change in the way that it authorizes and funds construction at the White House.[7]

In sum, Defendants ask this Court to ignore the full text of the statute in favor of two words plucked free from all statutory context. Because Defendants' reading of the statute is clearly contrary to its plain meaning, their reliance on § 105(d)(1) is likely *ultra vires*.

### 2. 40 U.S.C. § 8106

Because Congress holds the keys to the Nation's property, the President must have *some* statutory basis to build the ballroom. Section 105(d)(1) doesn't work, so the Court

---

[7] One clue that Congress did not intend to give the President vast construction authority in § 105(d)(1) is Congress's use of similar language in a different statute. *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."). In 1966—a little over a decade before the relevant version of § 105(d)(1) was enacted—Congress passed a law providing that "the Administrator of General Services is hereby authorized to plan, design, and construct an official residence for the Vice President of the United States in the District of Columbia." Pub. L. No. 89-386, § 1, 80 Stat. 106, 106 (1966). In a separate subsection, Congress authorized the Administrator to provide "for the care, maintenance, repair, improvement, alteration, and furnishing of the official residence and grounds, including heating, lighting, and air conditioning." *Id.* § 3. Construction of the Vice President's residence was delayed indefinitely due to "economic conditions." *The Vice President's House*, N.Y. Times (Apr. 27, 1966), https://perma.cc/E7KK-4X38. But the statutory text indicates that Congress knew how to distinguish between construction and maintenance.

Add.108

could find the President's actions *ultra vires* on that basis alone.   But to underscore Defendants' lack of statutory authority, Congress has affirmatively prohibited the "erect[ion]" of "[a] building or structure" "on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."  40 U.S.C. § 8106.

Defendants do not dispute that, if the statute is valid and applicable, then the ballroom qualifies as a "structure" in a "park . . . of the Federal Government in the District of Columbia."  Defs.' Suppl. Br. at 29.  Indeed, the statute appears to be a "specific and unambiguous statutory directive." *FedEx*, 39 F.4th at 764 (quoting *Griffith*, 842 F.2d at 493).  It commands, without reservation, that anyone who constructs a building on federal parkland in the District of Columbia needs the "express authority of Congress."  40 U.S.C. § 8106.

Not surprisingly, Defendants raise a number of objections to the application of § 8106.  None, however, overcome the statute's clear text.

*First*, Defendants argue that the phrase "express authority of Congress" in § 8106 refers to a general "authority from Congress to *build*—not to build a *particular structure*." Defs.' Renewed Opp'n at 19.  The National Trust's interpretation would, according to Defendants, implausibly require Congress to approve specific buildings on a project-by-project basis.  But whether § 8106 requires general or specific authorization is beside the point because Congress has not provided *any* authorization to Defendants.  Without question, Congress has not specifically authorized the ballroom construction!  And, as discussed throughout this opinion, Defendants have not identified any statute giving the

20

Add.109

President or any other Defendants freewheeling authority to construct buildings at the White House or in the District of Columbia. So the level of specificity that § 8106 requires is not dispositive here.

In my view, § 8106 is most naturally read to require *some form* of authorization from Congress to construct a building, and an appropriation of funds—either a lump sum for construction or a specific appropriation for a particular project—would easily satisfy that requirement. Indeed, an appropriation from Congress is authorization to use funds for a specified purpose. *See* 31 U.S.C. § 1301(a); *see also U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) ("The [Appropriations] Clause does not permit an agency . . . to authorize the expenditure of funds beyond what Congress has approved." (internal quotation marks omitted)). It is as simple as that.

*Second*, Defendants argue that § 8106 should not be read to constrain the President or limit construction at the White House absent a clear statement. Please! A clear statement rule makes sense when Congress is legislating in an area where the President exercises overlapping constitutional authority. *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) (declining to read the APA as subjecting the President to judicial review "[o]ut of respect for the separation of powers and the unique constitutional position of the President"); *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991). But Defendants here have disclaimed that the President has any inherent constitutional authority over construction at the White House and have conceded that Congress's constitutional authority over federal property is "exclusive." Pl.'s Suppl. Br. at 10; *see* Defs.' Suppl. Br. at 12, 30. In addition, Congress has continued to exercise, via its appropriations authority, close

21

Add.110

oversight over spending at the White House—including by prescribing the number of staff and their compensation. *See generally* 3 U.S.C. § 105. I therefore decline to read § 8106 as excluding the President.[8]

*Third*, Defendants offer a series of historical points showing, Defendants contend, that § 8106 cannot really mean what it says. Defendants argue that Congress did not intend § 8106 to apply to NPS or the White House. Defendants point to examples of buildings constructed by NPS on national parkland and by the President on White House grounds to argue that § 8106 is not a viable constraint on Defendants' authority. *See* Defs.' Renewed Opp'n at 19–23. Of course, when the "text is clear," courts "need not consider . . . extra-textual evidence." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017); *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("[T]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material."). In any event, Defendants' extratextual evidence is neither "uniform[]" nor "compelling." *NLRB*, 580 U.S. at 305.

Defendants first argue that Congress enacted § 8106 in 1912 to stop "unauthorized third parties" from building on federal land in Washington, D.C. and did not intend § 8106 to constrain the Government. *See* Defs.' Renewed Opp'n at 19 (explaining that at the time, D.C. federal property was "illegally used as dumps, or occupied by shacks, gardens, [and] railroad companies"). While other statutes from the era suggest "unlawful occupation" of "public lands" in D.C. was a concern of Congress, *see* Act of April 28, 1902, ch. 594, 32

---

[8] Defendants' point proves too little for yet another reason: even if § 8106 does not apply to the President himself, it still applies to EXR and the other Defendants.

Stat. 120, 152 (directing U.S. Army Corps of Engineers to prevent "unlawful occupation" of D.C. public lands), this vague historical evidence has no connection to the text of § 8106. Moreover, Defendants' argument cannot be reconciled with their suggestion that § 8106 *applies* to Government agencies besides NPS. *See* Defs.' Renewed Opp'n at 23. Nor does Defendants' reliance on post-enactment legislative history, *see id.* at 20, move the needle. *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation.").[9]

Defendants next attempt to exclude NPS from the reach of § 8106. They point to a similar statute enacted in 1912 that applied to the Department of the Interior. *See* Defs.' Renewed Opp'n at 22 ("No expenditure for construction of administration or other buildings . . . exceeding one thousand dollars shall hereafter be made in any national park except under express authority of Congress." (quoting 16 U.S.C. § 451 (1912))). At the time, federal parklands in D.C. were *not* part of the National Park System. *See* Exec. Order 6166 (June 10, 1933). So it appears that Congress enacted one rule for D.C.—no buildings without express authority of Congress—and another rule for national parks—no buildings over $1,000 dollars without express authority of Congress.[10]

---

[9] In fact, the post-enactment history cited by Defendants is consistent with the view that NPS has relied on congressional appropriations for construction authorization. Major Ulysses S. Grant III testified to the House Subcommittee on Appropriations in 1926 that § 8106 "has been never been construed to prevent such construction by the park authorities *within the limits of the appropriations*." Dist. of Columbia Appropriation Bill, 1927, Hr'g Before Subcomm. of H. Comm. on Appropriations 533, 69th Cong. (1926) (emphasis added). The transcript goes on to reflect that the buildings in question had, in fact, been presented to Congress and that Congress had appropriated funds for their construction. *Id.*

[10] Historical practice, including the way that Congress expressly *exempted* NPS from the prohibition in what Defendants argue was a comparable statute in 16 U.S.C. § 451, *see* Defs.' Renewed Opp'n at 22, suggests that NPS has never had a blank check under the NPS Organic Act to construct buildings, regardless of the source of funds.

23

The existence of a separate statute governing national parks does not mean, however, that § 8106 ceased to apply once federal parks in D.C. joined the National Park System in 1933. While Congress repealed 16 U.S.C. § 451 in 1996, Congress has never repealed 40 U.S.C. § 8106, and in fact recodified it in 2002. *See* Act of Aug. 21, 2002, Pub. L. No. 107-217, 116 Stat. 1062, 1206. The stronger reading of this history is that Congress means what it says! Congress has removed the threshold construction limitation applicable to NPS for national parks across the country, but has maintained § 8106's limitation on parks in the District of Columbia.

Undaunted, Defendants argue that NPS has erected "countless structures on national parkland" without "express congressional approval" and suggest as a result that the Court should read § 8106 as a dead letter. Defs.' Renewed Opp'n at 20. Unfortunately, that is not how statutory interpretation works—the Court must give effect to the unambiguous text of a statute even if there is contrary historical evidence. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("If we do our job of reading the statute whole, we have to give effect to this plain command, even if doing that will reverse the longstanding practice under the statute." (internal citations omitted)); *Exxon Mobil Corp.*, 545 U.S. at 568. In any case, it is not so clear that the structures identified by Defendants were built without Congress's knowledge or authorization.[11]

---

[11] For example, the National Capital Region Headquarters and U.S. Park Police Headquarters, *see* Defs.' Renewed Opp'n at 14, were constructed as part of Mission 66: a "ten-year project" "proposed . . . to Congress in 1955" and "funded by Congress." Mission 66: Birth of the Modern National Park, NPS (accessed Mar. 24, 2026), https://perma.cc/9VLT-C3V6; *see also* Act of June 13, 1956, Pub. L. No. 84-573, 70 Stat. 257, 262 (appropriating over $15 million for "construction . . . of buildings, utilities, and other physical facilities").

24

Finally, Defendants point to a handful of examples of construction at the White House since the enactment of § 8106 to argue that § 8106 does not apply to the White House. *See* Defs.' Suppl. Br. at 31. I disagree. Congress authorized the 1933 West Wing expansion and the 1942 East Wing expansion through general appropriations.[12] And to the extent President Ford's 1975 pool and President Trump's 2019 tennis pavilion are "building[s]" or "structure[s]," *see* 40 U.S.C. § 8106, they were never challenged in court, are not visible to the public, and were for the President's private use.[13] Without question, Defendants have never engaged in a construction project of *this* size and scale using donated funds. "This 'lack of historical precedent,' coupled with the breadth of authority that [Defendants] now claim[], is a 'telling indication' that [the ballroom] extends beyond [Defendants'] legitimate reach." *NFIB v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022) (quoting *Free Enterprise Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010)). For these reasons, the National Trust is likely to succeed on its *ultra vires* claims under both 3 U.S.C. § 105(d) and 40 U.S.C. § 8106.[14]

---

[12] In 1933, Congress authorized a "comprehensive program of public works," including "construction, repair, and improvement of . . . public buildings." National Industrial Recovery Act, ch. 90, §§ 202, 220, 48 Stat. 195, 201, 210 (1933). One such construction project was the 1934 West Wing renovations. *See* Annex at 7–8. The National Trust suggests that funding for the 1942 construction of an expanded East Wing, including a secure underground bunker, came from a national-defense appropriation. *See id.* at 9; Sixth Supplemental National Defense Appropriation Act, 1942, 56 Stat. 226, 236 (providing funds for "public buildings and grounds in the District of Columbia").

[13] To be sure, the one statute that expressly cites 40 U.S.C. § 8106—the statute authorizing the construction of bonsai facilities at the National Arboretum, *see* Act of Oct. 21, 1993, Pub. L. No. 103-11, 107 Stat. 1046, 1051—does not fit neatly into the National Trust's narrative. Congress's practice of excluding construction projects from the scope of § 8106 has not been consistent. But nothing in the text of § 8106 requires Congress to cite § 8106 in authorizing legislation, and in any event inconsistent congressional practice cannot limit the clear text.

[14] Defendants argue that the National Trust's interests "are quite plainly beyond the zone of interests protected by" 40 U.S.C. § 8106, Defs.' Renewed Opp'n at 25, and therefore the National Trust's *ultra vires*

25

Add.114

## B.   *Administrative Procedure Act*

Defendants have not been entirely consistent in this litigation as to which entities remain involved with the ballroom.  Before the Court's denial of the National Trust's first motion for a preliminary injunction, Defendants represented that EXR was "managing the [ballroom] project under the President's direction," Defs.' Suppl. Br. at 3, and that NPS was "indisputably not directing the [ballroom] project," *id.* at 17 n.7; *see also id.* at 23.  I went on to hold that the National Trust was not likely to succeed on the merits as to its APA claims because EXR was likely not an "agency" within the meaning of the APA.  Mem. Op. at 13–16.  The National Trust added claims arguing that shifting responsibility from NPS to EXR violated separation of powers and was *ultra vires*.  *See* Second Am. Compl. ¶¶ 217–24.  Both the Court and the National Trust were under the impression that, as Defendants themselves stated, NPS "had (and has) no role in directing the Project." Defs.' Suppl. Br. at 23; *see* Pl.'s Renewed Reply Br. at 16.

So it came as a surprise when Defendants' most recent brief invoked NPS's construction authority as an independent basis for denying the National Trust's motion. Defs.' Renewed Opp'n at 1.  Indeed, it is difficult to understand how Defendants can rely on NPS's construction authority while claiming that NPS "had (and has) no role in

---

claims premised on that statute must fail.  I find it unlikely that the zone of interests test applies here.  *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 812 n.14 (D.C. Cir. 1987) (reasoning that parties "need not . . . show that their interests fall within the zones of interests of the constitutional and statutory powers invoked by the President in order to" bring *ultra vires* claims); *see also Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 48 (D.D.C. 2020) (whether the zone of interests test applies to *ultra vires* claims has not been resolved).  If it were otherwise, litigants injured by *ultra vires* action would often be precluded from suit "since the litigant's interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest." *Haitian Refugee Ctr.*, 809 F.2d at 812 n.14; *see also Ctr. for Biological Diversity*, 453 F. Supp. 3d at 48.

26

Add.115

directing" the ballroom project. Defs.' Suppl. Br. at 23. In a sleight-of-hand maneuver, Defendants argue that NPS chose to "contract" with EXR under the Economy Act, which would suggest that NPS is still involved with the ballroom project as a party to a contract, with EXR as its agent. *See* Defs.' Renewed Opp'n at 18. Therefore, in the alternative, to the extent that NPS is directing or otherwise involved in the ballroom project, the National Trust is likely to succeed on its claim under the APA that the ballroom construction is "contrary to law" in violation of 40 U.S.C. § 8106.[15]

Regarding Defendants' arguments about the NPS Organic Act, nothing in the text of the statute grants NPS blanket authority to engage in construction in national parks. The statute provides that NPS "shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units[.]" 54 U.S.C. § 100101(a). Such purposes are "conserv[ing] the scenery, natural and historic objects, and wild life in the System units" and "provid[ing] for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." *Id.* This general statement of purpose does not say anything about NPS's authority to construct buildings.

Instead, historical practice not surprisingly shows that Congress has given *limited* authority to NPS to construct by authorizing appropriations for those purposes. *See, e.g.*, Commerce, Justice, Science; Energy and Water Development; and Interior and

---

[15] The Court must evaluate any APA claims in the alternative to the National Trust's *ultra vires* claims, because if the National Trust is able to obtain "judicial review" via the APA, nonstatutory *ultra vires* review is not available. *See Changji Esquel*, 40 F.4th at 722 (quoting *Griffith*, 842 F.2d at 492).

27

Add.116

Environment Appropriations Act, 2026, Pub. L. No. 119-74, 140 Stat. 5, 100.[16] Defendants identify a handful of structures built with donated funds in D.C. and argue that these were authorized by only the NPS Organic Act. Defs.' Renewed Opp'n at 18. Please! Even if these buildings were somehow comparable to the ballroom project, the available evidence strongly suggests that Congress was aware of these projects and at least indirectly authorized them.[17]

The NPS Organic Act is best read for what it is—a statement of NPS's general purposes. Defendants conflate taking actions "consistent with [NPS's] enabling legislation" with affirmative construction authorization. *See* Defs.' Renewed Opp'n at 16. Particularly in light of 40 U.S.C. § 8106's express prohibition, the broad language of the NPS Organic Act cannot supply the requisite authorization for construction of the ballroom.

## II. Irreparable Harm

To obtain injunctive relief, the National Trust must show that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. The threat of harm must be "both certain and great, actual and not theoretical, beyond remediation,

---

[16] Defendants do not purport to be relying on NPS's construction appropriation for the White House ballroom. In any case, NPS construction appropriations in recent years expressly limit the use of "National Park Service Donations" to "adjustments and changes *within the original scope of effort for projects funded by the National Park Service Construction appropriation.*" *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 226 (emphasis added); *see also, e.g.*, 140 Stat. at 101 (same). So NPS cannot, in fact, use donations to construct buildings on national park lands outside the scope of construction appropriations. And it is highly doubtful that NPS could "contract" with EXR to avoid the limitations on NPS's construction authority.

[17] Defendants cite the new U.S. Park Police Stables on the National Mall as an NPS construction with donated funds. But it appears that *Congress* initiated this project. *See* Commemorative Works Clarification and Revision Act of 2003, Pub. L. No. 108-126, 117 Stat. 1349, 1353 (directing the Secretary of the Interior to produce a report "setting forth plans" for the "relocat[ion]" of "the National Park Service's stable and maintenance facilities").

28

Add.117

and of such *imminence* that there is clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal quotation marks omitted). Aesthetic and environmental injuries are typically "irreparable" because they are "seldom . . . adequately remedied by money damages" and are "often permanent or at least of long duration." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25 (D.D.C. 2009) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)).

According to the National Trust, one of its members, Professor Alison Hoagland, is a longtime D.C. resident and a professor of historic preservation who regularly visits President's Park to "enjoy the historic buildings" and take in "the beauty of the L'Enfant Plan." Decl. of Alison K. Hoagland ("Hoagland Decl.") [Dkt. #2-3] ¶ 9. Hoagland also gives walking tours and has published scholarly articles on Washington's historic architecture, to which the White House is central. *Id.* ¶ 8. Hoagland alleges that construction of "a ballroom of the proposed form and scale" would cause "permanent and irreparable harm to the White House and President's Park," thereby damaging her own "aesthetic, cultural, and historical interests." *Id.* ¶¶ 13–14.

I previously concluded that these alleged aesthetic injuries established a substantial likelihood of Article III standing. *See* Mem. Op. at 7–13.[18] The National Trust's alleged

---

[18] Defendants urge the Court to revisit its standing analysis, *see* Defs.' Renewed Opp'n at 29–33, but I decline to do so. As I previously held, the National Trust has established a substantial likelihood of associational standing to challenge the construction of the ballroom, *see* Mem. Op. at 7–13, and I reincorporate that analysis today. Defendants offer two points in response, neither of which alter my conclusion. Defendants first argue that Hoagland cannot claim aesthetic injury from the ballroom because the new structure will "scarcely be seen from any public vantage point." Defs.' Renewed Opp'n at 29. That

aesthetic injury also establishes irreparable harm for purposes of a preliminary injunction. Hoagland has adequately described the "specific ways in which, in the absence of the injunction," her "interests in . . . [the] aesthetic . . . use and enjoyment" of the White House grounds "will be irreparably injured." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 324 (D.C. Cir. 1987); *see also, e.g.*, *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 220–22 (D.D.C. 2003) (aesthetic injury from hunting of mute swans sufficient for irreparable harm).

At the temporary restraining order stage in December 2025, I held that the National Trust had failed to demonstrate a "sufficiently imminent risk of irreparable harm" because below-grade structural work had just begun and Defendants' construction plans were still in flux. Mem. Order at 2–3. Things have changed. Above-ground construction will begin sometime in April 2026. Stanwich Decl. ¶ 20. Moreover, the design plans are nearly final. On February 27, 2026, the Commission of Fine Arts approved the ballroom's concept design submission as a "final design." *See* T. Luebke to J. Fisher, CFA 19/FEB/26-1, https://perma.cc/CV2F-VE6M (cited in Martin Suppl. Decl. ¶ 6). On March 5, 2026, Defendants submitted "preliminary and final site and building plans" to the National

---

is pure fiction. Defendants' own renderings show that the proposed ballroom will be clearly visible from Lafayette Park, *see* Exec. Director's Recommendation at 17–18, Nat'l Cap. Planning Comm'n (Mar. 5, 2026), https://perma.cc/4LFC-YDEJ (cited in Martin Suppl. Decl. ¶ 7), and even from the steps of the U.S. Capitol, *id.* at 23; *see also* Finding of No Significant Impact [Dkt. #14-2] at 6 (ballroom will "creat[e] a visual imbalance"). Defendants further argue that Hoagland's injury is not germane to the National Trust's purposes, which, Defendants insist, relate only to the acquisition of property for preservation and exclude the White House. Defs.' Renewed Opp'n at 31–33. "The bar for germaneness, however, is low." *AARP v. EEOC*, 226 F. Supp. 3d 7, 19 (D.D.C. 2016). To clear the bar, an organization need only show "a mere pertinence between [the] litigation subject and [the] organization's purpose." *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 111 (D.C. Cir. 1990) (internal quotation marks omitted). For the reasons articulated in my prior opinion, the National Trust has easily done so here. *See* Mem. Op. at 12.

Capital Planning Commission ("NCPC"). Martin Suppl. Decl. ¶ 7. The NCPC is scheduled to vote on the project at its April 2, 2026 meeting. *Id.* And once complete, the building's foundation could accommodate only "modest changes" to the size and scale of the structure. Decl. of Prof. Engineer [Dkt. #30-4] ¶ 10.

As such, the National Trust has demonstrated that injuries to its "aesthetic, cultural, and historical interests" are "imminen[t]," "certain," and "great" absent a preliminary injunction. *Mexichem*, 787 F.3d at 555 (typeface altered). If construction continues, the harm of an enormous ballroom overshadowing the White House grounds would indeed be "permanent." *Brady Campaign*, 612 F. Supp. 2d at 25. Moreover, the harm will likely materialize "before a decision on the merits can be reached." *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 288–89 (D.D.C. 2017).[19] Above-ground construction begins in a matter of days, and continued construction will only further lock in the size, scale, and styling of the proposed building.

Defendants contend that the National Trust faces no imminent aesthetic harm because Hoagland "will not be able to see any part of the East Wing for many months." Defs.' Renewed Opp'n at 35. But Defendants cannot seriously argue that Hoagland has no claim for imminent aesthetic harm until the completed building is fully visible. Once the

---

[19] As the National Trust points out, the *Semonite* case is a cautionary tale. The *Semonite* plaintiffs sought to enjoin construction of seventeen electrical towers over a river. One of my colleagues found no irreparable harm because the project was still in its infancy and therefore denied injunctive relief. *See* 282 F. Supp. 3d at 289. After construction was completed, the court found in plaintiff's favor on the merits but concluded that the towers were too costly to remove and, therefore, no injunctive relief was available. *See Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 94, 100–01 (D.D.C. 2019). If I deny preliminary injunctive relief now and allow construction to continue while the case progresses, any eventual victory on the merits for the National Trust may likewise prove to be too little, too late!

31

building is complete, any aesthetic harm would be "beyond remediation," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006), and courts typically find challenges to completed projects to be moot, *see Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 62 F. Supp. 3d 1, 5 (D.D.C. 2014) (noting lack of cases where courts "ordered a defendant to dismantle a completed construction project"). The National Trust need not wait until the last brick is laid to obtain injunctive relief.

### III.   The Balance of the Equities and the Public Interest

The National Trust finally must show that "the balance of equities tips in [its] favor," and that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. When, as here, "the Government is the opposing party," these final two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (D.C. Cir. 2022).

Here too, the National Trust has carried its burden. It has demonstrated imminent, irreparable harm in the form of ongoing construction of a ballroom that would, in its own words, "overshadow[]" the White House and disrupt the appearance of a historic and cultural icon. *See supra* Part II. The National Trust has shown that Defendants are making these irreversible changes without statutory or constitutional authority. While the National Trust would be deeply harmed in the absence of an injunction, the Government "cannot suffer harm from an injunction that merely ends an unlawful practice." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

The public interest, too, weighs in favor of enjoining this project pending approval from Congress. Congress is the collective voice of the American people in our system of

32

Add.121

government, *see Learning Res.*, 146 S. Ct. at 672 (Gorsuch, J., concurring) (Congress reflects "the combined wisdom of the people's elected representatives, not just that of one faction or man"), and the Constitution *itself* vests authority over federal property, including the White House, in Congress! *See* U.S. Const. Art. I, § 8, cl. 17; *id.* Art. IV, § 3, cl. 2; *cf. Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 289–90 (1984) (noting that federal parkland in Washington, D.C. and around the White House are a "unique resource[] that the Federal Government holds in trust for the American people"). After all, the White House does not belong to any one man—not even a president!

Defendants predictably object, arguing that any delay to construction would imperil national security and expose the White House to damage. Grasping for straws, Defendants call the construction site a "coordinated and managed safety hazard" that has disrupted existing security procedures. *See* Decl. of Matthew C. Quinn [Dkt. #30-5] ¶ 8. Thus, according to Defendants, any construction delay will undermine national security. Please! While I take seriously the Government's concerns regarding the safety and security of the White House grounds and the President himself, the existence of a "large hole" beside the White House is, of course, a problem of the President's own making! Defs.' Renewed Opp'n at 34. Bald assertions of "national security" cannot excuse the Government's failure to follow the law and then insulate those failures from judicial review.[20]

---

[20] The Court has reviewed the classified *ex parte* declarations submitted by Defendants. *See* Mot. for Leave to File Decl. *Ex Parte* [Dkt. #13]; Not. of Lodging Suppl. *Ex Parte* Decl. [Dkt. #25]; Not. of Lodging Second Suppl. *Ex Parte* Decl. [Dkt. #40]; Not. of Lodging Third Suppl. *Ex Parte* Decl. [Dkt. #59]. Based on my review, I do not find that an injunction halting construction would in any way jeopardize national security. *But see TikTok Inc. v. Garland*, 604 U.S. 56, 74 (2025) (Gorsuch, J., concurring) ("Efforts to inject secret evidence into judicial proceedings present obvious constitutional concerns.").

33

I acknowledge that this case raises novel and weighty issues, that halting an ongoing construction project may raise logistical issues, and that Defendants intend to seek an appeal immediately. I will therefore delay enforcement of the injunction for fourteen days, as described in the attached Order.[21] I will also exclude construction necessary to ensure the safety and security of the White House from the scope of the injunction.[22]

## CONCLUSION

Where does this leave us? Unfortunately for Defendants, unless and until Congress blesses this project through statutory authorization, construction has to stop! But here is the good news. It is not too late for Congress to authorize the continued construction of the ballroom project. The President may at any time go to Congress to obtain express authority to construct a ballroom and to do so with private funds. Indeed, Congress may even choose to appropriate funds for the ballroom, or at least decide that some other funding scheme is acceptable. Either way, Congress will thereby retain its authority over the nation's property and its oversight over the Government's spending. The National Trust's interests in a constitutional and lawful process will be vindicated. And the American people will benefit from the branches of Government exercising their constitutionally prescribed roles. Not a bad outcome, that!

---

[21] The Court gives fair notice to Defendants, however, that any above-ground construction over the next fourteen days that is not in compliance with my Order is at risk of being taken down depending on the outcome of this case.

[22] I decline to exercise my "broad discretion" to require the National Trust to post a bond. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

Add.123

For the foregoing reasons, it is hereby **ORDERED** that the National Trust's Motion

for a Preliminary Injunction [Dkt. #51] is **GRANTED**.  An accompanying order will issue

contemporaneously with this opinion.


RICHARD J. LEON
United States District Judge

Add.124

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,<br><br>     Plaintiff,<br><br>     v.<br><br>NATIONAL PARK SERVICE, *et al.*,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Case No. 25-4316 (RJL)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### ORDER
March **31**, 2026 [Dkt. #51, 55]

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiff's Second Motion for Preliminary Injunction [Dkt. #51] is **GRANTED**; and it is further

**ORDERED** that the National Park Service; Jessica Bowron, in her official capacity as Acting Director, National Park Service; John Stanwich, in his official capacity as Superintendent, the White House and President's Park; the Department of the Interior; Douglas Burgum, in his official capacity as Secretary of the Interior; the General Services Administration; Michael J. Rigas, in his official capacity as Acting Administrator, General Services Administration; the Executive Office of the President; Susie Wiles, in her official capacity as White House Chief of Staff; the Office of the Executive Residence; and Robert B. Downing, in his official capacity as White House Chief Usher (together, "Defendants"),

1

Add.125

and any agents of Defendants or any other persons working at their direction or in active concert therewith, are preliminarily **ENJOINED** from taking any action in furtherance of the physical development of the proposed ballroom at the former site of the East Wing of the White House, including but not limited to any further demolition, site preparation work, landscape alteration, excavation, foundation work, or other construction or related work, other than actions strictly necessary to ensure the safety and security of the White House and its grounds, including the ballroom construction site, and provide for the personal safety of the President and his staff; and it is further

**ORDERED** that, subject to the safety-and-security exception above, no such work shall proceed absent express authorization from Congress; and it is further

**ORDERED** that Defendants' counsel shall provide written notice of this Order to all officers, agents, successors, servants, employees, and attorneys of Defendants, as well as any other persons working at their direction, in active concert therewith, or subject to Defendants' control; and it is further

**ORDERED** that this Order shall take effect fourteen (14) days after its issuance; and it is further

**ORDERED** that Defendants shall file a status report apprising the Court of the status of their compliance with this Order no later than twenty-one (21) days after the date the Order takes effect; and it is further

**ORDERED** that the security requirement is hereby waived, *see* Fed. R. Civ. P. 65(c); and it is further

2

Add.126

**ORDERED** that Defendants' Motion for Leave to File Supplemental Declarations

[Dkt. #55] is **GRANTED.**

**SO ORDERED.**

RICHARD J. LEON
United States District Judge

3

Add.127