**ORAL ARGUMENT NOT YET SCHEDULED**

No. 26-5101

United States Court of Appeals
*for the*
District of Columbia Circuit

_____

NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES,
*Plaintiff-Appellee*

v.

NATIONAL PARK SERVICE; JESSICA BOWRON, in her official capacity as
ACTING DIRECTOR, NATIONAL PARK SERVICE; JOHN STANWICH, in his
official capacity as SUPERINTENDENT, THE WHITE HOUSE AND
PRESIDENT'S PARK; DEPARTMENT OF THE INTERIOR; DOUGLAS
BURGUM, in his official capacity as SECRETARY OF THE INTERIOR;
GENERAL SERVICES ADMINISTRATION; MICHAEL J. RIGAS, in his
official capacity as ACTING ADMINISTRATOR, GENERAL SERVICES
ADMINISTRATION; DONALD J. TRUMP, in his official capacity as
PRESIDENT OF THE UNITED STATES; EXECUTIVE OFFICE OF THE
PRESIDENT; SUSIE WILES, in her official capacity as WHITE HOUSE CHIEF
OF STAFF; OFFICE OF THE EXECUTIVE RESIDENCE; and ROBERT B.
DOWNING, in his official capacity as WHITE HOUSE CHIEF USHER,
*Defendants-Appellants*

_____

From the United States District Court for the District of Columbia
Case No. 1:25-cv-04316-RJL (Hon. Richard J. Leon)

_____

**NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES' OPPOSITION
TO APPELLANTS' EMERGENCY MOTION
FOR A STAY PENDING APPEAL**

_____

Gregory B. Craig (*counsel of record*)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
Tel. (202) 223-1200
gcraig@foleyhoag.com

Thaddeus A. Heuer
Matthew F. Casassa
Kevin Y. Chen
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Tel. (617) 832-1000
theuer@foleyhoag.com
mcasassa@foleyhoag.com
kchen@foleyhoag.com

*Attorneys for Plaintiff-Appellee*
*National Trust for Historic*
*Preservation in the United States*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

BACKGROUND.................................................................................................4

I. Defendants Demolish The East Wing And Begin Unlawfully Constructing The Ballroom. ..................................................................................................4

II. The National Trust Sues And The District Court, Relying On Defendants' Representations, Declines To Grant A TRO. .................................................6

III. The District Court Denies The National Trust's Preliminary-Injunction Motion, And The Trust Amends Its Complaint And Renews Its Motion. .......8

IV. The District Court Preliminarily Enjoins Construction Of The Ballroom. ....10

ARGUMENT .....................................................................................................11

I. Defendants Fail To Show Irreparable Harm Without A Stay. .......................11

II. Defendants Are Unlikely To Succeed On The Merits....................................13

    A. The National Trust Has Standing..........................................................14

    B. The Injunction Can Be Affirmed On Three Separate Grounds. ................15

III. The Remaining Factors Disfavor A Stay......................................................23

CONCLUSION ..................................................................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Dalton v. Specter*,
    511 U.S. 462 (1994)......................................................................3, 9, 22

*Deal v. United States*,
    508 U.S. 129 (1993)...........................................................................17

*Global Health Council v. Trump*,
    153 F.4th 1 (D.C. Cir. 2025)...........................................................9, 22

*KalshiEX LLC v. CFTC*,
    119 F.4th 58 (D.C. Cir. 2024)...............................................2, 11, 12, 13

*King v. St. Vincent's Hosp.*,
    502 U.S. 215 (1991)...........................................................................17

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)...............................................................23

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
    523 U.S. 26 (1998)............................................................................21

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012)...........................................................................19

*Nat'l Lime Ass'n v. EPA*,
    233 F.3d 625 (D.C. Cir. 2000)...........................................................15

*Nken v. Holder*,
    556 U.S. 418 (2009)...........................................................................23

*Nuclear Reg. Comm'n v. Texas*,
    605 U.S. 665 (2025)...........................................................................18

*United States ex rel. O'Connor v. USCC Wireless Inv., Inc.*,
    128 F.4th 276 (D.C. Cir. 2025)..........................................................18

*Sierra Club v. FERC*,
    827 F.3d 59 (D.C. Cir. 2016).............................................................14

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)...........................................................................14

*Sweetland v. Walters*,
    60 F.3d 852 (D.C. Cir. 1995)..............................................................7

*TikTok Inc. v. Garland,*
  604 U.S. 56 (2025) ........................................................................12

*United States v. Chromalloy Am. Corp.*,
  158 F.3d 345 (5th Cir. 1998) ........................................................21

*Wachovia Bank, N.A. v. Schmidt*,
  546 U.S. 303 (2006) ......................................................................18

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ......................................................................17

**Constitutional Provisions**

Art. IV, §3, cl. 2 ................................................................................4

**Statutes and Regulations**

3 U.S.C. §105(d) ........................... 2, 3, 6, 7, 8, 10, 15, 16, 17, 18, 19, 23

31 U.S.C. §1301(a) .....................................................................7, 16

31 U.S.C. §1535 ................................................................................21

40 U.S.C. §8106 ............................. 1, 2, 3, 4, 10, 11, 18, 19, 20, 21

40 U.S.C. §8722(b) ............................................................................5

40 U.S.C. §8722(d) ............................................................................5

42 U.S.C. §4332(2) ............................................................................5

54 U.S.C. §100101(a) ..................................................................9, 20

54 U.S.C. §100101(b) ........................................1, 3, 5, 10, 20, 21

54 U.S.C. §307104 ..........................................................................15

54 U.S.C. §308602(b) ......................................................................15

54 U.S.C. §312102(a) ..............................................................1, 15, 19

Pub. L. 118-47, 138 Stat. 460 (2024) ............................................7, 16

45 C.F.R. §2101.1(a) ..........................................................................5

45 C.F.R. §2101.2(b) ..........................................................................5

**Other Authorities**

52 Comp. Gen. 128 (1972) ..............................................................21

GAO, *Principles of Federal Appropriations Law* (3d ed. 2008) ......15, 21

H.R. Subcomm. on Nat'l Parks & Insular Affairs, 95th Cong.,
   Legislative History of Redwood Nat'l Park Expansion Act of 1978
   (Pub. L. 95-250) .......................................................................................20

NPS, Foundation Document: The White House & President's Park
   (Sept. 2014),
   https://www.nps.gov/whho/planyourvisit/upload/WHHO_FD_201
   5-508-accessible-resize.pdf (last visited Apr. 8 2026) .......................................20

# GLOSSARY OF TERMS

| Term | Definition |
| --- | --- |
| Add. | Addendum filed by Appellants |
| APA | Administrative Procedure Act, 5 U.S.C. §551 *et seq.* |
| CFA | Commission of Fine Arts |
| Dkt. | Docket in *National Trust for Historic Preservation in the United States v. National Park Service*, et al., No. 25-cv-04316 (D.D.C.). |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EOP | Executive Office of the President |
| EXR | Office of the Executive Residence |
| GAO | Government Accountability Office |
| Mot. | Defendants' Emergency Motion for a Stay Pending Appeal |
| National Trust or Trust | National Trust for Historic Preservation in the United States |
| NCPC | National Capital Planning Commission |
| NEPA | National Environmental Policy Act, Pub. L. 91-190, 83 Stat. 832 (1970) |
| NHPA | National Historic Preservation Act, Pub. L. 89-665, 80 Stat. 915 (1966) |
| NPS | National Park Service |
| The Red Book | *Principles of Federal Appropriations Law*, published by GAO |
| TRO | Temporary restraining order |

## CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

All parties, intervenors, and amici appearing in this Court are listed in Defendants' Emergency Motion for a Stay Pending Appeal.

I certify under Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1 that the National Trust is a congressionally chartered charitable, educational, and nonprofit corporation, *see* 54 U.S.C. §312102, which has no parent company, and in which no publicly held company has a 10% or greater ownership interest. The National Trust was established by Congress to "facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest." 54 U.S.C. §312102(a).

### B. Rulings Under Review

References to the rulings under review appear in Defendants' Emergency Motion for a Stay Pending Appeal. In addition, an order and accompanying memorandum opinion filed February 26, 2026, denying the National Trust's first preliminary-injunction motion, is the subject of a conditional cross-appeal by the National Trust. The memorandum opinion is available on Lexis at 2026 LX 33472.

### C. Related Cases

The case on review has not previously been before this Court or any other court, except for the district court from which this appeal was taken. To counsel's

knowledge, there are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

*/s/ Gregory B. Craig*

## INTRODUCTION

On October 20, 2025, without notice or warning, Defendants demolished the East Wing of the White House. Their purpose? To speed construction of a 90,000-square-foot ballroom—nearly twice as large as the White House's Executive Residence—without first obtaining the required constitutional and statutory authority from Congress, and without seeking any meaningful public input.

The District Court correctly held that the ballroom construction is likely illegal. The Constitution's Property Clause vests Congress with plenary power over federal property and lands, and Congress has not authorized Defendants to demolish the East Wing and build the ballroom. To the contrary, Congress has twice by statute prohibited such construction absent express congressional approval. *See* 40 U.S.C. §8106; 54 U.S.C. §100101(b)(2).

Because unauthorized construction of the ballroom would irreparably harm the National Trust—a not-for-profit corporation congressionally chartered to "facilitate public participation in the preservation of ... buildings … of national significance or interest," 54 U.S.C. §312102(a)—its members, and the public, the District Court correctly enjoined construction "unless and until" Congress authorized the ballroom, Add.123.

Defendants now seek an emergency stay. Although the purported "emergency" remains unclear, *see* Mot.1-6, Defendants appear to contend that being

1

prevented from illegally constructing a massive ballroom constitutes a national-security emergency. It plainly does not.

The District Court's injunction does not prevent Defendants from working on the underground *bunker* their motion exhaustively describes; indeed, the Trust has never objected to that. The Court's injunction simply prevents Defendants from constructing the *ballroom* without Congress's specific and express approval. And as is obvious, the absence of a massive ballroom on White House grounds has not stopped this (or any other) President from residing at the White House or hosting events there. Temporarily halting the ballroom project until it complies with the law will not irreparably harm Defendants or the nation.

Defendants' failure to meet their burden as to irreparable harm—a "necessary prerequisite for a stay"—is "fatal" to their motion. *KalshiEX LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024). But even if the Court could look past that failure, Defendants have not satisfied their burden as to the other factors. *See id.*

To start, Defendants are unlikely to succeed on the merits of their appeal for three independently sufficient reasons.

First, 3 U.S.C. §105(d)—under which Congress appropriated $2.475 million for White House maintenance—provides no authority at all to construct the ballroom, let alone the required "express authority of Congress," 40 U.S.C. §8106.

2

Second, even if §105(d) permitted Defendants to spend $2.475 million on the ballroom (it does not), Defendants could not use NPS's Organic Act authority and private donations to execute the remainder of the $400 million project. The reason is straightforward: The Organic Act and its 1978 "Redwood Amendment" *prohibit* NPS from constructing the ballroom without "direct[] and specific[]" congressional approval, 54 U.S.C. §100101(b)(2), meaning the project violates not only the Act itself, but also §8106 and the APA.

Third, the Trust's Property Clause claim, which the District Court erroneously held was likely barred by *Dalton v. Specter*, 511 U.S. 462 (1994), separately permits affirmance.

The equities and the public interest strongly favor relief. Unauthorized construction on one of the nation's most historically significant buildings harms the Trust and the public. And the Court should not reward Defendants' persistent efforts to evade review.

The District Court got it right: "[T]he White House does not belong to any one man—not even a president[.]" Add.122. If the President wants a ballroom, he must obtain specific and express authorization from Congress—"the collective voice of the American people in our system of government," and the steward of the nation's monuments and federal lands, Add.121-22. While Defendants are free to advance their idiosyncratic and limitless view of executive authority on appeal,

nothing in their stay motion shows they will be harmed—let alone irreparably—while that process plays out. And nothing in their motion shows their appeal is likely to succeed.

The Court should deny Defendants' motion.

## BACKGROUND

**I.  Defendants Demolish The East Wing And Begin Unlawfully Constructing The Ballroom.**

On July 31, 2025, a White House press release announced plans for a 90,000-square-foot ballroom on the site of the East Wing. Dkt.2-14. The press release stated that, "in recent weeks," President Trump had "held several meetings" with NPS, White House staff, and others to discuss "design features and planning," and announced the project would "begin in September 2025." *Id.*

Like every federal construction project, the ballroom must be authorized by Congress, which is vested with plenary control over federal property and lands by the Constitution, U.S. Const. Art. IV, §3, cl. 2. Where the project involves erection of a "building or structure" on D.C. federal parkland, that authorization must be "express."[1] 40 U.S.C. §8106. Similarly, where the project impairs the fundamental resources of a national park—which for President's Park is the "White House and

---

[1] The White House is located in President's Park, a national park maintained by NPS, and the ballroom is a "structure," as Defendants concede. Add.109.

the [East and West] Wings," *infra* p.20—Congress must "directly and specifically" authorize it, 54 U.S.C. §100101(b)(2).

That is not all. Projects Congress has authorized must be carried out in accordance with numerous federal laws. Before plans are finalized or work begins, the lead agency must conduct and publish NEPA reviews, consult with NCPC and CFA, and secure NCPC's approval. 40 U.S.C. §8722(b), (d); 42 U.S.C. §§4332(2), 4336; 45 C.F.R. §§2101.1(a)(1), 2101.2(b). The commission reviews are iterative, multi-stage processes during which the commissions and the public provide feedback on the project proposals. This ensures projects conform to NCPC's comprehensive plan for D.C.'s development, benefit from the commissions' expertise, and take public opinion into account. It is not unusual for even minor projects (like the recent replacement of the White House fence, *see* Dkt.20-1 at 13-14) to undergo thorough review processes, from which they emerge in a final and improved form befitting the nation's capital.

On October 20, 2025, despite not having received congressional authorization for the ballroom; not having sought review from either commission; not having obtained NCPC approval; not having published an EA (much less conducted an EIS); and not having given any advance notice to the public, Defendants began demolishing the East Wing and the east colonnade (connecting the East Wing to the Executive Residence). Within days, both were destroyed.

The National Trust wrote Defendants urging them to pause and allow public input, to no avail. Add.93. In the following weeks, Defendants began construction at the East Wing site. Yet they still had not begun most of the required reviews—having completed only an inadequate EA, which they unlawfully failed to publish—and had not obtained the necessary approval from NCPC or the required authorization from Congress.

## II. The National Trust Sues And The District Court, Relying On Defendants' Representations, Declines To Grant A TRO.

On December 12, 2025, with no sign that Defendants would comply with the law or permit meaningful public participation in the most significant exterior alteration to the White House in over a century, the National Trust sued. The Trust alleged Defendants were violating the Property Clause by constructing the ballroom without authorization from Congress, and also asserted claims under the APA. Dkt.1. The Trust moved for a TRO and a preliminary injunction. Dkt.2.

In the months that followed, Defendants advanced a series of shifting and contradictory positions regarding the nature of—and authority for—the ballroom project. In their TRO opposition, Defendants claimed authority to construct the ballroom under (i) the Constitution's Reception Clause and (ii) 3 U.S.C. §105(d). Dkt.15-1. Section 105(d)(1) authorizes Congress to appropriate funds for "care, maintenance, repair, alteration, refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures)" of the White House,

and permits the President to spend only "[s]ums appropriated under" §105(d)(1) for those purposes, subject to any further limits imposed by the relevant appropriating act, 31 U.S.C. §1301(a). In 2024, Congress appropriated $2.475 million under §105(d) for the specified purposes of "required maintenance, resolution of safety and health issues, and continued preventative maintenance." Pub. L. 118-47, 138 Stat. 460, 532 (2024).

Although the ballroom was planned to be built in a national park under NPS jurisdiction, Defendants asserted—in a transparent attempt to evade APA review—that the President had placed the project under the control of EXR, an office within EOP historically responsible for tasks like "greet[ing] visitors" to the White House, "prepar[ing] and serv[ing] meals," floral arrangements, and calligraphy, *Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995). Dkt. 15-1 at 6. According to Defendants, NPS was engaged in mere "continued consultation," *id*., even though documents appended to their opposition revealed—for the first time—that NPS had conducted (but failed to publish) a NEPA review of the project months earlier, Add.14-30.

After a hearing on December 16, 2025, the District Court denied the Trust's motion insofar as it sought a TRO, concluding the Trust had not shown it would be immediately and irreparably harmed. Add.40-41. The Court reached that conclusion largely due to Defendants' representations that "nothing about the ballroom ha[d]

been finalized" and ongoing below-grade work would not lock in its above-grade features, Add.41—representations whose veracity Defendants' recent statements have undermined, *see* Mot.3 (claiming "the new East Wing's entire design cohesively advances critical national-security objectives" that "dictate the entire project"). The Court declined to reach the other factors, including the Trust's likelihood of success on the merits. Add.41. And it deferred ruling on the Trust's request for a preliminary injunction. Add.42.

## III. The District Court Denies The National Trust's Preliminary-Injunction Motion, And The Trust Amends Its Complaint And Renews Its Motion.

After the hearing, the District Court directed the parties to submit supplemental briefs. Add.42. Shifting positions, Defendants' opposition suddenly *disclaimed* any constitutional authority to construct the ballroom. Instead, they relied *solely* on §105(d), asserting it empowered EXR to build the ballroom at the President's direction. *See* Dkt.30 at 16, 18. Defendants also declared NPS was "indisputably not" in charge of the project, *id.* at 17 n.7, and had "no role" beyond funneling hundreds of millions of dollars in private donations accepted under the agency's gift statute to EXR's maintenance account, *id.* at 23. The Trust objected to both EXR and NPS's supposed authority, as well as the project's byzantine funding structure—intended to bridge the $2.475 million appropriated under §105(d) and the ballroom's $400 million cost—which the Trust explained was "illegal," Dkt.33 at 9.

8

On January 22, 2026, the District Court heard argument on the Trust's motion, which it denied the next month. After concluding the Trust likely had associational standing, Add.62-67, the Court held EXR was likely not an "agency" under the APA, and the Trust was therefore unlikely to succeed on its APA claims, Add.68-71. It did not separately address the Trust's APA claims against NPS. The Court also held that because Defendants conceded they lacked constitutional authority to build the ballroom, the Trust was foreclosed from asserting constitutional claims per *Dalton v. Specter*, 511 U.S. 462 (1994), and *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025), a result the Court admitted was "incongruous." Add.71-76. But, noting Defendants' shifting position—initially asserting constitutional authority before disclaiming it, Add.75—the Court invited the Trust to amend its complaint to add the *ultra vires* counts the Court considered necessary, Add.77.

The Trust promptly amended its complaint and again moved for a preliminary injunction. In their opposition, Defendants shifted positions again, asserting—for the first time—a *second*, supposedly "independent" source of statutory authority for the ballroom: NPS's Organic Act. Dkt.52 at 9. This was both belated and perplexing: The Organic Act requires NPS to "promote and regulate the use of the National Park System by means and measure that conform to the fundamental purpose" of each park, obligating the agency to "conserve" "historic objects … in such manner … as will leave them unimpaired for future generations." 54 U.S.C. §100101(a).

Moreover, the Trust observed that NPS's conservation obligation is reinforced by the statute's Redwood Amendment, which prohibits administration of national parks "in derogation of the values and purposes for which the [parks] have been established, *except as directly and specifically provided by Congress*." *Id.* §100101(b)(2) (emphasis added). Because *NPS*'s Organic Act does not authorize *EXR* to do anything, any supposed Organic Act authority must be exercised by *NPS*—an agency indisputably subject to APA review.

**IV.    The District Court Preliminarily Enjoins Construction Of The Ballroom.**

On March 31, 2026, after another hearing, the District Court granted the Trust's second preliminary-injunction motion. Add.90-127.

The District Court concluded the Trust was likely to succeed on the merits for two reasons. First, it held construction of the ballroom was likely *ultra vires* of Defendants' authority under §105(d). Add.100-08. It further held §8106's "affirmative[] prohibit[ion]" of the erection of a building or structure in D.C. federal parks "without express authority of Congress" "underscore[d] Defendants' lack of statutory authority." Add.108-14.

Second, the District Court concluded the Trust was likely to succeed on the merits of its APA claim against NPS. Noting "surprise" at Defendants' late-breaking reliance on the Organic Act, the Court concluded the project likely was contrary to

§8106. Add.115-17. Nothing in the Organic Act, it reasoned, provided the express authorization §8106 demanded. *Id.*

On the other factors, the District Court held the Trust would likely be irreparably harmed without a preliminary injunction. Add.117-21. And, because Defendants were making "irreversible changes" to the White House, "a historic and cultural icon" "without statutory or constitutional authority," it concluded the equities and public interest also favored relief. Add.121-22.

The District Court enjoined Defendants from "taking any action in furtherance of the physical development of the proposed ballroom … other than actions strictly necessary to ensure the safety and security of the White House and its grounds … and provide for the personal safety of the President and his staff." Add.125-27.

## ARGUMENT

### I. Defendants Fail To Show Irreparable Harm Without A Stay.

Defendants' stay motion should be denied because they have not shown they will be irreparably harmed absent a stay—a "necessary prerequisite" to relief. *KalshiEX*, 119 F.4th at 64.

Defendants' argument rests principally on the contention that pausing ballroom construction they were never legally authorized to commence risks national security and the safety of the President. Mot.1-6, 24-26. The National Trust

11

takes national security and the President's safety seriously. But the injunction threatens neither. *KalshiEX*, 119 F.4th at 64 ("Irreparable harm must be both certain and great, and actual and not theoretical." (cleaned up)). Defendants can continue working on their underground *bunker*; they just cannot "tak[e] any action in furtherance of the physical development of the proposed *ballroom*." Add.126 (emphasis added).

Put simply, the lack of a massive ballroom on the White House grounds is not a national-security emergency. Its absence has not prevented any past president from residing in the White House during his tenure over the past two centuries. And demonstrably, Defendants' self-described (and self-inflicted) "open construction site," Mot.26, has not prevented President Trump from continuing to live at the White House since he demolished the East Wing; from hosting guests, press conferences, and foreign dignitaries; or from convening meetings of Cabinet members and other high-ranking officials.

While Defendants' reliance on "secret evidence"—classified declarations submitted for *ex parte*, *in camera* review—limits the Trust's ability to respond to Defendants' audacious claims, *TikTok Inc. v. Garland*, 604 U.S. 56, 82 (2025) (Gorsuch, J., concurring), nothing in Defendants' motion or President Trump's public statements suggests any emergency at all. Damage that temporary tents might cause the White House lawn and sprinkler system, Mot.25 (citing Add.33), or the

fact that construction materials may need to be put in storage, Mot.1-2, is not the stuff of which crises are made.

Indeed, it is difficult to believe that even Defendants really think the absence of a massive White House ballroom jeopardizes national security. Their own project documents state the ballroom will not be completed for at least two more years, Add.16, 21, and the Executive Residence—where the President actually lives—is not a "hardened national security facility," either, Mot.25. And as recently as January, Defendants' position was emphatic: "below-grade [work] will not lock in the scope of the above-grade construction" of the ballroom, Dkt.30 at 4. Yet once the injunction entered, the ballroom and bunker suddenly (and conveniently) became inseparable, a "cohesive[]" whole "dictate[d]" by "security … objectives," Mot.3.

The point is this: Defendants voluntarily chose to create these conditions and planned to maintain them for years on end. Only when someone stopped their illegal ballroom did the previously acceptable status quo become a supposed "national security" crisis overnight. There is no emergency, and no basis for a stay.

## II.  Defendants Are Unlikely To Succeed On The Merits.

Given Defendants' failure to meet their burden as to irreparable harm, the Court need not consider the other factors. *KalshiEX*, 119 F.4th at 64. But Defendants' failure to make "a strong showing that [they] are likely to succeed on the merits," *id.* at 63 (citation omitted), further confirms a stay is unwarranted.

13

A. <u>The National Trust Has Standing.</u>

The District Court correctly concluded the Trust has associational standing. Add.62-67, Add.118-19. Ms. Hoagland—a trustee and longtime member of the Trust—lives in D.C., regularly visits President's Park and its environs for professional and personal reasons, and plans to continue using and enjoying the area, Add.9-11. She has explained, both from her perspective as a historian and as someone who cares deeply about the White House, how she will be harmed by construction of the ballroom. *Id.* That is precisely the particularized, concrete, and continuing use of a specific place that establishes aesthetic injury. *See Sierra Club v. FERC*, 827 F.3d 59 (D.C. Cir. 2016).

Defendants mischaracterize Ms. Hoagland's declaration as detailing merely "incidental viewership" of the White House, and claim she will not be able to see the completed ballroom, Mot.13-14 (citing *Environmental Def. Fund v. FERC*, 2 F.4th 953, 970 (D.C. Cir. 2021)). The District Court rejected the latter as "pure fiction," Add.118-19—a finding that Defendants do not even try to show was clearly erroneous—and the former entirely misses the point. The White House is not a nuisance or "eyesore," causing cognizable harm only to those who have the misfortune of living near it, as in *EDF*; rather, it is an attraction, which when damaged harms those like Ms. Hoagland who use and enjoy it, *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009); Add.62-67.

Ms. Hoagland's injury is also "germane" to the Trust's purposes—an "undemanding" standard of "mere pertinence" the Trust easily satisfies, *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 637 (D.C. Cir. 2000) (citations omitted). The Trust was established by Congress "to facilitate public participation in the preservation of sites, buildings, and objects of national significance or interest," 54 U.S.C. §312102(a), and for decades has done so by maintaining historic properties, suing to protect others, and assisting in administration of federal preservation programs, Add.1-3, *see, e.g.*, 54 U.S.C. §308602(b). Unable to dispute this, Defendants instead dissemble by misrepresenting the legislative history of the NHPA—a statute *not* invoked in this case precisely because it does *not* apply to the White House, 54 U.S.C. §307104, *see* Dkt.33 at 3-4.

B. <u>The Injunction Can Be Affirmed On Three Separate Grounds.</u>

The District Court correctly held that the National Trust was likely to succeed on the merits of its *ultra vires* and APA claims. Each is separately sufficient to support the injunction, and Defendants are unlikely to succeed on the merits of their appeal as to either. And while that is more than enough to deny Defendants' motion, the Trust's Property Clause claim also provides a separate basis for affirmance.

**1.** The ballroom project is *ultra vires* of Defendants' authority under §105(d). As relevant here, §105(d) does two things. First, and primarily, it authorizes Congress to appropriate funds for the "care, maintenance, repair, alteration,

15

refurnishing, improvement, air-conditioning, heating, and lighting (including electric power and fixtures) of the Executive Residence at the White House." 3 U.S.C. §105(d); *see* GAO, The Red Book, 2-56 ("An authorization act is basically a directive to Congress itself, which Congress is free to follow or alter … in the subsequent appropriation act.").

Second, §105(d) permits the President to expend funds Congress has "appropriated *under th[at] subsection*," *id.* (emphasis added), subject both to (i) the bounds imposed by §105(d) and (ii) as with any appropriation, whatever additional limitations Congress imposes in the appropriating act itself, *see* 31 U.S.C. §1301(a). In 2024, Congress appropriated a mere $2.475 million under §105(d) for the even narrower purposes of "required maintenance, resolution of safety and health issues, and continued preventative maintenance." 138 Stat. at 532; *see* Dkt.30 at 34 (conceding private donations to NPS are "appropriated to be disbursed" under a *different* statute than §105(d)).

Defendants' motion ignores nearly all of this. Instead, Defendants principally contend that because dictionary definitions of two words in §105(d)— "alteration" and "improvement"—could, they claim, plausibly encompass the Ballroom, the Trust's *ultra vires* claims fail. Mot.17-18. That is not how statutory interpretation works. To start, §105(d) does not give the President freestanding authority to "alter[]" or "improve[]" anything; it authorizes *Congress* to appropriate funds for

16

those and other purposes, and for the President to expend those funds—and those funds only—on the terms Congress sets. Those are the "express limits" of Defendants' authority under §105(d) and the accompanying appropriations act. Mot.18. The only "line-drawing" problem here, *id.*, is Defendants' refusal to acknowledge those clear and obvious restrictions.

Defendants' argument also fails on its own terms, because their interpretation of §105(d) is untenable. It is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States*, 508 U.S. 129, 132 (1993). When read "as a whole," as it must be, §105(d) could not be clearer: "alteration" and "improvement" do not encompass completely new structures but instead contemplate relatively minor projects of the sort connoted by the words surrounding them, *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991). The canons of construction applied by the District Court, Mot.17-18, simply confirm what §105(d)'s plain text already communicates: Congress did not authorize appropriations for the executive to unilaterally demolish and rebuild a third of the White House in the same breath as it authorized appropriations to pay his utility bills, *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Because the ballroom project relies on a "patent[] … misconstruction" of §105(d), *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir.

2022), it is *ultra vires* of Defendants' statutory authority. But if more were needed, further confirmation is provided by the "specific prohibition" of §8106, *Nuclear Reg. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)), which, because it concerns D.C. federal parks (and therefore President's Park), must be read *in pari materia* with §105(d), *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 315-16 (2006).

Section 8106 could not be clearer: "A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. §8106. Below, Defendants advanced a series of unconvincing explanations for why, despite its plain text, §8106 did not apply, *see* Add.108-14. Their instant motion abandons those arguments, contending that Defendants only need authority to engage in "construction as a general matter." Mot.22. But §105(d) does not give them *any* such authority—and even if it did, general authority to engage in *some* construction would not amount to "express authority of Congress" necessary to build the *ballroom*, 40 U.S.C. §8106.

Defendants' remaining arguments fare no better. Their assertion that §8106 does not apply to the President, Mot.23, is irrelevant because the District Court did not *enjoin* the President, Add.125-26. Moreover, their apparent claim that the Trust is outside §8106's zone of interests is forfeited for lack of development, *United*

*States ex rel. O'Connor v. USCC Wireless Inv., Inc.*, 128 F.4th 276, 287 (D.C. Cir. 2025), and is meritless twice over. That test does not apply to nonstatutory *ultra vires* claims. Add.115-16. Even if it did, the Trust would need only "arguably" fall within §8106's zone of interests. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). It plainly does. The Trust was congressionally chartered to facilitate "preservation of sites, buildings, and objects of national significance or interest." 54 U.S.C. §312102(a). And §8106 protects D.C.'s federal parks and lands—encompassing perhaps the greatest concentration of historic and cultural "sites, buildings, and objects of national significance or interest" in the country—from unapproved development.

**2.** Defendants are also unlikely to succeed on their appeal of the Trust's APA claim, which provides a second, independent basis for the injunction.

Even if Defendants were right that §105(d) provided authority to construct the ballroom, that alone would be insufficient to prevail on the merits of their appeal. Section 105(d) authorizes the President to spend only funds "appropriated under th[at] subsection," 3 U.S.C. §105(d)—here, $2.475 million, *supra* p.16—meaning Defendants would need another source of funding and "express authority," 40 U.S.C. §8106, to carry out the remainder of their $400 million project.

As the District Court correctly held, Defendants' only other supposed source of authority—NPS's Organic Act—does not expressly authorize construction of the

ballroom, Add.115-17. The Act requires NPS to "promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of" the parks, 54 U.S.C. § 100101(a), but "does not say anything about NPS's authority to construct buildings," Add.116.

In fact, far from providing "express authority of Congress" for the ballroom, 40 U.S.C. §8106, the Organic Act imposes a second, independent obligation upon Defendants to obtain Congress's approval. The Act's Redwood Amendment— enacted after NPS's Organic Act authority failed to prevent irreversible harm to Redwood National Park, *see* H.R. Subcomm. on Nat'l Parks & Insular Affairs, 95th Cong., Legislative History of Redwood Nat'l Park Expansion Act of 1978 (Pub. L. 95-250)—prohibits impairment of park resources without "direct[] and specific[]" approval of Congress, 54 U.S.C. §100101(b)(2).

NPS's official Foundation Document for President's Park unambiguously declares "[t]he White House and the Wings" as the "[f]undamental resources … essential to achieving the purpose of the park"[2]—the exact same resources Defendants admit the project will permanently and adversely affect (Add.25-29), notwithstanding Defendants' self-serving non-impairment determination, Add.29.

---

[2] NPS, *Foundation Document: The White House & President's Park* (Sept. 2014), https://www.nps.gov/whho/planyourvisit/upload/WHHO_FD_2015-508-accessible-resize.pdf, 11-12, (last visited Apr. 8, 2026).

Plainly, the Organic Act cannot simultaneously provide the very congressional authorization it requires Defendants to obtain.

In response, Defendants principally rely on examples of past NPS construction, Mot.19-20, but those are no help. Even if it had been "longstanding practice" not to adhere to the prohibitions of §8106 and the Organic Act, that would not relieve the Court of its obligation to "give effect to [those statutes'] plain command[s]" now. *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998). And regardless of whether the Organic Act might give Defendants authority to construct other projects in other national parks, they still need "express," "direct[,] and specific[]" congressional authority, 40 U.S.C. §8106, 54 U.S.C. §100101(b)(2), to construct *this* privately-funded ballroom in *this* national park. They do not have it.

Finally, even if NPS somehow had Organic Act authority to construct the ballroom, it could not (as Defendants suggest, Mot.21-22) use the Economy Act, 31 U.S.C. §1535, to transfer its project-management responsibilities wholesale to EXR. The Economy Act is a procurement statute, allowing agencies to contract for services from other agencies when cost-efficient. *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349 (5th Cir. 1998). It does not permit NPS to "delegat[e]" "statutory duties vested in it," 52 Comp. Gen. 128 (1972), or "give [EXR] any

authority which it would not otherwise have," GAO, The Red Book, 12-28 (citing 18 Comp. Gen. 262, 266 (1938)).

**3.** The Trust's Property Clause claim provides a third independent basis for affirmance. Relying on *Dalton* and *Global Health Council*, the District Court reasoned that, because Defendants had shifted positions and disclaimed constitutional authority to build the ballroom, the Trust was foreclosed from asserting constitutional violations. Add.71-76. The Court acknowledged this result was "incongruous." Add.75. It was also wrong.

In both *Dalton* and *Global Health Council*, the delegating statute contemplated that the executive could implement the actions at issue (the closure of a shipyard and the impoundment of budget authority, respectively), so long as he complied with the statute's terms. *Dalton*, 511 U.S. at 464-66; *Global Health Council*, 153 F.4th at 15-16. In sharp contrast, here Congress never delegated any of its Property Clause authority to Defendants to build the ballroom in the first place—meaning Defendants are not just violating statutes, but are arrogating Congress's constitutional powers to themselves without any authority whatsoever.

Neither the Supreme Court nor this Court has applied *Dalton* to insulate genuinely constitutional claims like the Trust's from review simply because the executive unilaterally (and strategically) *claimed* only statutory authority for the challenged action. Nor is there reason to believe the District Court would have

22

exercised its preliminary-injunction discretion differently had it based its ruling on Defendants' lack of Property Clause authority, since Defendants conceded they had none and relied solely on §105(d)—of which the District Court concluded the project was likely *ultra vires*, Add.102-08. *See Sherley v. Sebelius*, 644 F.3d 388, 397-98 (D.C. Cir. 2011) (ordinary rule against affirming preliminary injunction on alternate grounds); *New Comm Wireless Servs. v. Sprintcom, Inc.*, 287 F.3d 1, 13 (1st Cir. 2002) (exception for "alternate theories that present abstract legal questions").

## III. The Remaining Factors Disfavor A Stay.

The other factors also disfavor a stay. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). The District Court correctly concluded that Ms. Hoagland and the Trust will be irreparably harmed without a preliminary injunction, as ballroom construction will otherwise proceed unabated. Add.117-21. And it is plainly not in the public's interest to be systematically and unlawfully excluded—along with its congressional representatives—from the decisionmaking processes involving the most transformative exterior construction project at one of the nation's most historically significant buildings in over a century. *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

Finally, in balancing the equities, the Court should consider Defendants' conduct. At every turn, Defendants have sought to evade their legal obligations. They demolished the East Wing unlawfully and without warning. They concealed

their NEPA analysis, then failed to commence commission review until forced by this litigation. They attempted to circumvent Congress's oversight and approval by privately funding the project. They claimed NPS was uninvolved, in a transparent effort to evade APA review. They told the District Court the ballroom was distinct from below-grade bunker work, yet now insist the ballroom and bunker are inseparably integral to national security. Equity does not reward such conduct.

## **CONCLUSION**

Defendants' Emergency Motion for a Stay Pending Appeal should be denied in full.

Respectfully submitted,

*/s/ Gregory B. Craig*
Gregory B. Craig
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
Tel: (202) 223-1200

Thaddeus A. Heuer
Matthew F. Casassa
Kevin Y. Chen
FOLEY HOAG LLP
155 Seaport Boulevard
Suite 1600
Boston, MA 02210
Tel. (617) 832-1000

Dated: April 8, 2026

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

Pursuant to Fed. R. App. P. 32(g), I hereby certify that the preceding document complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because the document contains 5,200 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f). I further certify that the document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

*/s/ Gregory B. Craig*

Dated: April 8, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2026, I caused this document to be filed through the ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Gregory B. Craig*

Dated: April 8, 2026