# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL TRUST FOR HISTORIC PRESERVATION
IN THE UNITED STATES,

Plaintiff-Appellee,

v.

NATIONAL PARK SERVICE, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

# REPLY IN SUPPORT OF EMERGENCY MOTION FOR A STAY
# PENDING APPEAL

ADAM R.F. GUSTAFSON
  *Principal Deputy Assistant*
*Attorney General*

PETER M. TORSTENSEN, JR.
  *Deputy Assistant Attorney*
*General*

MARISSA A. PIROPATO
  *Deputy Chief*
  *Environment and Natural*
  *Resources Division*
  *Natural Resources Section*

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant*
  *Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
BRANTLEY T. MAYERS
  *Attorneys*
  *Civil Division, Room 3632*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202)-890-9874*

# INTRODUCTION

Acting on the personal preferences of a wandering pedestrian, a district court judge unlawfully enjoined a national security mandated construction Project of the East Wing of the White House, except as "necessary to ensure the safety and security of the White House and its grounds, including the ballroom construction site, and provide for the personal safety of the President and his staff." Add. 126. While we fully agree with this last statement concerning Presidential and White House safety, this otherwise unlawful injunction, which takes effect in 5 short days, gravely threatens national security. The upgrades to the East Wing are not cosmetic; instead, they involve the use of missile-resistant steel columns, beams, drone-proof roofing materials, and bullet, ballistic, and blast proof glass windows. They also include the installation of bomb shelters, hospital and medical facilities, protective partitioning, and top-secret military installations, air conditioning, heating, venting, and more. These upgrades, alterations, and improvements to the dilapidated, infested, and structurally unsound prior East Wing, are essential to protecting the President, his family, and his staff, as well as the White House itself, and the entire project flows from them. The old East Wing

could not have accommodated these vital, and very necessary, enhancements. Congress clearly delegated to the President the power to implement these changes. Hundreds of Millions of Dollars have already been spent and committed on this far along Project.

In its opposition (Opp.), the National Trust cannot rehabilitate this untenable injunction. The Trust lacks Article III standing to vindicate its member's feelings; its claims fail on the merits because the President is doubly authorized, under two Statutes, to renovate the East Wing; and the equities demand a stay to protect both the security and the operational integrity of the White House. This Court must stay the unprecedented preliminary injunction.

## ARGUMENT

## I. The Trust Has No Article III Basis to Challenge the Project.

A. As this Court has already recognized, "nothing in the existing case law … suggest[s] that a person who incidentally views something unpleasant has suffered an injury-in-fact." *Environmental Def. Fund v. FERC*, 2 F.4th 953, 970 (D.C. Cir. 2021). Yet, that was the sole standing theory upon which the district court based its remarkable injunction.

Defending the district court's conclusion, the Trust insists that Hoagland's subjective feelings—she "cares deeply about the White House," and her once-a-month trips to "the White House neighborhood" for medical appointments, exhibitions and other meetings—vest her with Article III standing. Opp.14; *see* Add.9-10. That is preposterous. Neither sharp disagreement nor the perceived psychological consequences of observing something inconsistent with her subjective architectural views confers Article III standing. *See FDA v. All. For Hippocratic Medicine*, 602 U.S. 367, 390 n.3 (2024); *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). The Trust's and the Court's unlimited theory of standing is untenable and unworkable.

The Trust's recourse to a supposed distinction between a "nuisance" and an "attraction" does not move the needle. Opp.14. Either way, the Trust must show that the conduct it seeks to enjoin causes concrete and particularized injury. Regardless, Hoagland is on the wrong side of the line the Trust draws—indeed, her claim is that the Project offends her architectural preferences. *See* Add.11.

The Trust cites one case from this Court, *Sierra Club v. FERC*, 827 F.3d 59 (D.C. Cir. 2016).  There, one of Sierra Club's members fished, boated, and hunted in a waterway that would experience increased tanker traffic.  *Id.* at 66.  Because, among other things, the Coast Guard maintains a "large exclusion zone" around these tankers, the increased traffic threatened to force the member to relocate.  *Id.*  As a result, this Court concluded that the member faced a cognizable injury.  *Id.* at 66-68.  This case is nothing like *Sierra Club*.  Hoagland has not alleged that the Project will materially alter her use of the White House, or that she will refrain from visiting the White House because of the Project.  Instead, Hoagland merely claims a view of the Project that she does not like will befall her once a month.  *EDF* confirms that is not enough.  2 F.4th at 970.[1]

**B.**    Even if Hoagland had standing, which she does not, this suit is not germane to the Trust's purposes.  The Trust claims otherwise by

---

[1] *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), is even less relevant.  The Supreme Court held in that case that the plaintiffs *lacked* standing.  *Id.* at 500.  The dicta on which the Trust relies does not exempt the Trust from the concreteness requirement that this Court has applied in cases that followed *Summers*.  *See, e.g.*, *EDF*, 2 F.4th at 969 (quoting *Summers*).

pointing to 54 U.S.C. § 312102(a).  Opp.15.  That conflates a prefatory provision explaining why *Congress created* the Trust (54 U.S.C. § 312102(a)) with *the Trust's actual purposes*—to "receive donations of sites, buildings, and objects significant in American history and culture" and "preserve and administer" those donated sites "for public benefit." 54 U.S.C. § 312102(b)(1)-(2).  The White House has obviously not been donated to the Trust; indeed, the Trust is *forbidden* from acquiring property (like the White House) within a National Park "System unit." *Id.* § 312105(g).  Congress has consistently made clear that the Trust has no role to play in White House affairs.  *See* Mot.15-16.  In fact, Congress stopped funding the Trust because it was not in agreement with its motives and objectives.  *See* Mot.6.

## II.    The Project is Doubly Authorized.

The White House's dual role—as both the home and office of the President and a national park—means it is governed by two sets of statutes, in Title 54 and in Title 3.  The East Wing renovation is independently authorized under both.

**A.**    The NPS Organic Act, 54 U.S.C. § 100101(a), has authorized construction in national parks for over a century.  *See* Dkt. 52 at 14-15;

5

Add.80-81. Because the White House is a national park, Pub. L. No. 87-286, 75 Stat. 586, 586 (1961), the Organic Act authorizes the Project.

Despite that history, the district court wrongly concluded that § 100101(a) does not authorize construction. Add.116. Although the Trust recounts this conclusion, it refuses to defend it. Opp.19-20. Indeed, throughout the litigation below, the Trust acknowledged NPS's power to construct. *See* Dkt. 20 at 25 (recognizing that NPS "has previously managed construction projects . . . on the White House grounds"); Dkt. 54 at 17 (recognizing "NPS's history of construction in national parks"); *see also* Opp.21 (recognizing "examples of past NPS construction" and that the "Organic Act might give Defendants authority to construct other projects in other national parks").

Instead, the Trust reverts to an argument that the district court did *not* accept. Namely, that the Project exceeds NPS's authority because it runs afoul of the "Redwood Amendment," which provides that NPS cannot exercise its authority "in derogation of the values and purposes for which the System units have been established." 54 U.S.C. § 100101(b)(2); Opp.20. But whether a specific project serves or impairs the values and purposes of a park unit is a judgment call reserved for

NPS, which enjoys "broad discretion" in administering the Organic Act, *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1454 (9th Cir. 1996); *see Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000). Here, NPS explained why the Project was in furtherance of the fundamental purpose of the park unit. *See* Add.25-30. The Trust makes no effort to contend with the substance of this determination, and there is no basis for a judicial override of NPS's reasoned policy decision.

Finally, the Trust challenges NPS's use of the Economy Act. Opp.21-22. Because the Trust did not raise this challenge below, the Trust cannot raise it now. *See District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984). In any case, the Trust's argument is meritless. The agreement between NPS does not vest EXR with any new "statutory duties," Opp.21, but instead recognizes that EXR, with its expertise and present duties, is best suited to manage the Project. This arrangement is entirely lawful and nothing new—as EXR "has often served as the servicing entity for construction projects at the White House." Add.88-89. "[T]he ordering agency," here NPS, "is authorized" to construct in national parks, and "the performing agency," here EXR,

"is in a position to provide" managerial services. GAO, Red Book, Third Edition, Volume III at page 12-64.

**B.** Congress also authorized the Project in 3 U.S.C. § 105(d), which empowers the President—"notwithstanding the provisions of any other law"—to undertake "alteration[s]" and "improvement[s]" of the White House, "as the President may determine." 3 U.S.C. § 105(d). Congress intentionally limited its oversight in this space to "avoid an overly broad intrusion into this area of Executive discretion." H.R. Rep. No. 95-979, at 8 (1978); S. Rep. 95-868, at 9 (1978).

The Trust again incorrectly insists that § 105(d) authorizes only "relatively minor projects," Opp.17, but this limitation is nowhere in the text. The Project comfortably comes within the plain meaning of "alteration" and "improvement," especially in the real property context. *See* Mot.17; *Washington State Department of Licensing* v. *Cougar Den, Inc.*, 586 U.S. 347, 352 (2019) (plurality) (describing *"improvements . . . such as building a hospital and schools"*). The Trust's argument is at odds with its own telling of the history. *See* Dkt. 20-1, at 9-10. Without support in text or history, the Trust fails to show that Defendants transgressed an "obvious[]" statutory limitation. *Florida Health Scis.*

8

*Ctr. v. Sec'y of Health & Human Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016).

The Trust suggests that the statute only confers power on Congress to appropriate, *see* Opp.16-17, but that misses half the point—§ 105(d) also serves to confer authority on the President to alter and improve the White House. Whether the 2024 appropriation is sufficient to fund the Project—which is immaterial because the Project is privately funded— has nothing to do with the question of whether Defendants have the statutory authority to undertake it. In arguing otherwise, the Trust conflates authorization with appropriation. Opp.16-17; *see* Dkt. 52 at 12-13. Indeed, the legality of the funding mechanism is not "at issue." Add.107. The Trust's *ultra vires* claim is therefore meritless.

**C.** The Trust injects two other provisions into its arguments, but neither adds anything to the analysis. First, the Trust contends that 40 U.S.C. § 8106 requires specific and particularized congressional approval for the construction of each "building or structure . . . on any reservation, park, or public grounds of the Federal Government in the District of Columbia." For good reason, the district court declined to adopt this argument. Add.110. It would be irreconcilable with the

9

contemporaneous understanding of § 8106 and with over a century of historical practice. *See* Dkt. 52 at 19-23. Instead, the district court reasoned that § 8106 requires only "some form of authorization." Add.110. Here, as explained, both the NPS Organic Act and 3 U.S.C. § 105(d) provide that authorization. Moreover, § 8106 does not "confer rights" upon the Trust, meaning *ultra vires* review is unavailable. *Global Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025). The Trust's recourse to the prefatory clause in § 312102(a)—rather than attempting to explain how § 8106 is the source of any enforceable right—proves the point.

The Trust's last-ditch effort to invoke the Property Clause is equally unavailing. Congress can delegate its power under the Property Clause, *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1135 (D.C. Cir. 2002), and, as covered above, has done so here. The Trust's contrary constitutional argument is predicated on its statutory interpretations and thus the Trust lacks a cause of action to bring its freestanding constitutional claim. *Global Health Council*, 153 F.4th at 15 n.11, 17.

## III. All Else Aside, the Equities Compel Staying This Order.

An injunction is not awarded as a matter of right. Courts must always weigh the equities to evaluate whether an injunctive remedy is an appropriate exercise of remedial discretion. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The Trust's alleged injury—that they waited months to raise, well after construction began—is plainly outweighed by the serious harms that would result from halting construction, leaving a large hole that would expose the Executive Mansion to damage and the President, his family, and staff to harm. On the equities, this is not a close call, and a stay must issue as the Project as a whole is "necessary to ensure the safety and security of the White House and its grounds, including the ballroom construction site, and provide for the personal safety of the President and his staff." Add. 126.

Incredibly, the Trust leads its brief with the argument that the preliminary injunction does not inflict irreparable harm on the President. Opp.11-13. That argument is meritless. The injunction freezes an active construction site at one of the country's most important public buildings, prevents critical national security upgrades from proceeding, leaves the Executive Mansion exposed and vulnerable, threatens the permanent

11

loss of hundreds of millions of dollars in materials and supplies, and sets back the planned, and overdue, repair of countless other features of the building. None of that will be recoverable after Defendants ultimately prevail on the merits. All of it is classically irreparable.

As to national security, the Trust responds that the Defendants can continue working on what they mislabel as a *"bunker."* Opp.12. But, the Project is much more than a *"bunker."* Rather, it is a much-needed national security Project, including all of the features noted above, necessary to the safety and security of the White House, the President, his family, and staff. This is the point the Trust has missed from the beginning: the national security upgrades are inseparable from the rest of the Project, which is why it is untenable for the district court to purport to adjudicate which aspects of construction are "strictly necessary" for national security—an expertise the district court surely lacks.

The Trust also argues that the President has continued to live at the White House since the demolition of the old East Wing. Opp.12. But that is an unavoidable, temporary state that the preliminary injunction threatens to make static and permanent, thereby increasing the threat posed by hostile actors. Likewise, the Trust observes that the Project will

not be completed for at least two years, but that is exactly why time is of the essence. An indefinite delay jeopardizes the entire Project.

On the other side of the ledger, the Trust offers only a single conclusory sentence that it "will be irreparably harmed without a preliminary injunction." Opp.23. Whatever those harms may be—the Trust never specifies—they cannot possibly outweigh the serious public interests set forth above. The Trust's only allusion to the public interest is to say that the public should not be "excluded . . . from the decisionmaking [*sic*] processes." *Id.* Yet the Trust itself, along with hundreds of other interested citizens, submitted comments to the National Capitol Planning Commission. Dkt. 52-2 at 2. It serves the public interest to respect the decisions made by that duly authorized public body and allow the President to continue improving and protecting the White House, as Presidents dating back to our founding fathers have done.

## CONCLUSION

The Court should enter a stay by April 10, 2026. At minimum, the Court should extend the district court's stay for an additional 14 days to allow the Solicitor General to seek relief in the Supreme Court.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ADAM R.F. GUSTAFSON
  *Principal Deputy Assistant*
*Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant*
  *Attorney General*

PETER M. TORSTENSEN, JR.
  *Deputy Assistant Attorney*
*General*

MARK R. FREEMAN
MICHAEL S. RAAB
 */s/ Brantley T. Mayers*
BRANTLEY T. MAYERS
  *Attorneys*
  *Civil Division, Room 3632*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 890-8974*
  *brantley.t.mayers@usdoj.gov*

MARISSA A. PIROPATO
  *Deputy Chief*
    *Environment and Natural*
    *Resources Division*
    *Natural Resources Section*

APRIL 2026

# CERTIFICATE OF COMPLIANCE

I hereby certify that this motion satisfies the type-volume requirements set out in Rule 27(d)(2)(C) because it contains 2,595 words. This motion was prepared using Microsoft Word in Century Schoolbook, 14-point font, a proportionally spaced typeface.

*/s/ Brantley T. Mayers*
Brantley T. Mayers
